UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **In Re: AUTOMOTIVE PARTS ANTITRUST LITIGATION** | 12-md-02311<br>Honorable Marianne O. Battani |
| **In Re: WIRE HARNESS SYSTEMS CASES** | |
| **THIS RELATES TO:**<br>**ALL DEALERSHIP ACTIONS**<br>**ALL END-PAYOR ACTIONS** | W:12-cv-00103-MOB-MKM<br>W:12-cv-00102-MOB-MKM |

**END-PAYOR PLAINTIFFS' AND AUTOMOBILE DEALER PLAINTIFFS' OPPOSITION TO THE GS ELECTECH DEFENDANTS' MOTION TO DISMISS THE END-PAYOR AND AUTO DEALER COMPLAINTS**

## STATEMENT OF ISSUE PRESENTED

1. Whether Automobile Dealer Plaintiffs' and End-Payor Plaintiffs' detailed allegations concerning GS Electech Inc.'s, G.S. Wiring Systems' and G.S.W. Manufacturing, Inc.'s participation in a global conspiracy to fix the price of automotive wire harness systems are sufficient to state a claim for relief under Fed.R. Civ.P. 8 and *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007).

# CONTROLLING OR MOST APPROPRIATE AUTHORITY

**Cases**

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)

*In re Packaged Ice Antitrust Litigation*, 723 F. Supp. 2d 987 (E.D. Mich. 2010)

**Rules**

Fed. R. Civ. P. 8

# TABLE OF CONTENTS


STATEMENT OF ISSUE PRESENTED ........ i

CONTROLLING OR MOST APPROPRIATE AUTHORITY ........ ii

TABLE OF AUTHORITIES ........ iv

I. INTRODUCTION ........ 1

II. THE ALLEGATIONS IN THE EP CCAC AND THE AD CCC ARE SUFFICIENT TO STATE A CLAIM AGAINST THE GS ELECTECH DEFENDANTS ........ 3

- A. Standard Of Review ........ 3
- B. When Viewed As A Whole, ADs' and EPPs' Allegations More Than Plausibly Suggest That The GS Electech Defendants Participated In The Alleged Conspiracy ........ 4
  1. GS Electech pleaded guilty to the alleged price fixing, bid rigging and market allocation alleged in the complaints ........ 4
  2. Allegations regarding other Defendants' guilty pleas ........ 11
  3. Allegations regarding other criminal investigations and proceedings ........ 14
  4. Allegations regarding opportunities to conspire ........ 14
  5. Plaintiffs' Allegations Against GS Wire and GSW Mfg. Are Sufficient ........ 15
- C. EPPs and ADs Sufficiently Allege That They Suffered Injury ........ 19

III. CONCLUSION ........ 20

## TABLE OF AUTHORITIES

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
06-md-1775(JG)(VVP), 2009 WL 3443405 (Aug. 21, 2009 E.D.N.Y.) ....................................9

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................ *passim*

*Carrier Corp. v. Outokumpu Oyj*,
673 F.3d 430 (6th Cir. 2012)........................................................................13, 17, 18

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
738 F.Supp.2d 1011 (N.D. Cal. 2010) ......................................................................15

*In re Chocolate Confectionary Antitrust Litig.*,
602 F. Supp. 2d 538 (M.D. Pa. 2009) .......................................................................14

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962) ..............................................................................................4, 5

*Cupp v. Alberto-Culver USA, Inc.*,
310 F. Supp. 2d 963 (W.D. Tenn. 2004) ...................................................................19

*Erickson v. Pardus*,
551 U.S. 89 (2007).....................................................................................................3

*In re Flat Glass Antitrust Litig. II*,
No. 08-mc-180, 2009 WL 331361 (W.D. Pa. Feb. 11, 2009)......................................14

*In re Fasteners Antitrust Litig.*,
No. 08-md-1912, 2011 WL 3563989 (E.D. Pa. Aug. 12, 2011) ..............................5, 6, 12, 13

*Fond du Lac Bumper Exchange, Inc. v. Jui Li Enterprise Co., Ltd.*,
753 F. Supp. 2d 792 (E.D. Wis. 2010) .......................................................................15

*In re High Fructose Corn Syrup Antitrust Litig.*,
295 F.3d 651 (7th Cir. 2002)......................................................................................8

*Hinds Cnty. v. Wachovia Bank N.A.*,
700 F. Supp. 2d 378 (S.D.N.Y. 2010).....................................................................14, 20

*Hyland v. Homeservices of Am., Inc.*,
No. 3:05-CV-612, 2007 WL 2407233 (W.D. Ky. Aug. 17, 2007) ..........................................3, 9

*In re Iowa Ready-Mix Concrete Antitrust Litig.*,
768 F. Supp. 2d 961 (N.D. Iowa 2011)........................................................................9

*In re OSB Antitrust Litig.*,
No. 06-826, 2007 WL 2253419 (E.D. Pa. Aug. 3, 2007) ........................................................13

*In re Optical Disk Drive Antitrust Litig.*,
No. 10-md-143, 2012 WL 1366718 (N.D. Cal. Apr. 19, 2012)...............................................19

*In re Packaged Ice Antitrust Litig.*,
No. 08-MDL-1952, 2011 WL 6178891 (E.D. Mich. Dec. 12, 2011) .......................................19

*In re Packaged Ice Antitrust Litig.*,
723 F. Supp. 2d 987 (E.D. Mich. 2010)............................................................... *passim*

*In re Polypropylene Carpet Antitrust Litig.*,
178 F.R.D. 603 (N.D. Ga. 1997)..............................................................................................7

*In re Polyurethane Foam Antitrust Litig.*,
799 F. Supp. 2d 777 (N.D. Ohio 2011)...................................................................................12

*Precision, Inc. v. Kenco/Williams, Inc.*,
66 Fed. Appx. 1 (6th Cir. 2003) ..............................................................................................15

*In re Refrigerant Compressors Antitrust Litig.*,
No. 2:09-md-02042, 2012 WL 2114997 (E.D. Mich. June 11, 2012)......................................13

*RSM Prod. Corp. v. Petroleos De Venezuela Societa Anonima (PDVSA)*,
338 F. Supp. 2d 1208 (D. Colo. 2004) ...........................................................................18, 19

*In re Se. Milk Antitrust Litig.*,
555 F. Supp. 2d 934 (E.D. Tenn. 2008)...............................................................3, 4, 12

*Standard Iron Works v. Arcelormittal*,
639 F. Supp. 2d 877 (N.D. Ill. 2009) .......................................................................................13

*Starr v. Sony BMG Music Entm't*,
592 F.3d 314 (2d Cir. 2010)......................................................................................................14

*Spadafore v. Gardner*,
330 F.3d 849 (6th Cir. 2003) ..................................................................................................10

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
580 F. Supp. 2d 896 (N.D. Cal. 2008) ...............................................................4, 10, 13

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
Nos. M 07-1827, C 09-5609, 2010 WL 2629728 (N.D. Cal. June 29, 2010).......................9, 10

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
599 F. Supp. 2d 1179 (N.D. Cal. 2009) ....................9, 13

*In re Travel Agent Comm'n Antitrust Litig.*,
583 F.3d 896 (6th Cir. 2009)....................13

*United States v. Gravier,*
706 F.2d 174 (6th Cir. 1983) ....................7

*U.S. v. Hayter Oil Co., Inc. of Greenville, Tenn,*
51 F.3d 1265 (6th Cir. 1995) ....................7

*In re Vitamins Antitrust Litig.,*
No. MISC 99-197, 2000 WL 1475705 (D.D.C. May 9, 2000) ....................8

## RULES

Fed. R. Civ. P. 8 ....................3

15 U.S.C. §16....................2

End-Payor Plaintiffs ("EPPs") and Auto Dealer Plaintiffs ("ADs") submit this memorandum in opposition to the GS Electech Defendants' Motion to Dismiss the Auto-Dealer and End Payor Complaints[1] filed by defendants G.S. Electech, Inc. ("GS Electech"), G.S. Wiring Systems ("GS Wire") and G.S.W. Manufacturing, Inc. ("GSW Mfg.").[2] This opposition adopts and incorporates by reference the arguments advanced in: (1) Direct Purchaser Plaintiffs' Response in Opposition to Defendants' Collective Motion to Dismiss; and (2) End-Payor Plaintiffs and Auto-Dealer Plaintiffs' Memorandum of Law in Response to Defendants' Collective Motion to Dismiss.

## I. INTRODUCTION

The EPPs Corrected Consolidated Amended Class Action Complaint (the "EP CCAC"), Docket No. 174, and the ADs Consolidated Class Complaint ("AD CCC"), Docket No. 85, contain highly detailed allegations regarding the existence of a conspiracy to fix prices, rig bids, and allocate markets for automotive wire harness systems ("AWHS"). These allegations, when viewed as a whole, plausibly suggest that each of the GS Electech Defendants participated in that conspiracy. This is especially true given GS Electech Defendants' own agreement to plead guilty to fixing prices and rigging bids in the AWHS market; the guilty pleas of five other Defendants[3] with the U.S. Department of Justice ("DOJ") for antitrust violations in the AWHS market[4]; and, a globally coordinated investigation of Defendants by the DOJ, the Japan Fair

---

[1] The GS Electech Defendants' motion to dismiss is hereinafter cited as GSE Mem. at __.

[2] GS Electech and its subsidiaries, GS Wire and GSW Mfg., are referred to collectively as the "GS Electech Defendants."

[3] The AD CCC describes the plea agreements of four defendants.

[4] As a formal matter, the guilty plea was entered by the Japanese parent, GS Electech, for participating in a conspiracy to fix prices of speed sensor wire assemblies, one of the products comprising the AWHS market. *See* Plea Agreement, *U.S. v. G.S. Electech, Inc.*, 2:12-cr-20215-GCS-PJK (E.D. Mich. May 16, 2012) (Docket No. 8) ("Plea Agreement"), at ¶4, Attached as Exhibit A to GSE Mem. However, the Plea Agreement also requires that GS Electech subsidiaries GS Wire and GSW Mfg. cooperate fully and truthfully with the U.S. investigation,

Trade Commission ("JFTC") and the European Commission ("EC") for antitrust violations in the AWHS market.

Yet, the GS Electech Defendants come before this Court and claim it is not "plausible" that they could have participated in the conspiracy alleged in the EP CCAC and the AD CCC. GS Electech, in particular, argues that since it admitted and pleaded guilty to fixing prices and rigging bids as to only one of the 11 AWHS products alleged in the EP CCAC and the 13 products alleged in the AD CCC – speed sensor wire assemblies – and only with respect to sales to one auto manufacturer for a more limited period of time, facts about its guilty plea are somehow irrelevant to the ADs' and EPPs' claims. GS Electech's argument rings hollow.

Even if GS Electech did plead guilty to a narrower slice of the AWHS conspiracy than alleged in the AD CCC and the EP CCAC, allegations of its plea still bolster EPPs' and ADs' claims against it here. Indeed, it is hard to imagine facts that better support plausibility than a defendant's own admission of guilt for criminal antitrust violations in the same market. Here, GS Electech's guilty plea, considered together with numerous other allegations in the AD CCC and the EP CCAC, more than plausibly suggest GS Electech's participation in the conspiracy alleged. Additionally, the AD CCC and the EP CCAC also adequately allege the involvement of GS Electech's Ohio based subsidiaries, GS Wire and GSW Mfg.[5] The EP CCAC and the AD CCC allege that these subsidiaries were wholly owned and controlled by GS Electech and served as a marketing arm in the United States for their parent.

---

including producing documents and witnesses. In turn, the Plea Agreement provides that GS Electech and its subsidiaries (GS Wire and GSW Mfg.) are released from criminal liability for participation in the alleged conspiracy. *See* Plea Agreement, ¶ 14(a). The final judgment entered in the government action against GS Electech is prima facie evidence that GS Electech violated Sherman Act, §1, through its participation in the speed sensor wire assemblies conspiracy. 15 U.S.C. §16.

[5] The AD CCC names G.S.W. Mfg., but not G.S. Wire.

## II. THE ALLEGATIONS IN THE EP CCAC AND THE AD CCC ARE SUFFICIENT TO STATE A CLAIM AGAINST THE GS ELECTECH DEFENDANTS

### A. Standard Of Review

On a motion to dismiss, the Court must accept the facts alleged in the complaint as true and construe all facts in favor of the nonmoving party. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) ("*Twombly*"). Federal Rule of Civil Procedure 8 requires that a complaint contain only a "short and plain statement" of a claim for relief. "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the … claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Twombly*, 550 U.S. at 555).

*Twombly* did not impose a heightened pleading standard for antitrust conspiracy cases on a motion to dismiss and does not require elaborate fact pleading. *In re Packaged Ice Antitrust Litig.,* 723 F. Supp. 2d 987, 1003-04 (E.D. Mich. 2010); *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943-44 (E.D. Tenn. 2008); *Hyland v. Homeservices of Am., Inc.*, No. 3:05-CV-612, 2007 WL 2407233, at *2-3 (W.D. Ky. Aug. 17, 2007).

Rather, *Twombly* requires only that plaintiffs allege enough factual matter to suggest an agreement and that discovery will reveal evidence of that agreement. *Packaged Ice*, 723 F. Supp. 2d at 1003-04; *Hyland*, 2007 WL 2407233, at *3. This Court explained:

> Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.

*Packaged Ice*, 723 F. Supp. 2d at 1003-04 (quoting *Twombly*, 550 U.S. at 556).

Furthermore, *Twombly* does not require that plaintiffs parse their allegations defendant-by-defendant. *Id.* at 1005 (*Twombly* does not require that plaintiffs plead the "who, what, when

and where" of the alleged conspiracy). Although Plaintiffs will need to provide evidence of each Defendant's participation in the conspiracy to survive summary judgment, on a motion to dismiss, they "only need to make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy." *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 904 (N.D. Cal. 2008).

Finally, and importantly, an antitrust complaint must be viewed as a whole. Conspiracy allegations are "not to be judged by dismembering [the conspiracy] and viewing its separate parts." *Packaged Ice*, 723 F. Supp. 2d at 1006; *see also Se. Milk*, 555 F. Supp. 2d at 943-44 (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)) (Court expressly rejected defendants' attempts to read the allegations of the complaint in isolation).

**B. When Viewed As A Whole, ADs' and EPPs' Allegations More Than Plausibly Suggest That The GS Electech Defendants Participated In The <u>Alleged Conspiracy</u>**

**1. <u>GS Electech pleaded guilty to the alleged price fixing, bid rigging and market allocation alleged in the complaints</u>**

To support their claims, EPPs and ADs alleged detailed and specific facts establishing GS Electech's agreement to plead guilty to the same price fixing conspiracy alleged in the AD and EPP complaints. EP CCAC ¶ 185; AD CCC ¶ 210. Nevertheless, GS Electech argues that since it only pleaded guilty to price-fixing and bid-rigging of one product alleged to be part of the conspiracy in the AD CCC and the EP CCAC – speed sensor wire assemblies – with one co-conspirator and only with respect to one auto manufacturer, facts about its plea are somehow irrelevant to EPPs' and ADs' claims in this civil litigation. GSE Mem., at 3-5. GS Electech's argument fails on every level.

This Court should reject GS Electech's meritless attempt to minimize the character of its criminal actions. "The character and effect of [the] conspiracy [alleged in the AD CCC and the

EP CCAC are] not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore*, 370 U.S. at 699. The ADs and EPPs have sufficiently pleaded an overarching conspiracy encompassing the individual actions of GS Electech and other defendants. When the pieces are assembled, what emerges is the plausible claim that all of these alleged "isolated" conspiracies comprise an overarching conspiracy to fix prices of Automotive Wire Harness Systems.[6]

Nor can GS Electech escape liability by attempting to parse the definition of wire harness systems alleged in the complaints. Contrary to GS Electech's newfound argument, the Plea Agreement concerns price-fixing and other unlawful conduct in the same market as alleged by EPPs and the ADs. ADs and EPPs have alleged that Speed Sensor Wire Assemblies are part of, and included within, the AWHS market as to which Defendants conspired. AD CCC ¶¶ 3, 11, 211; EP CCAC ¶¶ 124-136, 198-202. ADs also allege that "[s]peed sensor wire assemblies comprise the ABS/Speed sensor wire harness, a portion of the Automotive Wire Harness System." AD CCC ¶211. On a motion to dismiss, EPPs' and ADs' allegations must be taken as true, *Twombly*, 550 U.S. at 555-56, making the GS Electech Defendants' challenge to the inclusion of Speed Sensor Wire Assemblies in the ADs and EPPs definition of AWHS premature. *In re Fasteners Antitrust Litig.,* Civ. No. 08-md-1912, 2011 WL 3563989 (E.D. Pa. Aug. 12, 2011) is directly on point. There, defendants objected that the plaintiffs "conflated different products under the umbrella term 'Fasteners'" and had not demonstrated "why different

---

[6] The AD CCC and the EP CCAC allege that Automotive Wire Harness Systems includes speed sensor wire assemblies, AD CCC ¶3; EP CCAC ¶3, and that all the defendants, including the GS Electech Defendants and the Sumitomo defendants, manufacture and distribute Automotive Wire Harness Systems. However, to the extent that the Court were to require more specificity, the ADs and EPPs could allege that another defendant group (Sumitomo) also manufactures and distributes speed sensor wire assemblies, along with other products comprising Automotive Wire Harness Systems. The involvement of this additional defendant group in the manufacture and distribution of speed sensor wire assemblies enhances the plausibility of the overarching conspiracy alleged by the ADs and EPPs.

products, such as zippers, snap fasteners and buttons, should be included in the same Fasteners product market." *Id*. at *10. The court held that "Plaintiffs are not required to spell out the precise boundaries of the Fasteners product market prior to discovery." *Id*. As in *Fasteners*, the EP CCAC and the AD CCC "sufficiently allege that each Defendant contributed to, and participated in, one conspiracy to fix prices in the [AWHS] market, which includes" speed sensor wire assemblies. Accordingly, any challenge to the boundaries of the AWHS product market must wait until after the EPPs and ADs are allowed discovery.

Nonetheless, any argument that speed sensor wire assemblies are not part of the AWHS market is also undercut by considering the plea agreements in the DOJ's parallel criminal prosecutions. In the GS Electech Plea Agreement, speed sensor wire assemblies, or "speed sensor wire harness assemblies," as they are referred to in GS Electech's plea hearing transcript, are described as "wire assemblies" that "connect a sensor on each tire to the [Antilock Brake Systems ("ABS")] and carry electrical signals from the sensors to the ABS to instruct it when to engage." Plea Agreement, ¶4(a). Other defendants' plea agreements with the DOJ in related criminal actions include definitions of automotive wire harnesses (comprised of automotive wire harnesses and related products) that unequivocally include speed sensor wire assemblies. For example, defendant Furukawa's DOJ Plea Agreement described "automotive wire harnesses" as "automotive electrical distribution systems used to direct and control electronic components, wiring, and circuit boards" and "related products" as including "automotive electrical wiring," "lead wire assemblies," "automotive wiring connectors," and "automotive wiring terminals." Defendant Fujikura's and defendant Yazaki's DOJ Plea Agreements contain the same definition for automotive wire harnesses. Here, it cannot be disputed that speed sensor wire assemblies are "automotive wire harnesses" "used to direct and control electronic components" and that they

incorporate "automotive electrical wiring," "automotive wiring connectors" and/or "automotive wiring terminals."

Second, GS Electech incorrectly argues in its papers that the Plea Agreement is also not probative here because it was for a narrower period than the conspiracy alleged in the AD CCC and the EP CCAC, stating that the conduct acknowledged in the Plea Agreement began in 2003 and ended by 2010. *See* GSE Mem. at 3. As explained below, even if this statement were factually true, it is irrelevant because neither GS Electech's guilty plea nor the statements made at its plea hearing limit or define what claims the EPPs and ADs may bring.[7] However, it is worth noting that GS Electech misstates the facts of its Plea Agreement. The Plea Agreement states that GS Electech's participation in the conspiracy was "from *at least as early as* January, 2003" and extended "until *at least* February, 2010." Plea Agreement, ¶4(a) (emphasis added). Accordingly, the Plea Agreement does not preclude the fact that GS Electech became a co-conspirator before January, 2003 and continued to actively participate in the conspiracy beyond February, 2010.

As noted, GS Electech's guilty plea and the statements made at its plea hearing do not limit or define what claims ADs and EPPs may bring against the GS Electech Defendants in this civil litigation. *Packaged Ice*, 723 F. Supp. 2d at 1011-12 (civil litigation is not circumscribed or defined by the boundaries of criminal investigations or plea agreements); s*ee also In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603, 620 (N.D. Ga. 1997) ("[T]he court is

[7] The fact that GS Electech may have conspired during only some of the conspiracy period also does not diminish its liability. A party that joins a conspiracy becomes liable for all acts committed by its co-conspirators, including acts done before it joined the conspiracy and acts done after it stopped actively participating in the conspiracy. *See U.S. v. Gravier,* 706 F.2d 174, 177-78 (6th Cir. 1983) ("It has long been established that a conspirator may join a conspiracy already in progress and be held responsible for actions done in furtherance of the conspiracy before he joined."); *U.S. v. Hayter Oil Co., Inc. of Greenville, Tenn,* 51 F.3d 1265, 1271 (6th Cir. 1995) ("Withdrawal is an affirmative defense which must be proven by the defendant. . . . Absent proof that any conspirator has withdrawn from the conspiracy, he is liable for all acts performed in furtherance of the conspiracy by the other conspirators.").

aware of no authority that requires a civil antitrust plaintiff to plead only the facts of a prior criminal indictment. To the contrary, several cases flatly reject that theory."); *In re Vitamins Antitrust Litig.*, No. MISC 99-197, 2000 WL 1475705, at *11 (D.D.C. May 9, 2000) (rejecting the "notion that the guilty pleas and cooperation agreements and the class settlements foreclose a broader conspiracy. . . the fact that the government chose to divide the conspiracy into separate parts does not in any way support the defendant's position that there could not have been a single overarching conspiracy.").[8]

As this Court explained in rejecting the very same argument in *Packaged Ice*, there are many reasons why a guilty plea may be narrower or otherwise differ from claims alleged in civil litigation, including the possibility that civil enforcement will be the vehicle by which victims of criminal conduct are provided a recovery. 723 F. Supp. 2d at 1012. *See also Vitamins*, 2000 WL 1475705, at *11 ("Guilty pleas are negotiated instruments which take into account not only the culpability of the accused but the Justice Department's resources and other cases requiring the government's attention."). One reason a guilty plea may be narrower than a civil antitrust claim is the enhanced burden of proof required to prove a criminal case. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 664–665 (7th Cir. 2002) (refusing to infer lack of a civil conspiracy from the government's decision not to move against certain defendants, acknowledging that the DOJ may decide to limit the scope of an investigation for numerous reasons, including differing standards of proof in a criminal case and the knowledge that the private bar "had both the desire and the resources to prosecute [the] suit"). The Sixth Circuit has

---

[8] At the GS Electech plea hearing, the government noted that "[t]his case arose out of the same investigation. It is a case related to those other cases that's been before you. Transcript of Guilty Plea and Sentencing, *U.S. v. G.S. Electech, Inc.*, 2:12-cr-20215-GCS-PJK (E.D. Mich. May 17, 2012) (Docket No. 10) ("Plea Tr."), p. 14, Attached as Exhibit B to GSE Mem. Also, at the plea hearing, GS Electech was not required to pay restitution in light of the pendency of these class actions because, according to the presiding judge, recovery in the civil cases was "probably a more efficient way of determining the appropriate amount of restitution." *Id.* at 17-18. If GS Electech has its way, no restitution or damages will be paid to injured class members.

made clear that allegations regarding guilty pleas can bolster the claims made by plaintiffs in civil litigation. *See, e.g., Packaged Ice*, 723 F. Supp. 2d at 1009-10 (government investigations and guilty pleas, while not determinative standing alone, do bolster the plausibility analysis and heighten the court's expectation that "discovery will reveal evidence of illegal agreement"); *Hyland*, 2007 WL 2407233, at *3 (DOJ enforcement actions properly supported § 1 price-fixing allegations in civil litigation); *In re Air Cargo Shipping Servs. Antitrust Litig.*, 06-md-1775(JG)(VVP), 2009 WL 3443405, *1 (Aug. 21, 2009 E.D. N.Y.) (Court gave great weight to the many guilty pleas in the case even if they did "not *confirm* the existence of the overarching conspiracy" because the admissions of guilt were "'suggestive enough to render a [Sherman Act] § 1 conspiracy plausible.'" (quoting *Twombly*, 550 U.S. at 556)).

This holds true even where defendants plead guilty to narrower conduct than alleged in civil litigation. *See Packaged Ice*, 723 F. Supp. 2d at 1009-10 (government prosecution of an agreement among packaged ice manufacturers to fix prices and allocate customers in Southeastern Michigan supported the plausibility of civil plaintiffs' claim of a nationwide conspiracy).[9] This is also true where defendants plead guilty to conduct in separate, but related,

[9] The GS Electech Defendants cite *In re Iowa Ready-Mix Concrete Antitrust Litig.*, 768 F. Supp. 2d 961, 975, 979 (N.D. Iowa 2011) in support of their argument that EPPs do not link the guilty plea to the conspiracy alleged. GSE Mem., at 6-7. *Iowa Ready-Mix* is clearly distinguishable. There, plaintiffs relied on guilty pleas involving a small region in Iowa, based on three bilateral agreements, to support their allegations of conspiracy in the larger "Iowa region." 768 F. Supp. 2d at 972. Unlike the conspiracy alleged by ADs and EPPs here, where the big picture of the alleged conspiracy--involving many conspirators and affecting numerous automobile manufacturers--is comprehensively laid out, the plaintiffs in *Iowa Ready-Mix* did not provide any "larger picture" of the conspiracy alleged. *Id.* The GS Electech Defendants also cite *In re TFT-LCD (Flat Panel) Antitrust Litig.*, Nos. M 07-1827, C 09-5609, 2010 WL 2629728 (N.D. Cal. June 29, 2010) ("*STN-LCD*"). As a preliminary matter, there are many cases coordinated under the "TFT-LCD" caption. The case cited by the GS Electech Defendants, while it bears the same caption as the TFT-LCD panel cases, involves an entirely different product category and unrelated market (the STN-LCD panel market) than in the TFT-LCD panel actions. In the TFT-LCD panel actions, the court found that the plaintiffs' allegations regarding defendants' guilty pleas as to TFT-LCD panels enhanced the plausibility of plaintiffs' conspiracy allegations. *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1184 (N.D. Cal. 2009). The case cited by GS Electech, however, regarding STN-LCD panels, is quite

markets. *See id.,* at 1011 ("guilty pleas in one market are suggestive of the plausibility of a conspiracy to commit the same illegal acts in another market"); *SRAM*, 580 F. Supp. 2d, at 903 (guilty pleas in related DRAM industry, while not sufficient on their own, supported an inference of conspiracy in the SRAM industry). Thus, even if GS Electech did plead guilty to narrower conduct or a narrower time period than alleged in the EP CCAC and AD CCC, EPPs' and ADs' allegations regarding GS Electech's admitted criminal conduct and guilty plea with the DOJ undoubtedly bolster the plausibility of EPPs' and ADs' claims against the GS Electech Defendants.

It should be noted that GS Electech did plead guilty to conspiring with "another major Japanese company that competed with GS Electech in the manufacturer *[sic]* and sale of wire -- speed sensor wire harness assemblies." Plea Tr., at 13. Such a major player may have also colluded with other co-conspirators, and engaged in a greater amount of anticompetitive activities. GS Electech's ignorance of that behavior would not prevent it from being liable for such actions. *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003) ("Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved."). A major player in the wire harness assembly market could also very well have been involved in manufacture of all portions of AWHS, and the broader conspiracy for all wire

different. In *STN-LCD*, plaintiffs attempted to rely on the guilty pleas regarding TFT-LCD panels to support their claims that defendants conspired in the STN-LCD market. *STN-LCD,* 2010 WL 2629728, at *5-6. The court noted that unlike the present case, there was no overlap between the two markets and that none of the class cases regarding TFT-LCD panels or the DOJ's investigations regarding TFT-LCD panels alleged any price-fixing related to STN-LCD panels. *Id.* Here, ADs and EPPs allege facts regarding GS Electech's guilty plea (and the guilty pleas of other Defendants) in the same market as alleged in the civil action – not in an entirely different, unrelated market as the court found in *STN-LCD*.

harness products. GS Electech's involvement in a conspiracy with such a company is evidence of its potential involvement in a broader conspiracy as well.[10]

**2. Allegations regarding other Defendants' guilty pleas**

As noted above, the EP CCAC and the AD CCC must be viewed as a whole. EPPs and ADs also offer facts regarding the guilty pleas of GS Electech and five other Defendants for antitrust violations in the AWHS market to support the inference that GS Electech participated in the alleged AWHS products conspiracy. EP CCAC ¶¶ 172-84, 186-87; AD CCC ¶¶ 183-209.[11] These pleas involve conduct in the same AWHS market at the heart of the AD CCC and the EP CCAC. Indeed, as set forth above, the definitions set out in Defendants' plea agreements in the DOJ's parallel criminal prosecutions confirm that speed sensor wire assemblies are part of the AWHS market. *See* 6-7, *supra*.

Moreover, all of the criminal pleas entered by Defendants here contain facts regarding the same types of collusive behavior as alleged in the EP CCAC and the AD CCC, and similarly describe how Defendants met, made agreements with each other, and carried out their conspiracy through conspiratorial meetings and communications during the same time period. *See* EP CCAC ¶¶ 172-82 (Furukawa); ¶ 183 (Yazaki); ¶ 184 (Denso); ¶ 185 (G.S. Electech); ¶ 186

---

[10] GS Electech's statement in its plea hearing transcript that it competed in the "manufacture and sale" of speed sensor wire assemblies as well as its statement that the "speed sensor wire assemblies manufactured and sold by the defendant GS Electech were relatively inexpensive," is in contradiction of the statement made in GS Electech's memorandum, at 5, that "GS Electech was an assembler—not a manufacturer."

[11] The Court may also take judicial notice that since the filing of these papers, the DOJ has announced two additional plea agreements related to its ongoing investigation of the automotive parts industry. *See Packaged Ice,* 723 F. Supp. 2d at 998 n.5 (noting that the Court may take judicial notice of details of plea agreement available on DOJ website). In particular, on November 8, 2012 the DOJ filed a plea agreement in *U.S. v. Nippon Seiki Co., Ltd.,* 12-cr-20569 (E.D. Mich.), wherein defendant Nippon Seiki Co., Ltd pled guilty to participating in a conspiracy to fix the price of instrument panel clusters. Second, on November 16, 2012 the DOJ announced that Hiroshi Yoshida, a Japanese national employed at the Ohio-based U.S. subsidiary of an automobile anti-vibration rubber parts supplier pled guilty to price fixing certain automobile anti-vibration rubber parts. In its press release, the DOJ stated that nine companies (including G.S. Electech) and 12 individuals have pleaded guilty or agreed to plead guilty in the DOJ's ongoing investigation into price fixing and bid rigging in the auto parts industry.

(Fujikura); AD CCC ¶¶ 183-196 (Furukawa); ¶¶ 197-206 (Yazaki); ¶¶ 207-209 (Fujikura); ¶¶ 210-213 (GS Electech). While not determinative on their own, facts regarding a multitude of guilty pleas by Defendants in the same market as alleged in civil litigation certainly are enough to render the GS Electech Defendants' participation in an AWHS conspiracy plausible to say the least. *Packaged Ice*, 723 F. Supp. 2d at 1010 ("admissions of price-fixing by so many defendants certainly 'are suggestive enough to render a § 1 conspiracy claim plausible'") (internal citations omitted).

Furthermore, the persuasive effect of other Defendants' guilty pleas on ADs' and EPPs' claims against the GS Electech Defendants is not undercut because they refer to "co-conspirators" or "competitors in the automotive wire harness" industry. *Twombly* imposed no obligation to identify specifically the time, place, and person as to each allegation and does not require elaborate fact pleading. *Id.* at 1005-08; *Se. Milk*, 555 F. Supp. 2d at 943-44. It is sufficient that these allegations refer to "co-conspirators" collectively and it is reasonable to expect that given these guilty pleas, discovery will reveal evidence regarding the GS Electech Defendants' role as "co-conspirators." *See Fasteners*, 2011 WL 3563989, at *9 ("Plaintiffs are not required to allege the exact nature of the agreements and the extent to which each conspirator furthered the conspiracy's objectives prior to discovery.").

In a similar vein, the GS Electech Defendants argue that allegations that refer to "Defendants" in the EP CCAC and AD CCC are "insufficient" to state a claim against them. GSE Mem., at 6-8. However, courts have repeatedly held that on a motion to dismiss, allegations need not be detailed "defendant-by-defendant." *See In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 794-95 (N.D. Ohio 2011) (plausibility pleading standard does not require a court to construct a mandatory checklist of the "who, what, where, when and

how" of an antitrust agreement for each defendant); *Fasteners*, 2011 WL 3563989, at *9 ("At [the Motion to Dismiss] stage in the litigation, the law does not require Plaintiffs to allege with particularity precisely how each Defendant participated in the conspiracy." (citation omitted)); *TFT-LCD*, 599 F. Supp. 2d at 1184 ("defendant-by-defendant fact pleading not required under *Twombly*); *SRAM*, 580 F. Supp. 2d at 903-07 (same); *Standard Iron Works v. Arcelormittal*, 639 F. Supp. 2d 877, 900 (N.D. Ill. 2009) (complaint need not contain detailed "defendant-by-defendant" allegations; it only needs to allege that each defendant "joined the conspiracy and played some role in it"); *In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253419, at *5-6 (E.D. Pa. Aug. 3, 2007) ("one lone paragraph" in a complaint mentioning defendant was enough to state a claim).

In addition, the allegations that refer to "Defendants" or "co-conspirators," collectively, are also sufficient. The cases offered by the GS Electech Defendants do not persuade otherwise.[12] ADs and EPPs also offer many allegations detailing the conspiratorial conduct of "Defendants" and "co-conspirators" which will likely point to the GS Electech Defendants once EPPs and ADs have had the benefit of discovery. *See, e.g.,* EP CCAC ¶¶ 1, 6, 8-9, 14, 18, 151-53, 164, 172-83, 185-87, 215, 231-35; AD CCC ¶¶1, 183-209, 228-233. While *Twombly* does not require the ADs and EPPs to parse their allegations at this stage, EPPs and ADs do provide

[12] *See, e.g., Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 446 (6th Cir. 2012) (discussed *infra*, finding it unnecessary for plaintiff to delineate in the complaint the role each defendant subsidiary played in the conspiracy to survive a motion to dismiss); *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905 (6th Cir. 2009) (plaintiffs only offered conclusory allegations about opportunities to conspire and nothing else); *In re Refrigerant Compressors Antitrust Litig.*, No. 2:09-md-02042, 2012 WL 2114997, at *8 (E.D. Mich. June 11, 2012) (holding that indirect plaintiffs' claims against defendants that did not plead guilty were too conclusory where they did not contain any allegations naming defendants individually, but denying defendants' motions to dismiss as to defendants that entered guilty pleas, even where there were no additional allegations that mentioned those defendants specifically by name).

facts specific to the GS Electech Defendants and do not simply provide "conclusory" allegations with nothing more.

### 3. Allegations regarding other criminal investigations and proceedings

EPPs and ADs also allege facts regarding a globally coordinated investigation of the AWHS industry amongst the DOJ, the JFTC, and the EC. EP CCAC ¶¶ 6, 164-69; AD CCC ¶¶ 6, 168-176. Courts have repeatedly found that allegations regarding criminal investigations bolster allegations of a conspiracy in civil litigation. *See, e.g., Packaged Ice*, 723 F. Supp. 2d at 1008-09; *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 324 (2d Cir. 2010) (when considered with other allegations, pending government investigations can enhance plausibility of illegal conduct); *see also Hinds Cnty. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 393-98 (S.D.N.Y. 2010) (pending government investigations can be used to bolster the plausibility of plaintiffs' claims); *In re Flat Glass Antitrust Litig. II*, No. 08-mc-180, 2009 WL 331361, at *2-3 (W.D. Pa. Feb. 11, 2009) (fact that one of the defendants was not a participant in a European conspiracy referred to in complaint did not provide basis for dismissal of that defendant where other allegations plausibly suggested defendant was part of U.S. conspiracy); *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 576 (M.D. Pa. 2009) (defendants' alleged conduct in Canada enhanced plausibility of the alleged U.S. price-fixing conspiracy). Here, the facts regarding other criminal investigations and foreign prosecution of Defendants only lend further plausibility to EPPs' and ADs' claims against the GS Electech Defendants.

### 4. Allegations regarding opportunities to conspire

The GS Electech Defendants also imply that allegations regarding attendance at trade shows cannot lend support to EPPs' and ADs' claims. *See* GSE Mem. at 9-10. However, allegations of opportunities to collude, taken with other allegations, can certainly bolster the plausibility of a complaint, particularly in cases where there are also numerous guilty pleas. *See*

*Packaged Ice*, 723 F. Supp. 2d at 1016 (citing *Flat Glass II*, 2009 WL 331361, at *3) (When viewed in the context of the allegations of the CAC as a whole, … "'opportunities' bolster the plausibility of a conspiracy and 'attendance at said meetings would be easily ascertained through discovery such that there is a reasonable expectation that discovery may reveal evidence of the alleged illegal conduct.'"). Contrary to GS Electech's assertions, EPPs and ADs allege far more than mere opportunities to conspire—they allege that GS Electech in fact pled guilty to participation in a conspiracy.

**5. Plaintiffs' Allegations Against GS Wire and GSW Mfg. Are Sufficient**

The GS Electech Defendants argue that GS Wiring and GSW Mfg. should be dismissed because plaintiffs "do not meet the stringent requirements necessary to pierce the corporate veil and attribute the plea agreement of GS Electech to its subsidiaries GS Wiring and GSW." *See* GSE Mem. at 9. Defendants' reference to the need to "pierce the corporate veil" is a red herring. Plaintiffs are not required to meet the requirements for piercing the corporate veil in order to sufficiently plead their claims against subsidiaries to avoid 12(b)(6) dismissal.[13] The main case cited by GS Electech for the proposition that allegations of piercing the corporate veil must be pleaded involves a motion for summary judgment as to subsidiary liability, not a 12(b)(6) motion. *Precision, Inc. v. Kenco/Williams, Inc.*, 66 Fed. Appx. 1, 4 (6th Cir. 2003). The 12(b)(6) standard is met by the facts alleged in the AD CCC and EPP CCAC, supporting the plausibility of illegal conduct by GS Wire and GSW Mfg. irrespective of their status as subsidiaries of GS Electech.

[13] A number of courts have upheld antitrust claims against U.S. subsidiaries of foreign manufacturers who produced price-fixed products, when those subsidiaries sold such products in the United States, without requiring plaintiffs to meet the requirements of pleading alter ego. *See Fond du Lac Bumper Exchange, Inc. v. Jui Li Enterprise Co., Ltd.*, 753 F. Supp. 2d 792,797 (E.D. Wis. 2010); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1020 (N.D. Cal. 2010) (Plaintiffs alleged that foreign manufacturers dominated and controlled the U.S. subsidiaries who sold their products).

The EP CCAC alleges both GS Wire and GSW Mfg. were marketers and suppliers of Automotive Wire Harness Systems, EP CCAC ¶¶ 119-120, and the AD CCC alleges that GSW Mfg. marketed and sold Automotive Wire Harness Systems. AD CCC ¶¶ 125. The EP CCAC also alleges that GS Electech sold its Automotive Wire Harness Systems through its two U.S. subsidiaries. EPP CCAC ¶ 118. The AD CCC alleges that GS Electech controlled and dominated G.S.W. Mfg.'s activities in the United States. AD CCC ¶ 125. GS Electech pled guilty to allocating supplies, rigging bids and fixing prices of speed sensor wire assemblies sold to an automobile manufacturer in the United States and elsewhere. Plea Agreement, ¶ 4(b).

One of the key components of the conspiracy, as reflected in GS Electech's guilty plea and the guilty pleas of other defendants, was rigging bids for individual models of cars made by various manufacturers, including those located in the United States. It is a fair inference from the facts alleged that GS Wire and GSW Mfg., as GS Electech's wholly-owned U.S. subsidiaries, participated in the conspiracy to carry out the portion of that conspiracy aimed at the United States. Thus, at a minimum, the foregoing facts, taken as a whole, lend plausibility to Plaintiffs' allegations that defendants GS Wire and GSW Mfg. were participants in the unlawful conspiracy. These allegations are sufficient to "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556. This is particularly so, where, as here, the United States has demanded the cooperation of GS Wire and GSW Mfg. in its further criminal investigation of the conspiracy in the United States and GS Electech has agreed that GS Wire and GSW Mfg. will provide such required cooperation. *Id.* ¶ 11. And, as part of the Plea Agreement, the two subsidiaries will not have criminal charges brought against them. *Id.* ¶ 14. Taken as a whole, all the alleged facts are sufficient to plausibly plead that GS Wire and GS Mfg. were participants in the conspiracy.

The Sixth Circuit's recent decision in *Carrier Corp.*, 673 F.3d 430, is instructive. There, the Court held that "requiring [plaintiffs] to delineate in the complaint the role each subsidiary played in the conspiracy is unnecessary." *Id.* at 445-46. In *Carrier*, the plaintiffs alleged that several defendant groups participated in an unlawful conspiracy to fix the prices of air conditioning and refrigeration copper tubes ("ACR Copper Tubes"). *Id.* at 436. One of the defendant groups included Finnish based Outokumpu Oyj ("OTO"), its wholly owned Finish subsidiary, Outokumpu Copper Products Oy ("OCP"), and OCP's two American subsidiaries, Outokumpu U.S. A. and Outokumpu Franklin (together, "U.S. Subsidiaries"). *Id.* at 435.

In moving to dismiss the complaint, OCP's U.S. Subsidiaries, like GS Wire and GSW Mfg. here, argued that there were insufficient allegations in the complaint as to their "specific involvement" in the conspiracy. *Id.* at 445. Indeed, the court in *Carrier*, characterized the U.S. Subsidiaries' arguments in a similar fashion to those made by GS Electech here: "The two U.S. entities' argument stems from [plaintiffs'] frequent use of the blanket references to the 'Outokumpu defendants, without always specifying the role that each corporate entity played in the conspiracy." *Id.* The Sixth Circuit rejected this argument and held that Carrier had sufficiently alleged OTO's control over its U.S. Subsidiaries to tie them to the conspiracy.

Here the factual allegations also demonstrate GS Electech's control over its U.S. subsidiaries. The EP CCAC and the AD CCC expressly pled that each of the defendants, including GS Electech, directly or through "the ownership and/or control of its United States subsidiaries . . . engaged in an illegal price-fixing conspiracy." EP CCAC ¶ 13; AD CCC ¶ 16. The EP CCAC further alleges that GS Electech, directly and through its subsidiaries (GS Wire and GSW Mfg.), "manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States." *Id.* ¶ 119. Most importantly, the EP CCAC and

the AD CCC allege that GS Wire and GSW Mfg were wholly-owned and/or controlled by GS Electech. EP CCAC ¶¶ 119-120; AD CCC ¶ 125. Thus, based upon these allegations of corporate unity and control by its parent, GS Electech, it is not necessary for the AD CCC or the EP CCAC to delineate the role that each subsidiary "played in the conspiracy" with any greater precision. *Carrier*, 673 F.3d at 446. Furthermore, there exists an even stronger case here than in *Carrier* for including the two U.S. subsidiaries in the complaint. Unlike the subsidiaries in *Carrier*, which were not tied specifically to the conspiracy, here GS Electech's subsidiaries are covered by its Plea Agreement, ¶ 13, which requires them to provide cooperation to the DOJ, including producing documents in their control and providing their "directors, officers and employees . . ." for "interview and the provision of testimony in grand jury, trial and other judicial proceedings . . . ." ¶11(a)-(b). Thus, even if ADs and EPPs had not pleaded control of GS Electech's U.S. subsidiaries by its parent, those subsidiaries would still be properly included in the complaint. GS Electech Defendants' contention that Plaintiffs' allegations regarding GS Wire and GSW Mfg. are insufficient is contrary to Sixth Circuit and other applicable precedent.[14]

Moreover, the two cases cited by the GS Electech Defendants are inapposite. First, *RSM Prod. Corp. v. Petroleos De Venezuela Societa Anonima (PDVSA)*, 338 F. Supp. 2d 1208 (D. Colo. 2004) dealt with a claim brought by RSM, a Texas corporation with an exclusive license granted by Grenada to explore oil off the shore of Grenada, against PDVSA, the state oil company of Venezuela, and its subsidiaries (including CITGO) based on the fact that PDVSA

---

[14] For the reasons stated above, the EPPs and ADs believe that they have adequately alleged that GS Wire and GSW Mfg. participated along with their parent, GS Electech, in the conspiracy alleged in the EP CCAC and the AD CCC. However, if these allegations are not sufficient, the EPPs and ADs seek leave to amend the EP CCAC and the AD CCC and set forth allegations regarding the control that GS Electech exercised over GS Wire and GSW Mfg. including the fact that GS Electech identifies the business address of GS Wire and GSW Mfg. as its "overseas business office" and that Joji Suzuki, the "Senior Executive Director of GS Electech" who executed the Plea Agreement on behalf of GS Electech, also serves as the Chief Executive Officer of GSW Mfg. and as the owner of GSW Mfg. under the name "George" Suzuki.

refused to resolve a dispute between Venezuela, Grenada and Trinidad regarding their maritime boundaries (until this dispute was resolved, RSM could not develop the Grenada oil and gas reserves). CITGO, the wholly owned U.S. marketing arm of PDVSA was dismissed based on the fact that RSM's "Complaint does not contain any allegations of fact that would, if true, subject CITGO to liability under the Sherman Act or on any other basis." *Id*. at 1216. The EPPs and ADs here have alleged that GS Wire and GSW Mfg. participated in the alleged conspiracy - facts that, if true, clearly subject each to liability under the Sherman Act.

The second case the GS Electech Defendants cited to support the dismissal of GS Wire and GSW Mfg. is likewise inappropriate. *Cupp v. Alberto-Culver USA, Inc.,* 310 F.Supp.2d 963 (W.D. Tenn. 2004) dealt with hair care products sold at either salons or in retail stores. In *Cupp*, the complaint failed because plaintiffs failed to adequately define the market for hair care products, and impermissibly brought allegations against retail distributors based only on their relationship with salon distributors and nothing more. *Id*. at 971. ("Plaintiffs attempted definition of the relevant product market is insufficiently and fatally vague.") In the case at bar, Defendants are not arguing that the market defined by plaintiffs is insufficiently vague.

### C. <u>EPPs and ADs Sufficiently Allege That They Suffered Injury</u>

It is well-settled that at the pleading stage, general factual allegations of injury resulting from defendants' conduct more than suffice. *See In re Packaged Ice Antitrust Litig.*, No. 08-MDL-1952, 2011 WL 6178891, at *11 (E.D. Mich. Dec. 12, 2011) (indirect purchasers' injury allegations sufficient at pleading stage, where they alleged that they purchased packaged ice and suffered injury in certain defined states whose class members they sought to represent); *see also In re Optical Disk Drive Antitrust Litig.*, No. 10-md-143, 2012 WL 1366718, at *4 n.9 (N.D. Cal. Apr. 19, 2012) (court rejected defendants' argument that named plaintiffs' purchases were too vague to determine what kind of products they purchased; at pleading stage, indirect

purchasers' allegations were sufficient where they alleged a pass-through of the alleged overcharges).

To sufficiently allege injury at the pleading stage, EPPs and ADs must only allege that they: (1) suffered or imminently will suffer injury; (2) the injury is fairly traceable to the conduct of the defendants; and (3) a favorable federal court decision is likely to redress the injury. *Hinds*, 700 F. Supp. 2d at 392-93; As the Court noted in *Hinds*, "[t]his standard must be further amplified in antitrust conspiracy cases, where specific details regarding the injury suffered by an individual plaintiff may not be ascertainable until after discovery." *Id.* at 393 (internal citations omitted).

Here, EPPs and ADs have provided sufficient allegations that they have suffered injury as a result of Defendants' conduct. EP CCAC ¶¶198-202; AD CCC ¶¶ 214-216, 228-233, 248,250, 251, 259. EPPs and ADs have traced that injury to Defendants' conduct, explaining how the overcharges caused by the conspiracy in the AWHS market were imposed on automobile dealers and consumers, and EPPs' and ADs' claims can be redressed through this lawsuit. EP CCAC ¶¶198-202; AD CCC ¶¶ 5, 12, 139, 191(f), 214, 228(b)-(c). Nothing more is required.

## III. <u>CONCLUSION</u>

Taken together, the allegations of GS Electech's guilty plea and the allegations in the EP CCAC and AD CCC are more than sufficient to plausibly suggest the GS Electech Defendants' participation in the conspiracy alleged. The EP CCAC and AD CCC also sufficiently allege injury. Accordingly, the GS Electech Defendants' motion to dismiss the EP CCAC and AD CCC should be denied.

Dated: December 3, 2012

_/s/ Gerard V. Mantese_

Gerard V. Mantese (Michigan Bar No. P34424)
David Hansma (Michigan Bar No. P71056)
Brendan Frey (Michigan Bar No. P70893)
Joshua Lushnat (Michigan Bar No. P75319)
MANTESE HONIGMAN ROSSMAN AND WILLIAMSON, P.C.
1361 E. Big Beaver Road
Troy, Michigan 48083
Telephone: (248) 457-9200 ext. 203
Email: gmantese@manteselaw.com
dhansma@manteselaw.com
bfrey@manteselaw.com
jlushnat@manteselaw.com

Don Barrett
Brian Herrington
David McMullan
BARRETT LAW GROUP, P.A.
P.O. Box 927
404 Court Square
Lexington, MS 39095
Telephone: (662) 834-2488
Email: dbarrett@barrettlawgroup.com
bherrington@barrettlawgroup.com
dmcmullan@barrettlawgroup.com

Jonathan W. Cuneo
Joel Davidow
Victoria Romanenko
CUNEO GILBERT & LADUCA, LLP
507 C Street, N.E.
Washington, DC 20002
Telephone: (202) 789-3960
Email: jonc@cuneolaw.com
Joel@cuneolaw.com
Vicky@cuneolaw.com

Charles Barrett
CHARLES BARRETT, P.C.
6518 Highway 100
Suite 210
Nashville, Tennessee 37205
Telephone: (615) 515-3393
Email: charles@cfbfirm.com

Shawn M. Raiter
Paul A. Sand
LARSON & KING, LLP
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
Telephone: (651) 312-6500
Email: sraiter@larsonking.com
psand@larsonking.com

*Interim Lead and Liaison Counsel for Automobile Dealer Plaintiffs and Proposed Automobile Dealer Class*

**COTCHETT, PITRE & McCARTHY, LLP**

By *__/s/ Frank C. Damrell__*

Joseph W. Cotchett
Frank C. Damrell
Steven N. Williams
Adam J. Zapala
Gene W. Kim
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
jcotchett@cpmlegal.com
fdamrell@cpmlegal.com
swilliams@cpmlegal.com
azapala@cpmlegal.com
gkim@cpmlegal.com

**LABATON SUCHAROW LLP**

By *__/s/ Hollis Salzman__*

Hollis Salzman
Bernard Persky
William V. Reiss
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 883-7058
hsalzman@labaton.com
bpersky@labaton.com
wreiss@labaton.com

**SUSMAN GODFREY L.L.P.**

By *__/s/ Marc M. Seltzer__*

Marc M. Seltzer
Steven G. Sklaver
**SUSMAN GODFREY L.L.P.**
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
mseltzer@susmangodfrey.com

ssklaver@susmangodfrey.com

Terrell W. Oxford
Warren T. Burns
**SUSMAN GODFREY L.L.P.**
901 Main Street, Suite 5100
Dallas, Texas 75202
Telephone: (214) 754-1900
Facsimile: (214)754-1933
toxford@susmangodfrey.com
wburns@susmangodfrey.com

*Interim Co-Lead Counsel for End-Payor Plaintiffs*

**THE MILLER LAW FIRM, P.C.**

By *__/s/ E. Powell Miller__________________*
E. Powell Miller (P39487)
Adam T. Schnatz (72049)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste. 300
Rochester, Michigan 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com

*Interim Liaison Counsel for End-Payor Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 3, 2012 I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send electronic notices of same to all counsel of record.

/s/Sherri Sikorski_______
Sherri Sikorski
Mantese Honigman Rossman and
Williamson, P.C.
1361 E. Big Beaver Rd.
Troy, Michigan 48083
Telephone: (248) 457-9200
Ssikorski@manteselaw.com