**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

_____

IN RE: AUTOMOTIVE PARTS
ANTITRUST LITIGATION                    MASTER FILE NO. 12-md-02311

_____

In Re: Wire Harness Cases                    HON. MARIANNE O. BATTANI

_____

THIS DOCUMENT RELATES TO:

Dealership Actions                              2:12-cv-00102
End-Payor Actions                              2:12-cv-00103

_____/

**OPINION AND ORDER GRANTING IN PART AND**
**DENYING IN PART COLLECTIVE DEFENDANTS'**
**MOTION TO DISMISS INDIRECT PURCHASER ACTIONS**

Before the Court is Defendants' Collective Motion to the Dismiss End-Payors'

Corrected Consolidated Amended Class Action Complaint and the Automobile Dealers'

Consolidated Class Complaint (Doc. No. 230). Automobile Dealer Plaintiffs and End

Payor Plaintiffs (collectively "Indirect Purchaser Plaintiffs" or "IPPs") bring class actions

against Defendants under federal and state law based on Defendants' alleged

conspiracy to rig bids, fix prices, and allocate the market for automotive wire harness

systems and related products. Although the IPPs filed separate complaints, Collective

Defendants analyze the complaints together for purposes of this motion, and the Court

does the same.

The Court heard oral argument on the motion on December 6, 2012, and at the conclusion of the argument, took this matter under advisement.  For the reasons that follow, the motion is **GRANTED in part** and **DENIED in part**.

## I.  INTRODUCTION

Collective Defendants are manufacturers or sellers of Wire Harness Products that are manufactured or sold in the United States. In their motion, they challenge the complaints alleging conspiracy to fix prices on products filed by two different groups of plaintiffs–automobile dealers and end-payors.   The Automobile Dealer Plaintiffs ("ADPs"), including Martens Cars of Washington, Inc., Landers Auto Group No. 1, Inc., d/b/a Landers Toyota, Hammett Motor Company, Inc., Superstore Automotive, Inc., Lee Pontiac-Oldsmobile-GMC Truck, Inc., Westfield Dodge City, Inc., V.I.P. Motor Cars Ltd., Desert European Motorcars, Ltd., Landers McLarty Fayetteville TN, LLC, Dale Martens Nissan Subaru, Inc., Green Team of Clay Center Inc., McGrath Automotive Group, Inc., Table Rock Automotive, Inc., d/b/a Todd Archer Hyundai, Archer-Perdue, Inc., d/b/a/ Archer-Perdue Suzuki, Lee's Summit Chrysler Jeep Dodge, Bonneville and Son, Inc., Holzhauer Auto and Truck Sales, Inc., Pitre, Inc., d/b/a/ Pitre Buick GMC, Patsy Lou Chevrolet, Inc., John Greene Chrysler Dodge Jeep, LLC, SLT Group II, Inc., d/b/a Planet Nissan Subaru of Flagstaff, Herb Hallman Chevrolet, Inc., d/b/a/ Champion Chevrolet, Charles Daher's Commonwealth Motors, Inc., d/b/a Commonwealth Chevrolet, Commonwealth Kia, Commonwealth Honda, Commonwealth Volkswagen, Inc., d/b/a Commonwealth Volkswagen, Commonwealth Nissan, Inc., d/b/a

Commonwealth Nissan, Ramey Motors, Inc., Thornhill Superstore, Inc., d/b/a Thornhill GM Superstore, Dave Heather Corporation, d/b/a Lakeland Toyota Honda Mazda Subaru, Central Salt Lake Valley GMC Enterprises, LLC, d/b/a Salt Lake Valley Buick GMC, Capitol Chevrolet Cadillac, Inc., Capitol Dealerships, Inc., d/b/a Capitol Toyota, Beck Motors, Inc., filed this Consolidated Class Complaint on behalf of themselves and all others similarly situated.  In their proposed class action, Automobile Dealer Plaintiffs allege that the largest suppliers of Automotive Wire Harness Systems engaged in a "massive, more than decade-long conspiracy to unlawfully fix and artificially raise the prices of these products."  (Doc. No. 85 at ¶ 1).

In their Corrected Consolidated Amended Class Action Complaint (Doc. No. 174), End-Payor Plaintiffs ("EPPs") Rebecca Lynn Morrow, Erica Shoaf, Ifeoma Adams, Melissa Barron, John Hollingsworth, Meetesh Shah, Gary Arthur Herr, Michael Tracy, Jane Taylor, Jennifer Chase, Darrel Senior, AGA Realty LLC, James Marean, Ron Blau, Roger Olson, Susan Olson, Nilsa Mercado, Darcy Sherman, Curtis Gunnerson, David Bernstein, Ellis Winston McInnis, Thomas Wilson, Lauren C. Primos, Robert Klingler, Jessica DeCastro, Lori Curtis, Virginia Pueringer, Nathan Croom, Richard Stoehr, Edward Muscara, Michael Wick, Ian Groves, Tenisha Burgos, Jason Grala, Peter Brook, Kathleen Tawney, Kelly Klosterman, Melinda Harr, DDS PC, Cindy Prince, Paul Gustafson, Frances Gammell Roach, William Picotte, Phillip Young, Becky Bergeson, Jessee Powell, Alena Farrell, Jane FitzGerald, Arthur Stukey, Janne Rice, Robert Rice, Jr., Stacey Nickell, Carol Ann Kashishian, and Susan LaCava, on behalf of themselves and all others similarly situated, bring a class action for damages, injunctive relief, and other relief pursuant to federal antitrust laws and state antitrust, unfair

3

competition, and consumer protection laws.

Both Automobile Dealer Plaintiffs and End-Payor Plaintiffs bring their actions under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). They also assert claims for actual and exemplary damages pursuant to state antitrust, unfair competition, and consumer protection laws, and seek to obtain restitution, recover damages, and secure other relief against Defendants for violations of the laws of various states.

Defendants are manufacturers or sellers of Wire Harness Systems ("WHS"), which are the "central nervous systems" of automotive vehicles and consist of wires or cables and data circuits that run throughout the vehicles. (Doc. No. 85 at ¶ 130; Doc. No. 174 at ¶ 124). According to the EPPs, wire harness systems include "automotive electrical wiring, lead wire assemblies, cable bond, automotive wiring connectors, automotive wiring terminals, electronic control units, fuse boxes, relay boxes, junction blocks, power distributors, and speed sensor wire assemblies." (Doc. No. 174 at ¶ 3). The ADPs include two additional products in their definition of wire harness products: automotive wire harnesses themselves and high voltage wiring. (Doc. No. 85 at ¶ 3).

In their Consolidated Class Complaint, Automobile Dealer Plaintiffs identify several groups of Defendants: the Delphi group, the Fujikura group (Doc. No. 85 at ¶¶ 91-93), the Furukawa group (Doc. No. 85 at ¶¶ 94-97), the Lear group (Doc. No. 85 at ¶¶ 98-101), the Leoni group (Doc. No. 85 at ¶¶ 102-107), the Sumitomo group (Doc. No. 85 at ¶¶ 108-114), the S-Y Systems and Yazaki group (Doc. No. 85 at ¶¶ 115-120), the Tokai Rika group (Doc. No. 85 at ¶¶ 121-123) and the G.S. Electech group (Doc.

4

No. 85 at ¶¶ 124-126). End-Payor Plaintiffs identify the same Defendants but add

DENSO Corporation and DENSO International America, Inc.  (See Doc. No. 174 at ¶¶

83-83).  The Defendant groups control about 90% of the global market, which is in

excess of a 21.9 billion dollar industry.  (Doc. No. 85 at ¶¶ 140-141; Doc. No. 174 at ¶

143).  The groups are made up of affiliated entities as follows:

> The Delphi group, which controls 16.71% of the global
> market, includes Defendants Delphi Automotive LLP, Delphi
> Automotive Systems LLC ("Delphi LLC"), DPH Holdings
> Corporation, and Delphi Furukawa Wiring Systems LLC.
> (Doc. No. 85 at ¶¶ at ¶ 137; Doc. No. 174 at ¶¶ 72-82).
>
> The Fujikura Group includes Fujikura, Ltd. and Fujikura
> America, Inc. and controls 2.69% of the global market. (Doc.
> No. 85 at ¶¶ 148; Doc. No. 174 at ¶¶ 86-88).
>
> The Furukawa group, which controls almost 4% of the global
> market (Doc. No. 85 at ¶¶ 146; Doc. No. 174 at ¶¶ 89-92,
> 162), includes Furukawa Electric, American Furukawa, Inc.,
> Furukawa Wiring Systems, America, Inc.  (Id.).
>
> The Lear group includes Lear Corporation and Kyungshin-
> Lear Sales and Engineering, LLC. and controls almost 5% of
> the global market.  (Doc. No. 85 at ¶¶ 98-101; Doc. No. 174
> at ¶¶ 93-96, 162).
>
> The Leoni group controls 6% of the global market for WHS
> and includes Leoni AG, Leoni Wiring Systems, Inc.,
> Leonische Holding, Inc., Leoni Kabel, GMBH, and  Leoni
> Wire Inc.  (Doc. No. 85 at ¶¶ 02-102-107; Doc. No. 174 at
> 162).
>
> The Sumitomo group, which is the "second largest
> manufacturer of WHS," controls 24%of the global market.  It
> includes Sumitomo Electric Industries, Ltd., Sumitomo
> Wiring Systems, Ltd., Sumitomo Electric Wiring Systems,
> Inc., K&S Wiring Systems, Inc., Sumitomo Wiring (U.S.A.)
> Inc., and Sumitomo Electric Wintec America, Inc. (Doc. No.
> 85 at ¶¶ 108-114; Doc. No. 174 at ¶ 103).

The S-Y Systems group includes S-Y Systems Technologies Europe, GMBH, Yazaki Corporation, S-Y Systems Technologies, America, LLC, Yazaki North America, Inc. (Doc. No. 85 at ¶ 143;  Doc. No. 174 at ¶¶ 110-114).

Defendants Yazaki Corporation and Yazaki North America, Inc. make up the Yazaki Group.  The Yazaki group controlled almost 30% of the global market as of 2009. (Doc. No. 85 at ¶ 142).  Wire Harness System sales comprise 77% of its business, and it supplies Toyota, Chrysler, Ford, Renault-Nissan, Honda, and General Motors. (Id.)

The Tokai Rika group includes TRAM, Inc. and Tokai Rika Co., Ltd.  (Doc. No. 84 at ¶¶ 121-123; Doc. No. 174 at ¶¶ 115-117).

The G.S. Electech group includes G.S. Electech, Inc. and G.S.W. Manufacturing, Inc. (Doc. No. 85 at ¶¶ 124-126; Doc. No. 174 at ¶¶ 118-120).

## II.  FACTUAL ALLEGATIONS

The IPPs allege that they were injured because some portion of an overcharge resulting from the conspiracy was passed through the distribution chain to them.  End-Payor Plaintiffs "purchased Automotive Wire Harness Systems indirectly from one or more of the Defendants.  By way of example, an owner of a vehicle may indirectly purchase an Automotive Wire Harness System from Defendants as part of purchasing or leasing the new vehicle."  (Doc. No. 174 at ¶ 141).  The WHS could be purchased indirectly as a replacement when repairing a damaged vehicle.  (Id.)  The ADPs purchased the products indirectly, not from the auto parts suppliers, but from original equipment manufacturers ("OEMs").  (Doc. No. 85 at ¶ 139).   Automobile OEMs install Wire Harness Systems "in new vehicles as part of the automotive manufacturing process."  (Doc. No. 85 at ¶ 133).   Wire Harness Systems also are installed in vehicles

6

to replace worn out, defective, or damaged automotive Wire Harnesses.  (Id.)

The purchase process involves a Request for Quotation (RFQ) issued by OEMs to the parts suppliers.  Auto parts suppliers submit quotations or bids in response, and the supplier that is selected typically supplies the part for four to six years, or the life of the model at issue.  (Id. at ¶ 135; Doc. No. 174 at ¶ 139).  The bid process begins about three years before the start of production.  (Id.)  Component manufacturers also purchase WHS directly.  (Doc. No. 85 at ¶ 134).

According to IPPs' complaints:

> Defendants and the co-conspirators supplied Automotive Wire Harness Systems to OEMs for installation in vehicles manufactured and sold in the United States and elsewhere. Defendants and their co-conspirators manufactured Automotive Wire Harness Systems (a) in the United States (including in all of the states having laws permitting recovery of damages by indirect purchasers, as listed *infra*), for installation in vehicles manufactured and sold in the United States (including all of the states having laws permitting recovery of damages by indirect purchasers as listed *infra*), (b) in Japan, and possibly other countries, for export to the United States (including all of the states having laws permitting recovery of damages by indirect purchasers, as listed *infra*) and installation in vehicles manufactured and sold in the United States (including all of the states having laws permitting recovery of damages by indirect purchasers as listed *infra*), and (c) in Japan, and possibly other countries, for installation in vehicles manufactured in Japan, and possibly other countries, for export to and sale in the United States (including all of the states having laws permitting recovery of damages by indirect purchasers, as listed *infra*).

(Doc. No. 85 at ¶ 158; Doc. No. 174 at ¶ 140).

### A.  Market Conditions

The Indirect Purchaser Plaintiffs allege that although costs remained steady, Defendants increased prices for WHS.  (Doc. No. 85 at ¶¶ 152-155; Doc. No. 174 at ¶¶ 151-153).  Other market conditions make the WHS market "particularly attractive" to collusion.  (Doc. No. 85 at ¶ 156; Doc. No. 174 at ¶ 154).  Specifically, high start-up costs hinder new entrants to business, in particular, costs associated with "manufacturing plants, equipment, energy, transportation, distribution infrastructure, skilled labor, and long-standing customer relationships." (Doc. No. 85 at ¶ 158; Doc. No. 174 at ¶¶ 155-157).   In addition, demand for WHS is highly inelastic:  there are no close substitutes for the products, which are essential.  (Doc. No. 85 at ¶¶ 161-163; Doc. No. 174 at ¶¶ 158-160).  Lastly, the WHS market is highly concentrated, making it more susceptible to collusion. (Doc. No. 85 at ¶¶ 164-165; Doc. No. 174 at ¶¶ 161-162).

In addition to market conditions favorable to collusion, IPPs allege that Defendants had ample opportunities to conspire.  They regularly attended industry events, which provided an opportunity to meet "under the guise of legitimate business." (Doc. No. 85 at ¶¶ 166-167; Doc. No. 174 at ¶ 163).  Several examples are identified: the North American International Auto Show and the Automotive Aftermarket Products Expo.  (Id.)

### B.  Investigations

Government investigations into the suppliers of WHS originated in Europe after several European OEMs brought a complaint to the European Commission ("EC").

8

(Doc. No. 85 at ¶ 169; Doc. No. 174 at ¶ 165).  In February 2010 and in June 2010, the EC conducted raids on the offices of several defendants.  (Doc. No. 85 at ¶¶ 170-75; Doc. No. 174 at ¶ 166).  Also in February 2010, Japan's Fair Trade Commission ("JFTC") raided the Tokyo offices of Furukawa Electric, Sumitomo Electric, and Yazaki Corporation, seeking evidence of collusion in the industry.  (Doc. No. 85 at ¶ 172; Doc. No. 174 at ¶ 168).   Finally, FBI investigators raided three Detroit-area Japanese auto parts makers as part of a federal antitrust investigation.  (Doc. No. 85 at ¶ 174; Doc. No. 174 at ¶ 170).

On January 19, 2012, the JFTC issued Cease and Desist orders against Fujikura Ltd., and Yazaki Corporation, and fined Sumitomo Electric, Fujikura Ltd., and Yazaki Corporation based on bidding practices relating to WHS.  (Doc. No. 85 at ¶ 177). According to the JFTC, "Sumitomo Electric, Fujikura Ltd., and Yazaki Corporation all violated Japan's Antimonopoly Act by rigging bids to OEMs Toyota, Honda, Nissan, and Fuji (manufacturer of Subaru-brand vehicles) on wire harnesses and related products. . . [by] appointing the designated successful bidder and managing to have the designated successful bidder win the bidding."  (Doc. No. 85 at ¶ 179).  The JFTC stated that the conspiracy began as early as July 2000, and that Furukawa Electric also had participated in the bid-rigging conspiracy.  (Doc. No. 85 at ¶¶ 180-81).

Several companies and their employees pleaded guilty.  Furukawa Electric and three of its executives pleaded guilty to conspiracy to rig bids, allocate customers, and fix prices of WHS sold to automobile manufacturers in the United States and elsewhere.  (Doc. No. 85 at ¶¶ 183-196; Doc. No. 174 at ¶¶ 172-181).  In January 2012, Yazaki Corporation and four of its executives agreed to plead guilty to conspiring to rig

9

bids, fix prices, and allocate customers for WHS, beginning in January 2000 through February 2010.  (See Doc. No. 85 at ¶¶ 197-206; Doc. No. 174 at ¶¶ 182-183).  In April 2012, Fujikura, Inc. agreed to plead guilty to a conspiracy from January 2006 through February 2010.  (Doc. No. 85 at ¶¶ 207-08; Doc. No. 174 at ¶ 186).  G.S. Electech, Inc. also agreed to plead guilty to the same conduct involving speed sensor wire assemblies.  (Doc. No. 85 at  at ¶¶ 212–213; Doc. No. 174 at ¶ 185).  In March 2012, DENSO pleaded guilty to antitrust violations relating to electronic control units.  (Doc. No. 174 at ¶ 184).  To date, Defendants pleading guilty have agreed to pay criminal fines totaling $770.75 million.  (Doc. No. 174 at ¶ 187).

Automobile Dealer Plaintiffs assert that they absorbed a significant portion of the overcharges they paid due to these illegal activities and they have suffered damages in the "states where they reside, compensable by indirect purchaser laws."  (Doc. No. 85 at ¶ 215).  EPPs allege that they have been injured in their business and property by Defendants' conspiracy and have paid more for WHS that they would have in the absence of the unlawful conduct (Doc. No. 174 at ¶ 260).

Automobile Dealers Plaintiffs and End-Payor Plaintiffs allege that they were unable to discover through the exercise of reasonable diligence, the existence of the conspiracy until February 2010, when the EC raids first were publicized.  (Doc. No. 85 at ¶ 234; Doc. No. 174 at ¶¶ 204-206, 208-216).  They allege that as a result of the fraudulent concealment the statute of limitations is tolled.  (Doc. No. 85 at ¶ 241; Doc. No. 174 at ¶¶ 207, 217).

Based on these allegations, IPPs advance federal and state law claims.  In their Collective Motion to Dismiss End-Payors' and Automobile Dealers' Complaints in their

10

entirety, Collective Defendants challenge the sufficiency of the complaints, standing, and whether the indirect purchaser plaintiffs can bring claims under the antitrust laws, the consumer protection laws, and the unjust enrichment laws of various states.

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) allows district courts to dismiss a complaint which fails "to state a claim upon which relief can be granted." To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the plaintiff must show that his complaint alleges facts which, if proven, would entitle him to relief. First Am. Title Co. v. DeVaugh, 480 F.3d 438, 443 (6th Cir. 2007). "A complaint must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory." Weiner v. Klais & Co., 108 F.3d 86, 88 (6th Cir. 1997). When reviewing a motion to dismiss, the Court "must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Although the federal procedural rules do not require that the facts alleged in the complaint be detailed, "'a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do.'" Twombly, 550 U.S. at 555; Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

11

## IV. ANALYSIS

### A. Sufficiency of the Antitrust Allegations

Collective Defendants rely on the arguments advanced in Defendants' Collective Memorandum in Support of Defendants' Collective Motion to Dismiss the Direct Purchaser Actions to challenge the sufficiency of the antitrust allegations.  In addition, they argue that ADPs and EPPs as indirect purchasers bear "even greater" pleading burdens that Direct Purchaser Plaintiffs.  Here, as indirect purchasers, ADPs and EPPs seek recovery for losses attributable to the purchase of finished vehicles incorporating wire harness systems and losses attributable to purchases of aftermarket replacement parts.

Collective Defendants distinguish the IPPs from the Direct Purchaser Plaintiffs in that in addition to the IPPs' failure to support a broad industry-wide conspiracy, they have failed to plausibly allege that any overcharge paid by an OEM for a WHS was passed through the chain of distribution.  Here, the complaints lack any allegations regarding the aftermarket for any of the parts--there is no conduct relating to pricing in the aftermarket, and there are numerous variables that play a part in how prices charged are reached.

Collective Defendants' strategy is to disassemble the guilty pleas.  The Court disregards this strategy because, here, the allegations suggest a broad industry-wide conspiracy.  Consequently, the existence of inferences that undermine a conspiracy doe not undermine the sufficiency of the complaint, provided one such inference suggests a plausible conspiracy.  See Watson Carpet & Floor Covering, Inc. v. Mohawk

12

Indus., Inc., 648 F.3d 452, 454-55 (6th Cir. 2011) (observing that when "a complaint specifically alleges an express agreement to restrain trade and conduct by defendants consistent with the agreement, a defendant cannot prevail at the pleading stage by offering alternative explanations for the allegedly unlawful behavior").  Therefore, the Court looks beyond each allegation, standing alone, to the guilty pleas that demonstrate an express agreement existed to fix prices and allocate customers in a market with conditions ripe for conspiratorial conduct.  The factual allegations create "a reasonable expectation that discovery will reveal evidence of illegal agreement" beyond those parties that have pleaded guilty.  Twombly, 550 U.S. at 556.  Accord In re Polyurethane Foam Antitrust Litig., 799 F. Supp. 2d 777, 782 (N.D. Ohio 2011) (relying on "specific admissions" made during a governmental investigation that supported the "existence of a conspiratorial agreement").  Accordingly, the Court denies Collective Defendants' request to dismiss the complaints based upon the sufficiency of the allegations and considers Collective Defendants' argument that constitutional standing is lacking.

**B. Constitutional Standing**

**1. Injury-in-fact**

"Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.'"  National Rifle Ass'n of Am. v. Magaw, 132 F.3d 272, 279 (6th Cir. 1997).  The "requirement limits the Court's authority to legal issues 'which are traditionally thought to be capable of resolution through judicial process,' "  Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich., 470 F.3d 286, 291 (6th Cir. 2006) overruled on other grounds as recognized by Davis v. Prison Health Servs., 679

13

F.3d 433 (6th Cir. 2012) (citing <u>Owen of Georgia, Inc. v. Shelby Cnty.</u>, 648 F.2d 1084, 1089 (6th Cir. 1981)), a limitation that insures "that the litigants possess 'a personal stake in the outcome of the controversy.'" <u>Id.</u> (citing <u>Baker v. Carr</u>, 369 U.S. 186, 208 (1962)).

To demonstrate Article III standing, a plaintiff must first allege that he has suffered an injury that is (a) concrete and particularized and (b) actual or imminent, rather than conjectural or hypothetical. <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992). Second, the alleged injury must be fairly traceable to the defendant's conduct, and not the result of the independent action of a third party. <u>Id.</u> Third, the plaintiff must allege that a favorable federal court decision is likely to redress the alleged injury. <u>Id.</u> at 561.

According to Collective Defendants, Indirect Purchaser Plaintiffs have not alleged that they suffered an actual injury because of the alleged conspiracy, and the relevant facts to not support the existence of an injury. In the absence of an injury, they lack standing to sue under Article III of the Constitution. Specifically, Collective Defendants contend that IPPs have not alleged facts that support their contention that an overcharge to the direct purchasers was passed on to the ADPs and EPPs in the purchase or lease of vehicles containing the price-fixed WHS or in the purchase of stand-alone WHS in the aftermarket or as a replacement part. Because ADPs and EPPs are indirect purchasers, their complaints must include two allegations: (1) Collective Defendants overcharged the direct purchasers; and (2) some or all of the overcharge was passed on to them through each of the various intermediate levels of the distribution chain. <u>See</u> <u>In re Graphics Processing Units Antitrust Litig.</u>, 253 F.R.D.

14

478, 502 (N. D. Cal. 2008) ("In re GPU") (observing that "indirect purchasers must prove that an overcharge was levied on direct purchaser of the defendants' products, who then passed all or some of that overcharge through to the indirect purchasers").

To challenge the plausibility that the conspiracy caused an injury, Collective Defendants note not only the protracted distribution chain for vehicles, but also the lengthy passage of time between the submission of WHS bids to the OEMs and the actual manufacture of the products. They raise the minimal cost percentage of a WHS relative to a finished vehicle. Lastly, Collective Defendants contend that Indirect Purchaser Plaintiffs did not meet their pleading burden because they do not include allegations as to whether an identifiable portion of the overcharges resulting from price-fixing was passed on at each step in the chain–-tracking the product itself is not enough. There is no allegation as to how the overcharge impacted the OEM's sale price of the finished product to a dealer or how the overcharge could have impacted the negotiated sale price to an end-payor.

The Court recognizes that IPPs face a difficult challenge in succeeding on their claims. They must show that every reseller in the chain passed on some or all of the alleged overcharge to demonstrate that the price of their vehicle was higher than it would have been because of the overcharge on the wire harness system. Nevertheless, the Sixth Circuit has made it clear that "an economic injury is sufficient to confer standing upon a party." Club Italia Soccer & Sports Org., 470 F.3d at 294. Collective Defendants have cited no authority requiring an indirect purchaser to allege the detailed mechanics of the pass-through process to plead injury-in-fact and causation for purposes of constitutional standing to survive a Rule 12(b)(6) motion. To

15

the contrary, the cases cited by Collective Defendants are procedurally distinguishable in that the issue of the pass-through process was being considered at the class certification or summary judgment stage.  See e.g. In re GPU, 253 F.D.R. at 502 (discussing certification of subclasses under Rule 23(b)(3)); A&M Supply Co. v. Microsoft Corp., 654 N.W.2d 572, 575 (Mich. Ct. App. 2002) (appeal of class certification order); Karofsky v. Abbott Labs., No. CV-95-1009, 1997 WL 34504652 (Me. Super. Ct. Oct. 16, 1997) (class certification); In re New Motor Vehicles Canadian Exp. Antitrust Litig., 632 F. Supp. 2d 42, 59 n.21 (D. Me. 2009) (summary judgment motion).

In contrast, here, for purposes of Rule 12(b)(6), the allegations need not be detailed. Indirect Purchaser Plaintiffs have alleged that Wire Harness Systems "follow a traceable physical chain of distribution" from Defendants to Plaintiffs and "any costs attributable to wire harness systems can be traced through the chain of distribution to Plaintiffs and members of the Classes.  (Doc. No. 85 at ¶ 231; Doc. No. 174 at ¶ 201). They have met their pleading obligations.   The shortcomings identified in Collective Defendants' laundry list of missing allegations are allegations addressing how OEMs price their vehicles and how the price of component parts affects the price of the finished vehicle:  including, how estimated demand impacts price; whether OEMs simply absorb the overcharges by reduced profit margin on each vehicle; and whether OEMs sometimes sell cars below cost of production because of competition.  The shortcomings may provide a basis for Collective Defendants to prevail on a motion for summary judgment, but do not provide a basis for dismissal under Rule 12(b)(6).

In sum, a buyer who is induced to pay an unlawfully inflated price for goods or services obviously suffers an actual injury, that is, an injury-in-fact.  Chattanooga

16

Foundry and Pipe Works v. City of Atlanta, 203 U.S. 390, 396 (1906).  Here, even if the

Automobile Dealer Plaintiffs passed the overcharge on to the End-Payor Plaintiffs,

ADPs are not deprived of standing to sue.  S. Pacific Co. v. DarnellTaenzer Lumber

Co., 245 U.S. 531, 534 451 (1918) (observing "that the plaintiff who has subsequently

passed on the overcharge to his customers is no more deprived of standing to sue than

is the claimant whose loss happens to be covered by insurance").  Accordingly, the

Court rejects this ground as a basis for dismissal and turns to Collective Defendants'

residency argument.

### 2.  Residency

The parties disagree as to whether Indirect Purchaser Plaintiffs have standing to

pursue claims in states where no named plaintiff resides.  Specifically, no Automobile

Dealer Plaintiff resides in Hawaii[1], Maine, Montana, North Dakota, South Carolina, or

Vermont; no End-Payor Plaintiff resides in the District of Columbia.  Collective

Defendants rely on case law from this district to support their position that IPPs may not

proceed in any state without a resident plaintiff.  See In re Refrigerant Compressors

Antitrust Litigation, No. 09-md-02042, 2012 WL 2917365 (E.D. Mich. July 17, 2012)

(holding that the antitrust class action plaintiffs had no standing to sue in states where

no would-be representative of the plaintiff class lived or allegedly was injured) (citing In

re Packaged Ice Antitrust Litig., 779 F. Supp. 2d 657 (E.D. Mich. 2011)).  In response to

―――――――――――――――――

[1]It appears that one ADP resides in Hawaii.  That complaint in that case was filed
under seal as required by state law.  Because the attorney general declined to
prosecute the action, the complaint has been unsealed, and the ADP has been given
permission to proceed by the deputy attorney general.  (See Doc. No. 390, Ex. 2).

Collective Defendants' argument, IPPs challenge whether a decision on standing should be deferred until class certification.

Generally, an Article III court determines whether a plaintiff has standing at the outset of a case.  See Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC, 433 F.3d 181, 197-98 (2d Cir. 2005).  Exceptions exist however, and in Ortiz v. Fibreboard Corp., 527 U.S. 815, 831 (1999), the Supreme Court reiterated one such exception it articulated in Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 612 (1997).  Notably, the Supreme Court endorsed postponing the standing determination until after a class certification ruling because the certification issues are "logically antecedent to Article III concerns."  In Amchem Prods., the district court rejected the defendant's adequacy challenge to a class of plaintiffs that had merely been exposed to asbestos.  The defendants argued that the class did not meet the amount in controversy requirements for diversity jurisdiction.  That group of plaintiffs had not suffered an injury that the proposed settlement compensated.  The Court deferred ruling on the motion to dismiss.

Courts have reached different conclusions as to what impact, if any, Ortiz and Amchem create in the context of an indirect purchaser antitrust class action.  The Sixth Circuit has not weighed in, but it has applied the rationale in an ERISA class action law suit.  In Fallick v. Nationwide Ins. Mut. Co., 162 F.3d 410 (6th Cir. 1998), the plaintiff sought to represent members of several of the defendant's benefit plans, including plans to which the plaintiff did not belong.  The appellate court reversed the lower court's dismissal of those allegations pertaining to the plans in which the plaintiff did not participate for lack of standing.  The Sixth Circuit reasoned that the plaintiff could

18

represent plans other than his own because his challenge was "to the general practices affecting all of the plans." Id. at 422. Thus, once a named plaintiff's standing has been established, his capacity to seek relief for absent members of the proposed class are to be determined under Rule 23. Id.

In Hovering v. Transnation Title Ins. Co., 545 F. Supp. 2d 662, 667 (E.D. Mich. 2008), the district court found "no reason not to apply the same rationale" to the class action case before it, which involved a Michigan plaintiff bringing claims under the insurance laws of other states. The plaintiff challenged the defendant's practice of overcharging on title insurance policy premiums where residential properties were refinanced within two years of a prior mortgage loan and title policy. Id. at 664. According to the plaintiff, the insurance companies filed title insurance rates that committed to charging less on a policy premium when "the second transaction was within two years of the previous policy issuance." Id. In reaching its conclusion that a decision on standing should be deferred until class certification had been decided, the district court noted:

> Even if the plaintiff has standing to assert claims in [Michigan]. . .to proceed as a representative of a class he must still establish that this claim is typical of those individual whose claims arise under the laws of other states and he can represented those individual adequately. That determination must be made before the Court can decide whether the plaintiff has standing to maintain a class action as the named plaintiff; and therefore the decision on class certification is logically antecedent to the determination of standing. For example, with the facts presented in the complaint, the plaintiff certainty could not file an individual suit only seeking relief under Arizona law; however, a member of his proposed class from that state likely would have suffered an injury that could be redressed under Arizona law. The defendant has not seriously challenged

19

> the plaintiff's standing to assert his claim arising from the
> alleged overcharge on his own refinancing transaction. The
> question whether he has standing to proceed as a class
> representative will be subsumed in the class certification
> decision. . . .

Id. at 667-68.  Accord In re Polyurethane Foam Antitrust Litig.. 799 F. Supp. 2d 777,

806 (N.D. Ohio 2011) (because "the supposed standing deficiencies. . .arise because

the [i]ndirect [p]urchaser [p]laintiffs invoke state antitrust and consumer protection

statutes for each state from which putative class members are drawn," the first step is

to "determine whether the [i]ndirect [p]urchaser [p]laintiffs may, as class

representatives, advance their state-law claims at class certification").

    In contrast to the Hovering decision, in deciding a standing issue raised by the

manufacturers of refrigerant compressors, the district court in In re Refrigerant

Compressors, 2012 WL 2917365, held that the antitrust class action plaintiffs had no

standing to sue in states where no would-be representative of the plaintiff class lived or

allegedly was injured.   Only indirect purchaser plaintiffs residing in and having been

injured in a particular state possessed constitutional standing to assert claims under the

laws of those states.  Accord In re GPU I, 527 F. Supp. 2d at 1026-27 (holding that

standing could "be addressed before class certification where. . .the court is not

considering a global class settlement") (citation omitted).

    Although there is no definitive Sixth Circuit authority, the Court finds the better

path is to defer this issue until the class certification stage.  The Indirect Purchaser

Plaintiffs allege injury based on price-fixing, bid-rigging, and customer allocation.  They

advance claims for relief under the statutes of the jurisdictions in which they reside but

seek similar relief for absent class members under the antitrust and consumer

20

protection statutes of other states.  The plaintiffs do not seek relief for themselves under the laws of the states where no plaintiff resides.  See Ramirez v. STI Prepaid LLC, 644 F. Supp. 2d 496 (D. N.J. 2009) (rejecting the defendants' argument that the plaintiffs could not bring claims based on the violation of consumer protection laws in states where the named plaintiffs did not suffer injury); In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Practices Litig., 701 F. Supp. 2d 356, 377 (E.D. N.Y. 2010) (explaining that "[w]hether the named plaintiffs have standing to bring suit under each of the state laws alleged is 'immaterial' because they are not bringing those claims on their own behalf, but are only seeking to represent other, similarly situated consumers in those states."); Indergit v. Rite Aid Corp., 2009 WL 1269250, at *4 (S.D. N.Y. May 4, 2009) (observing that "once a named plaintiff establishes individual standing, the issue of whether a named plaintiff can assert claims on behalf of absent class members is determined at the class certification stage of the litigation").

The Court recognizes this approach permits the IPPs to engage in discovery regarding alleged violations of state laws in the absence of absolute certainty that any individual suffered an injury under those laws.  See In Re Wellbutrin XL Antitrust Litig., 260 F.R.D. 143, 155 (E.D. Pa. 2009) ("In re Wellbutrin") (finding that certifying a class action without named plaintiffs who have standing to assert each claim would "allow named plaintiffs in a proposed class action, with no injuries in relation to the laws of certain states referenced in their complaint, to embark on lengthy class discovery with respect to injuries in potentially every state in the Union.").  Here, the nature of the claims, however, provides the Court with ample reason to address the standing issues in the context of class certification.  Consequently, the Court denies Collective

21

Defendants' request to dismiss the claims brought under the laws of states in which no named IPPs reside.

In sum, the Court finds that IPPs may proceed with their federal antitrust claims. Collective Defendants also challenge the state law claims, and the Court now considers the arguments advanced to support dismissal of those claims.

### C.  Availability of Relief under State Law

Automobile Dealer Plaintiffs do not distinguish between state antitrust and consumer protection statutes in their complaint.  They seek relief under the laws of thirty states and the District of Columbia:  Arizona (Doc. No. 85 at ¶ 261), Arkansas (Doc. No. 85 at ¶ 262), California (Doc. No. 85 at ¶ 263), District of Columbia (Doc. No. 85 at ¶ 264), Florida (Doc. No. 85 at ¶ 265), Hawaii (Doc. No. 85 at ¶ 266), Illinois (Doc. No. 85 at ¶ 267), Iowa (Doc. No. 85 at ¶ 268), Kansas (Doc. No. 85 at ¶ 269), Maine (Doc. No. 85 at ¶ 270), Massachusetts (Doc. No. 85 at ¶ 271), Michigan (Doc. No. 85 at ¶ 272), Minnesota (Doc. No. 85 at ¶ 273), Mississippi (Doc. No. 85 at ¶ 274), Missouri (Doc. No. 85 at ¶ 275), Montana (Doc. No. 85 at ¶ 276), Nebraska (Doc. No. 85 at ¶ 277), Nevada (Doc. No. 85 at ¶ 278), New Hampshire (Doc. No. 85 at ¶ 279), New Mexico (Doc. No. 85 at ¶ 280), New York (Doc. No. 85 at ¶ 281), North Carolina (Doc. No. 85 at ¶ 282), North Dakota (Doc. No. 85 at ¶ 283), Oregon (Doc. No. 85 at ¶ 284), South Carolina (Doc. No. 85 at ¶ 285), South Dakota (Doc. No. 85 at ¶ 286), Tennessee (Doc. No. 85 at ¶ 287), Utah (Doc. No. 85 at ¶ 288), Vermont (Doc. No. 85 at ¶ 289), West Virginia (Doc. No. 85 at ¶ 290), and Wisconsin (Doc. No. 85 at ¶ 291).

In IPPs' response brief, however, they indicate that ADPs are not seeing relief under the consumer protection laws of Arizona, Kansas, Michigan, Minnesota, New

22

Mexico, North Dakota, North Carolina, Rhode Island, South Dakota, or the District of Columbia.  (Doc. No. 390 at 21 n.16, n.17, and 23 n.18).  In addition ADPs do not oppose dismissal of their antitrust claim under Massachusetts or Missouri law.  (Doc. No. 390 at 32).    Accordingly, the Court declines to address arguments raised relative to the dismissal of those claims.

EPPs bring antitrust claims under the laws of twenty-three states and the District of Columbia:  Arizona (Doc. No. 174 at ¶ 236) California (Doc. No. 174 at ¶ 237), District of Columbia (Doc. No. 174 at ¶ 238), Iowa (Doc. No. 174 at ¶ 239), Kansas (Doc. No. 174 at ¶ 240), Maine (Doc. No. 174 at ¶ 241), Massachusetts (Doc. No. 174 at ¶ 242), Michigan (Doc. No. 174 at ¶ 243), Minnesota (Doc. No. 174 at ¶ 244), Mississippi (Doc. No. 174 at ¶ 245), Nebraska (Doc. No. 174 at ¶ 246), Nevada (Doc. No. 174 at ¶ 247), New Hampshire (Doc. No. 174 at ¶ 248), New Mexico (Doc. No. 174 at ¶ 249), New York (Doc. No. 174 at ¶ 250), North Carolina (Doc. No. 174 at ¶ 251), North Dakota (Doc. No. 174 at ¶ 252), Oregon (Doc. No. 174 at ¶ 253), South Dakota (Doc. No. 174 at ¶ 254), Tennessee (Doc. No. 174 at ¶ 255), Utah (Doc. No. 174 at ¶ 256), Vermont (Doc. No. 174 at ¶ 257), West Virginia (Doc. No. 174 at ¶ 258), Wisconsin (Doc. No. 174 at ¶ 259).  EPPs do not oppose dismissal of their antitrust claim under Massachusetts law.  (Doc. No. 390 at 32).

End-Payor Plaintiffs bring consumer protection claims under the laws of California (Doc. No. 174 at ¶ 265), the District of Columbia (Id. at ¶ 266), Florida (Id. at ¶ 267), Hawaii (Id. at ¶ 268), Massachusetts (Id. at ¶ 269), Missouri (Id. at ¶ 270), Montana (Id. at ¶ 271), New Mexico (Id. at ¶ 272), New York (Id. at ¶ 273), North Carolina (Id. at ¶ 274), Rhode Island (Id. at ¶ 275), and Vermont (Id. at ¶ 276).  In their

23

response brief, EPPs agreed to dismissal of their claim under § 30-14-201(1) of Montana law, which they included inadvertently.  (Doc. No. 390 at p. 31 n.31).

Neither complaint specifically identifies the source of state law upon which their claims of unjust enrichment are based.  ADPs "incorporate by reference the allegations in the preceding paragraphs."  (Doc. No. 85 at ¶ 296).  EPPs likewise "incorporate by reference the allegations in the preceding paragraphs."  (Doc. No. 174 at ¶ 277).

Collective Defendants challenge the viability of the state law claims on numerous grounds.  The Court first turns to the arguments raised relative to IPPs' state antitrust claims. Collective Defendants raise numerous grounds for dismissal:  lack of antitrust standing; the claims predate the enactment of the state statute; statutory prohibitions on class actions; and failure to state a claim under the relevant statute.  The Court addresses the arguments below.

### 1. Antitrust Standing

 In response to the prohibition against antitrust actions by indirect purchasers set forth by the Supreme Court in Illinois Brick Co. v. Illiniois, 431 U.S. 720 (1977), many states enacted repealer provisions, allowing state actions for indirect purchasers.  In California v. ARC Am. Corp., 490 U.S. 93, 105-06 (1989), the Supreme Court held that state indirect purchaser statutes are not preempted by federal law.

Nevertheless, courts are required to determine whether a particular plaintiff is a proper party to bring a private antitrust action.  NicSand, Inc. v. 3M Co., 507 F.3d 442, 450 (6th Cir. 2007) (observing that antitrust claimant must show more than mere "injury causally linked" to a competitive practice).   In its decision in Associated Gen. Contractors of Cal., Inc. v. Cal, State Council of Carpenters, 459 U.S. 519, 535 (1983)

24

("AGC"), the Supreme Court interpreted the Clayton Act provision permitting recovery by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws".   The Court concluded that even when a plaintiff plausibly alleges an injury-in-fact sufficient for constitutional standing, the plaintiff still must establish antitrust standing.  "It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property." Id. (quoting Blue Shield of Virginia, Inc. v. McCready, 457 U.S. 465, 477 (1982)).

In AGC, the Supreme Court articulated a number of factors that courts should consider in analyzing the relationship between a plaintiff's harm and a defendant's wrongdoing: (1) the causal connection between the violation and the harm, and whether the harm was intended; (2) the nature of injury and whether it was one Congress sought to redress; (3) the directness of the injury, and whether damages are speculative; (4) the risk of duplicate recovery or complexity of apportioning damage; and (5) the existence of more direct victims.  AGC, 459 U.S. at 537-45.  A plaintiff need not prevail on every factor, instead, the courts balance the factors, "giving great weight to the nature of the plaintiff's alleged injury."  Id.  Collective Defendants maintain that the balancing test weighs against standing.

Indirect Purchaser Plaintiffs argue AGC does not apply to claims brought under the state antitrust statutes.  They distinguish AGC because it interprets federal antitrust law in a different context.  They conclude that it was never intended to apply to indirect purchasers' claims of price-fixing under state law because Illinois Brick barred these

25

claims under federal law.  The Court agrees with IPPs that the facts giving rise to the claims in AGC are distinguishable.

The plaintiff labor union in AGC, sued a multi-employer association with whom it had a contract, as well as some of the association's members.  AGC, 459 U.S. at 520.  The plaintiff alleged that the defendants conspired to coerce third parties and other association members to enter into business relationships with nonunion companies.  Id.  According to the plaintiffs, the conspiracy diminished the trade of certain unionized firms and restrained the union's business activities.  In analyzing the facts before it, the Supreme Court found the claims fell within the scope of contact law, labor law, or common-law fraud, but did not state a claim under antitrust law.  Id. at 527.

Despite the different factual context, the Court rejects IPPs' argument that AGC does not factor into the standing analysis.  The issue of applicability of AGC is one that is governed by state law because this Court is sitting in diversity.  Erie R.R. v. Tompkins, 304 U.S. 64 (1938).  Therefore, to determine the applicability, this Court must apply the substantive law of the state's highest court.  Id.  Moreover, where a clear rule of law cannot be gleaned from the state's highest court, the duty of this court is to "ascertain from all available data what the state law is and apply it."  Bailey v. V & O Press Co., 770 F.2d 601, 604 (6th Cir. 1985).

In support of their respective positions, the parties provide charts and case and statutory authority in their exhibits referencing the twenty-four states identified as sources of antitrust violations.  (See Doc. No. 237, Ex. D; Doc. No. 390, Ex. 3).  The Court has reviewed the authority, which demonstrates that some states apply the AGC factors, some states have enacted harmonization statutes that require courts to

interpret the state antitrust laws in accordance with federal law, some states allow

consideration of federal law, and some have declined to adopt the AGC factors.  Before

turning to the specific states at issue, the Court considers whether, assuming that the

factors articulated in AGC apply, IPPs have standing.

### a.  Antitrust Injury

In assessing whether a plaintiff suffered an antitrust injury, courts assess the

relevant market.  Here, the parties dispute whether IPPs were participants in the

relevant market, which Collective Defendants characterize as the WHS market.

Collective Defendants contend that because IPPs bought vehicles containing the Wire

Harness Systems, they were not participants in the WHS market, they were participants

in the vehicle market.  Specifically, Collective Defendants note that the only allegations

of fixed prices relate to the WHS, not the finished products containing the WHS.  Yet,

Indirect Purchaser Plaintiffs participated in the vehicle market, a market that is

secondary to the allegedly price-fixed market.  See In re Dynamic Random Access

Memory (DRAM) Antitrust Litig., 536 F. Supp. 2d 1129, 1137-38, 1141 (N. D. Ca. 2008)

("In re (DRAM II)").

Some courts have rejected a strict "market-participant" test, and allowed indirect

purchasers to bring claims arising out of the purchase of finished products containing

allegedly-restrained products.  In re TFT-LCD (Flat Panel) Antitrust Litig., 586 F. Supp.

2d 1109, 1121 (N.D. Ca. 2008) ("In re Flat Panel") (citing D.R. Ward Constr. Co. v.

Rohm & Haas Co., 470 F.Supp.2d 485, 491 (E.D. Pa. 2006) (finding standing where

"plaintiffs allege that they paid an inflated price for plastics additives due to [the]

defendants' price-fixing agreement, thereby implying that the direct harm of the

27

price-fixing conspiracy was passed through the stream of commerce to them, purchasers of products containing plastics additives").  See also Novell, Inc. v. Microsoft Corp., 505 F.3d 302, 316 (4th Cir. 2007) (observing that the market participant requirement test is not rigid).  In In re (Flat Panel), the court considered allegations similar to those advanced by IPPs and found them sufficient to establish factual questions about the relevant market.  586 F. Supp. 2d at 1123.  Notably, the plaintiffs had alleged that the markets were inextricably linked and intertwined, that the component had no utility except as a component, and that the demand for the product drove the demand for the component.  Id.  See also Provice v. Cleveland Press Pub. Co., 787 F. 2d 1047, 1052 (6th Cir. 1986) (observing that a plaintiff's "injury must be 'inextricable intertwined' with the injury sought to be inflicted on the relevant market").

In the alternative, the In re (Flat Panel) court observed that even if the plaintiffs were not participants in the relevant market, the allegations still favored standing under the first factor of AGC because the plaintiffs had alleged that the products were "identifiable, discrete physical objects that did not change form or become an indistinguishable part of the product in which they are contained, therefore they follow "a traceable physical chain from the defendants to the OEMS to the purchasers of the finished products."  586 F. Supp. 2d at 1123.  Accord In re GPU II, 540 F. Supp. 2d 1085, 1098 (N.D. Ca. 2007) (observing that allegations that the price-fixed component part was "a separate and removable part of a finished computer, [and] any overcharge would be passed on to the consumer" favored standing.  Similar allegations are included in the complaints in this case.

28

> The markets for Automotive Wire Harness Systems and the market for cars are inextricably linked and intertwined because the market for Automotive Wire Harness Systems exists to serve the vehicle market. Without the vehicles, the Automotive Wire Harness Systems have little to no value because they have no independent utility. Indeed, the demand for vehicles creates the demand for Automotive Wire Harness Systems. As Lear stated in its 2010 Annual Report: "Our sales are driven by the number of vehicles produced by the automotive manufacturers, which is ultimately dependent on consumer and fleet demand for automotive vehicles."

(Doc. No. 174 at ¶ 200; Doc. No. 85 at ¶ 230).

In sum, IPPs have alleged that they paid higher prices for automobiles containing WHS and that the price-fixed products remain unchanged after incorporation. They further allege that Wire Harness Systems had no independent utility and that the demand for vehicles create the demand for Wire Harness Systems. (Doc. No. 85 at ¶¶ 130, 230-31; Doc. No. 174 at ¶¶ 124, 200-201). These allegations sufficiently allege the existence of an antitrust injury. Therefore, the Court considers whether the allegations satisfy the next AGC factor.

### b.  Directness of Injury

Collective Defendants assert that the distribution chain is complex and numerous market factors affect the prices paid by IPPs. Therefore, the relevant market is separated by the distribution chain, which renders IPPs' claimed injuries speculative. They have cited several cases supporting their position. First, in In re Dynamic Random Access Memory (DRAM) Antitrust Litig., 516 F. Supp.2d 1072 (N. D. Cal. 2007) ("In re Dram I"), the court applied the AGC factors to a claim of price-fixing of a component part and found standing lacking. The court noted that there was no "direct

29

link in the causation chain" between the challenged conduct and the increased prices of the finished goods, and that the damage would be speculative and difficult to apportion inasmuch as the relevant market allegations would be for finished goods containing the component part.  Even after the plaintiffs amended their complaint, their allegations were insufficient to convince the court that they had standing to pursue their antitrust claims.  In re DRAM II, 536 F. Supp. 2d at 1136-37.   Accord In re Potash Antitrust Litig, 667 F. Supp. 2d 907, 915, 945-46 (N.D. Ill. 2009) (holding that an indirect purchaser of agricultural fertilizer containing price-fixed ingredient lacked antitrust standing due to lack of allegation of a "chain of causation" between the alleged restraint in the market and their injury").  See also Strange v. Visa U.S.A. Inc., No. 03-cv-011323, 2005 WL 1403769 (Wis. Cir. Ct. Feb. 8, 2005) (holding that any injury resulting from a transaction fee imposed by credit card companies on merchants that resulted in higher prices paid by plaintiffs for goods and services purchased from merchants too remote and speculative to confer antitrust standing on the plaintiffs).

Nevertheless, there also is case law to the contrary.  Specifically, in In re Flash Memory Antitrust Litig., 643 F. Supp. 2d 1133, 1155 (N.D. Cal. 2009), the court summarized:

> In [In re Flat Panel] and [In re GPU I], the courts found that indirect purchasers of components had satisfied their burden of pleading directness of injury by alleging that the cost of the component was traceable through the product distribution chain.  Compare [In re Flat Panel], 586 F.Supp.2d at 1123 (directness requirement met based on allegations that cost of component part comprised a substantial amount of the finished product cost and could be traced through the distribution chain); GPU II, 540 F.Supp.2d at 1098 (same) with DRAM I, 516 F. Supp. 2d at

30

> 1092 (directness requirement not met where the "complaint
> sets forth no allegations that, within the final purchase price
> of a given product purchased by plaintiffs for 'end use,' the
> ultimate cost of DRAM is somehow directly traceable or
> distinguishable").

Here, IPPs have alleged a chain of causation.

> Automotive Wire Harness Systems are identifiable, discrete
> physical products that remain essentially unchanged when
> incorporated into a vehicle. As a result, Automotive Wire
> Harness Systems follow a traceable physical chain of
> distribution from the Defendants to Plaintiffs and the
> members of the Classes, and any costs attributable to
> Automotive Wire Harness Systems can be traced through
> the chain of distribution to Plaintiffs and the members of the
> Classes.

(See e.g. Doc. No. 174 at ¶ 201; Doc. No. 85 at ¶ 231). Because IPPs have alleged

that they can trace overcharges through the distribution chain, they have satisfied this

AGC factor.

### c. Speculative Nature of the Harm

Pursuant to the AGC factors, courts consider whether the harm alleged is too

speculative. Collective Defendants present several arguments to support their position

that the harm here is so speculative as to undercut standing. For example, one hurdle

IPPs must overcome to establish that the alleged overcharge influenced the price paid

by IPPs is the sheer number of components in a finished vehicle. Another hurdle is the

existence of many other factors that play into the cost of a vehicle. Collective

Defendants conclude that these hurdles weigh against standing.

The Court recognizes the difficulties IPPs face in prevailing on the merits.

However, IPPs have alleged that the component parts remain separate and traceable

and that the impact of Defendants' conspiracy on Plaintiffs' businesses was substantial.

31

ADPs allege that an analysis of automobile dealer profit margins and other data indicates that automobile dealers were substantially injured by higher but-for-prices regardless of the pass on of some portion of such prices to end users. (Doc. No. 85 at ¶ 214).  They further allege that they did absorb a significant portion of the overcharges that they paid due to Defendants' illegal activities.  (Id.)  Similarly, EPPs allege that competition was restrained, and they paid supracomepetitive, artificially inflated prices. (See Doc. No. 174 at ¶ 202).  These allegations distinguish this case from those cases involving component part that mingle with the finished product to the extent that the manufacturers could not be identified.

Although it may prove to be impossible to calculate and apportion damages for IPPs, they have alleged that they can show what portion of the WHS price resulted from the conspiracy, and the extent to which the overcharge amount affected the price paid for the finished vehicle.  They have met their pleading burden.

### d.  Duplicative Recovery

Next, Collective Defendants claim there is a pronounced risk of duplicative recovery.  End-Payor Plaintiffs and Automotive Dealer Plaintiffs seek overlapping damages.  Moreover, in this case, there is a direct purchaser class.  Collective Defendants conclude that standing cannot be condoned given the nature of this case.

The risk of duplicative recovery analysis is impacted by the fact that state statutes authorize indirect purchasers to bring these claims.  States have explicitly repealed Illinois Brick, and this Court declines to undermine what the state legislatures have condoned.  Here, IPPs have indicated that the alleged overcharges are distinct and traceable.  Other courts have recognized that such allegations lessen the risk of

32

duplicative recovery.  See In re Flash Memory, 643 F. Supp. 2d at 1156 (citing In re Flat Panel, 586 F.Supp.2d at 1124; In re GPU II, 540 F.Supp.2d at 1098).

Because the Court finds that the pleadings are sufficient to demonstrate that the AGC factors do not undermine standing, there is no need to determine whether the various states identified in the ADPs and EPPs' complaints apply those factors, whether mandatory, permissive, or not at all in assessing the existence of antitrust standing.

### 2.  Date of enactment of statute

Collective Defendants ask the Court to dismiss antitrust claims brought under the laws of Hawaii, Nebraska, New Hampshire, and Utah because the conduct at issue occurred before the statutes were enacted. Specifically, Hawaii and Nebraska enacted their indirect purchaser statutes in 2002; Utah enacted its statute in 2006; and New Hampshire enacted its indirect purchaser statute in 2008.  According to Collective Defendants, the statutes either expressly apply prospectively or the state courts have refused to apply the statutes retroactively.  The Court considers the arguments below, but is mindful that although a date of enactment may limit damages, it does not preclude any claim alleged here in its entirety.

### a.  Hawaii

In 2002, the Hawaii legislature amended the state's unfair competition law, H.R.S. § 480–2, to provide that "[a]ny person may bring an action based on unfair methods of competition. . . ."  Based on this amendment, Collective Defendants argue that ADPs' antitrust claims under the law of Hawaii must be dismissed.

33

The argument that the passage of the 2002 amendment "impl[ies] that state law had imposed an Illinois Brick limitation on lawsuits alleging price-fixing was flatly rejected in In re Static Random Access Memory (SRAM) Antitrust Litig., 07-MD-01819 CW, 2010 WL 5094289 at *5 (N.D. Cal. Dec. 8, 2010). Accordingly, the Court declines to limit the price-fixing claim based on the 2002 amendment.

### b. Utah

In 2006, the Utah legislature amended that state's antitrust laws to provide that actions "may be brought under this section regardless of whether the plaintiff dealt directly or indirectly with the defendant." Utah Code Ann. § 76-10-918. This statute took effect on May 1, 2006. See Utah Const. Art. VI § 25 (unless otherwise ordered, an act of the legislature takes effect "sixty days after the adjournment of the session at which it passed"). Collective Defendants argue that IPPs cannot seek recovery for conduct that occurred prior the respective effective dates.

IPPs do not respond to the argument. The Court finds that Illinois Brick was applied prior to the 2006 amendment. See e.g., Boisjoly v. Morton Thiokol, Inc., 706 F. Supp. 795, 805 (D. Utah 1988). Accordingly, IPPs' antitrust claim is limited to price-fixing that occurred after the 2006 amendment.

### c. Nebraska

Before the state legislature amended the Junkin Act, it allowed "[a]ny person who shall be injured in his business or property" by an antitrust violation to bring a suit for damages. Neb. Rev. Stat. § 59-821 (2000). The July 20, 2002, amendment specified that an injured person could bring suit regardless of "whether such injured person dealt

34

directly or indirectly with the defendant." In re Flat Panel Antitrust Litig., 2011 WL at 3738985 (citing 2002 Neb. Laws L.B. 1278; Neb. Rev. Stat. § 59-821 (2011)).  The court in that case rejected the defendants' argument that the amendment did not apply retroactively  in the absence of expressed intention by the legislature even as it conceded that the state courts generally did not give amendments retroactive effect. The federal court held that the decision by the state supreme court in Arthur v. Microsoft Corp., 676 N.W.2d 29 (Neb. 2004), showed that the highest court would allow an indirect purchaser standing to sue for antitrust violations even before the 2002 amendment.  Therefore, the Court finds no time limitation applies.

### d.  New Hampshire

New Hampshire enacted its indirect purchaser statute effective January 1, 2008. See N.H. Rev. Stat. Ann. § 356:11.  IPPs do not dispute that the statute was intended to operate prospectively.  Accordingly, IPPs cannot seek recovery under the New Hampshire statute for any conduct that occurred prior to January 1, 2008.

### 3.  Sufficiency of the Nexus Between Conduct and Intrastate Commerce

The parties are in agreement that the antitrust statutes of certain states require a plaintiff to allege a nexus between the defendant's conduct and intrastate commerce. Specifically, included in those states are Mississippi, Nevada, New York, North Carolina, South Dakota, Tennessee, and West Virginia.  The District of Columbia also requires nexus allegations.  The parties disagree as to whether the allegations in the complaints satisfy the pleading requirements.

35

ADPs allege that the anticompetitive conduct complained of was "intentionally directed at the market for Automotive Wire Harness Systems in all states allowing indirect purchasers to collect damages, [including the states identified above] and that the conduct "had a substantial and foreseeable effect on intrastate commerce by raising and fixing prices for Automotive Wire Harness Systems through those states."  (Doc. No. 85 at ¶ 259).  In addition, ADPs allege that specific plaintiffs had their principal places of business in the states identified above, that they purchased WHS and vehicles containing WHS during the class period, and that the specific ADPs were injured in those states through payment of inflated prices.  (Doc. No. 85 at ¶¶ 22-23, 34-35, 31-33, 38-39, 60-61, 64-65, 72-73, 84-85).  Lastly, ADPs allege that Defendants "manufactured Automotive Wire Harness Systems for installation in vehicles manufactured and sold" in "all of the states having laws permitting recovery of damages by indirect purchasers."  (Doc. No. 85 at ¶ 138).  They conclude that these allegations satisfy their burden.

End-Payor Plaintiffs allege that "price competition was restrained, suppressed, and eliminated throughout" these states; that WHS prices "were raised, fixed, maintained and stabilized at artificially high levels throughout" each state, and that plaintiffs and other consumers were "deprived of free and open competition" and "paid supracompetitive, artificially inflated prices" within each state.  (Doc. No. 174 at ¶¶ 238(a)-(b), 245(a)(-(b), 250(a)-(b); 251(a)-(b), 254(a)-(b), 255(a)-)(b), and 258(a)-(b)).  The Court considers whether these allegations satisfy the requirement in the challenged states and District of Columbia.

36

### a.  Tennessee

Under Tennessee Code Annotated § 47-25-101 (2001) (emphasis added),

> [a]ll arrangements, contracts, agreements, trusts, or
> combinations between persons or corporations made with a
> view to lessen, or **which tend to lessen, full and free
> competition in the importation or sale of articles
> imported into this state,** or in the manufacture or sale of
> articles of domestic growth or of domestic raw material, and
> all arrangements, contracts, agreements, trusts, or
> combinations between persons or corporations designed, or
> which tend, to advance, reduce, or control the price or the
> cost to the producer or the consumer of any such product or
> article, are declared to be against public policy, unlawful,
> and void.

The provision was interpreted in Freeman Indus., LLC v. Eastman Chem. Co.,
172 S.W.3d 512, 516 (Tenn. 2005).  The state court concluded that "the proper
standard for determining whether a case falls within the scope of the [statute] is a
substantial effects standard."  Id.  Because the out-of-state plaintiff in the case before
the court never alleged that it purchased the price-fixed product from a defendant with
ties to Tennessee, the court found the standard was not satisfied.  That is not the case
here, where in-state IPPs allege they purchased vehicles containing price-fixed
products in Tennessee.  Accordingly, the Court rejects Collective Defendants' request
for dismissal.

### b.  District of Columbia and Other States

The same outcome holds for the other states at issue.  IPPs purchased price-
fixed products that entered the state and therefore became subject to the antitrust laws
of that particular state and the District of Columbia.  IPPs have presented authority to

37

establish that their allegations satisfy the law of the District of Columbia.  Sun Dun, Inc. of Washington v. Coca-Cola Co., 740 F. Supp. 381, 397 (D. Md. 1990) (allowing discovery to ascertain whether an interstate link could be established even though none of the defendants, nor the plaintiff were residents or citizens of the District of Columbia). Further, IPPS have met the requirements of Mississippi, In re GPU II Antitrust Litig., 540 F. Supp. 2d at 1099 (holding that allegations that the defendants' conspiracy affected commerce within Mississippi, satisfied requirement that the majority of an antitrust conspiracy occur within the state) (citing Standard Oil Co. of Kentucky v. State, 107 Miss. 377, 65 So. 468, 471 (1914), overruled in part on other grounds sub nom. Mladinich v. Kohn, 250 Miss. 138, 164 So.2d 785 (1964)).  The allegations likewise satisfy South Dakota's antitrust statute, S.D. Codified Laws § 37-1-3.1, which reads:  "a contract, combination or conspiracy between two or more persons in restraint of trade or commerce any part of which is within this state is unlawful."  In re GPU II Antitrust Litig., 540 F. Supp. 2d at 1099.

The allegations also meet the pleading requirements relative to Nev. Rev. Stat. Ann. § 598A.060(1), which prohibits conduct that is part of a conspiracy in restrain of trade in Nevada.  See In re Flat Panel Antitrust Litig., 599 F. Supp. 2d at 1189 (finding similar allegations sufficient to state a claim under the Nevada statute).

The allegations before this Court differ from those found lacking and insufficient under New York law.  Specifically, in H-Quotient, Inc. v. Knight Trading Grp., Inc., 03 CIV. 5889 (DAB), 2005 WL 323750 (S.D. N.Y. Feb. 9, 2005), the plaintiff included no allegation that intrastate conduct, or New York's local interests, were affected by the challenged conduct.  That is not the case here.

38

Pursuant to the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA"), N.C. Gen Stat. § 75-1 et seq, "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." In Lawrence v. UMLIC-Five Corp., No. 06 CVS 20643, 2007 WL 2570256, at *5-6 (N.C. Super. Ct., June 18, 2007), the state court held that a foreign plaintiff may proceed under the NCUDTPA against a resident defendant even when the injury did not occur in North Carolina, provided the injuries have a "substantial in-state effect on North Carolina trade or commerce." Jacobs v. Cent. Transp. Inc., 891 F.Supp. 1088, 1112 (E.D.N.C.1995), aff'd in relevant part, rev'd in part, 83 F.3d 415 (4th Cir. 1996). EPPs include a North Carolina resident who was injured when he purchased a WHS. This allegations satisfied EPPs' burden. Accord In re Flonase Antitrust Litig., 692 F. Supp. 2d 524, 540-41 (E.D. Pa. 2010) (considering whether allegations that large amounts of product sold in North Carolina at artificially inflated prices satisfied the substantial in-state effect required by the statute).

Lastly, West Virginia antitrust law "is directed towards intrastate commerce." State ex rel. Palumbo v. Graley's Body Shop, Inc., 425 S.E.2d 177, 183 n.11 (W. Va. 1992). The allegations in the complaints here allege an impact on intrastate commerce.

In sum, IPPs have alleged that WHS were transported into these states and purchased by IPPs. Therefore, the price-fixed products entered into the stream of commerce in these states and caused injury, thereby triggering the antitrust laws of the states. As is the case with many other allegations in IPPs' complaints, they still will have to prove those pleaded facts.

39

### 4. Availability of Class Action in Illinois

Collective Defendants argue that the ADPs' claim on behalf of themselves and as representatives of classes of Illinois consumers must be dismissed.  Illinois does not allow an indirect purchaser plaintiff to maintain an antitrust claim as a class action.  740 Ill. Comp. Stat. §10/7(2); In re Digital Music Antitrust Litig., 812 F. Supp. 2d 390, 415-16 (2011) (dismissing putative class action under Illinois antitrust law).

In Shady Grove Orthopedic Assoc. v. Allstate ins. Co., 559 U.S. 393, 130 S.Ct. 1431, 1445 (2010), the Supreme Court held that Rule 23 applies in federal court unless it "abridge[s], enlarge[s] or modif[ies] any substantive right" under the Rules Enabling Act, 28 U.S.C. §2072(b).  Although ADPs agree that the Act bars class actions, they maintain that the bar is procedural and inapplicable in federal courts.

The dispute turns on the language of the statute itself.  It reads:

> Any person who has been injured in his business or property, or is threatened with such injury, by a violation of [the Illinois antitrust statute] may maintain an action in the Circuit Court for damages, or for an injunction, or both, against any person who has committed such violation. . . .

> No provision of this Act shall deny any person who is an indirect purchaser the right to sue for damages. . . . Provided further that no person shall be authorized to maintain a class action in any court of this State for indirect purchasers asserting claims under this Act, with the sole exception of this State's Attorney General, who may maintain an action parens patriae as provided in this subsection.

740 Ill. Comp. Stat. 10/7(2).

The court in In re Digital Music Antitrust Litig., 812 F. Supp. 2d 390, 416 (S.D. N.Y. 2011), considered the very argument raised here and concluded that the

procedure was "so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy."  The court based its conclusion on several factors:  that the procedural rule was contained in the same paragraph of the same statute as the substantive right; and that the policy judgment reflected in the statute addresses management of duplicative recovery by entrusting class actions to the attorney general.  Id.  ADPs do not challenge the reasoning and fail to demonstrate it is faulty.  Accordingly, the Court dismisses ADPs' antitrust claim under Illinois law.

### D.  Availability of Relief under State Consumer Protection Laws

Although End-Payor Plaintiffs did not oppose dismissal of their claims under Montana law, they proceed on their claims that Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts in violation of the laws of California (Doc. No. 174 at ¶ 265), the District of Columbia (Id. at ¶ 266), Florida (Id. at ¶ 267), Hawaii (Id. at ¶ 268), Massachusetts (Id. at ¶ 269), Missouri (Id. at ¶ 270), New Mexico (Id. at ¶ 272), New York (Id. at ¶ 273), North Carolina (Id. at ¶ 274), Rhode Island (Id. at ¶ 275), and Vermont (Id. at ¶ 276).

The Court already dismissed some of the consumer protection claims brought by ADPs.  The remaining claims are brought under the laws of Arkansas (Doc. No. 85 at ¶ 262), California (Doc. No. 85 at ¶ 263), Florida (Doc. No. 85 at ¶ 265), Hawaii (Doc. No. 85 at ¶ 266), Illinois (Doc. No. 85 at ¶ 267), Iowa (Doc. No. 85 at ¶ 268), Maine (Doc. No. 85 at ¶ 270), Massachusetts (Doc. No. 85 at ¶ 271), Mississippi (Doc. No. 85 at ¶ 274), Missouri (Doc. No. 85 at ¶ 275), Montana (Doc. No. 85 at ¶ 276), Nebraska (Doc. No. 85 at ¶ 277), Nevada (Doc. No. 85 at ¶ 278), New Hampshire (Doc. No. 85 at ¶ 279), New York (Doc. No. 85 at ¶ 281), Oregon (Doc. No. 85 at ¶ 284), South Carolina

41

(Doc. No. 85 at ¶ 285), Tennessee (Doc. No. 85 at ¶ 287), Utah (Doc. No. 85 at ¶ 288), Vermont (Doc. No. 85 at ¶ 289), West Virginia (Doc. No. 85 at ¶ 290), and Wisconsin (Doc. No. 85 at ¶ 291).

Collective Defendants raise several arguments in support of dismissal, including failure to plead fraud with particularity, failure to allege unconscionable conduct or aggravating circumstances, the prohibition on price-fixing claims brought under the consumer protection laws, lack of standing, failure to allege a sufficient nexus between conduct and commerce; failure to meet the definition of consumer; remoteness; and class action restrictions.  The arguments are discussed below.

### 1. Pleading Fraud with Particularity

Collective Defendants maintain that neither ADPs nor EPPs allege fraud or deception with any particularity.  At most their complaints allege that Defendants "wrongfully concealed" their actions by "using code names and arranging meetings at private residences and remote locations. (See e.g. Doc. No. 85 at 236, 238).  None of those statements is identified.  Further, EPPs admit that they had no direct contact or interaction with any of the Defendants and had no means of obtaining any facts or information concerning any aspect of Defendants' dealings with OEMs or other direct purchasers.  (Doc No. 175 at ¶¶ 205, 206).  Based upon the allegations, Collective Defendants conclude that the consumer protection claims under Florida, Michigan, Minnesota, North Dakota, and South Dakota law fail to meet Rule 9(b)'s requirement that a Plaintiff allege "with particularity the circumstances constituting fraud or mistake." See Fed. R. Civ. P. 9(b).  Because IPPs only bring a consumer protection claim under

Florida law, and not the law of the other states raised in Collective Defendants' brief, the Court limits its discussion to the consumer protection law of Florida.

Collective Defendants cite In re Packaged Ice Antitrust Litig., 779 F. Supp. 2d 642, 665 (E.D. Mich. 2011), as support for their position that IPPs have failed to state a claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.204, because the allegations must be pled with the particularity required under Rule 9(b).  The decision in In re Packaged Ice, referenced three unpublished decisions in reaching its conclusion.  Id. at 665.  See Sunoptic Technologies, LLC v. Integra Luxtec, Inc., No. 08-cv-878, 2009 WL 722320 at *4 (M.D. Fla. Mar. 18, 2009); Wrestlereunion, LLC v. Live Nation Television Holdings, Inc., No. 8:07-cv-2093, 2008 WL 3048859 *3 (M.D. Fla. Aug. 4, 2008); Fla. Digital Network, Inc. v. N. Telecom, Inc., No. 6:06-cv-889, 2006 WL 2523163 *5 (M.D. Fla. Aug. 30, 2006).

In a published opinion, Galstaldi v. Sunvest Communities USA, LLC, 637 F. Supp. 2d 1045, 1058 (S.D. Fla. 2009), the federal district court rejected the notion that Rule 9(b) applies to FDUTPA claims.  The court observed that "FDUTPA was enacted to provide remedies for conduct outside the reach of traditional common law torts such as fraud, and therefore, 'the plaintiff need not prove the elements of fraud to sustain an action under the statute.'" Id. at 1058 (citations omitted).  The court concluded that Rule 9(b) does not apply to FDUTPA claims; thus, its requirements cannot serve as a basis to dismiss those claims.  In addition, in State, Office of Atty. Gen., Dep't of Legal Affairs v. Wyndham Int'l, Inc., 869 So.2d 592, 598 (Fla. Dist. Ct. App. 2004), the state appellate court held that "[a] deceptive or unfair trade practice constitutes a somewhat unique tortious act because, although it is similar to a claim of fraud, it is different in

43

that, unlike fraud, a party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue."

Accordingly, the Court finds that Rule(9) is inapplicable to Plaintiff's FDUTPA claims, and the claims survive.

### 2.  Unconscionable Conduct/Aggravating Circumstances

Next, Collective Defendants challenge ADPS' claims under the consumer protection statute of Arkansas and EPPs' claims under the statutes of the District of Columbia, New Mexico, and North Carolina.  The arguments are addressed below.

### a.  Arkansas

Under Arkansas law, deceptive and unconscionable trade practices are prohibited including, among other things "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade."  See Ark. Stat. Ann. § 4-88-107(a) (10).  To state a claim under the Arkansas Deceptive Trade Practices Act ("ADTPA"), the ADPs must allege that Defendants engaged in an "unconscionable, false, or deceptive act or practice."  In Independence City v. Pfizer, Inc., 534 F. Supp. 2d 882, 886 (E.D. Ark. 2008), aff'd 552 F.3d 659 (8th Cir. 2009), the court observed that the Arkansas Supreme Court defined an unconscionable act as one that "affronts the sense of justice, decency, or reasonableness, including acts that violate public policy or a statute."  Moreover, the Act is construed liberally inasmuch as it was enacted "to protect the interest of both the consumer public and legitimate business community. Curtis Lumber Co. v. La. Pacific Corp., 618 F.3d 762, 780 (8th Cir. 2010).  See also In re Flash Memory Antitrust Litig., 643 F. Supp. 2d 1133, 1156-57 (N.D. Cal. 2009).

44

Because the statute does not limit itself to unconscionable acts–false or deceptive acts are all that is needed under the statute–ADPs have stated a claim.

### b.  District of Columbia

Section 28-3904, entitled "Unlawful trade practices," makes it unlawful to enforce unconscionable terms or provisions of sales.  The statute details factors to consider:

> (1) knowledge by the person at the time credit sales are consummated that there was no reasonable probability of payment in full of the obligation by the consumer;
>
> (2) knowledge by the person at the time of the sale or lease of the inability of the consumer to receive substantial benefits from the property or services sold or leased;
>
> (3) gross disparity between the price of the property or services sold or leased and the value of the property or services measured by the price at which similar property or services are readily obtainable in transactions by like buyers or lessees;
>
> (4) that the person contracted for or received separate charges for insurance with respect to credit sales with the effect of making the sales, considered as a whole, unconscionable; and
>
> (5) that the person has knowingly taken advantage of the inability of the consumer reasonably to protect his interests by reasons of age, physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of the agreement, or similar factors.

Id.

Nevertheless, the statute does not include an exclusive or exhaustive list, District Cablevision Ltd. P'ship v. Bassin, 828 A.2d 714, 723 (D.C. 2003), and courts have allowed plaintiffs to proceed with a claim of price-fixing under the statute without

45

additional unconscionable allegations.  See In re Flat Panel, 586 F. Supp. 2d at 1126.

"A main purpose of the [Act] is to 'assure that a just mechanism exists to remedy all

improper trade practices.'"  Id. (citing D.C.Code § 28-3901(b)(1)).  "Trade practices that

violate other laws, including the common law, also fall within the purview of the

[statute]."  Id.; Accord Osbourne v. Capital City Mortg. Corp., 727 A.2d 322, 325-26

(D.C. 1999).  Based on the case law, the Court finds EPPs have met their burden.

### c.  New Mexico

Under the law of New Mexico, unfair or deceptive trade practices as well as

"unconscionable trade practices in the conduct of any trade or commerce" are

prohibited.  N.M. Rev. Stat. § 57-12-2. The statute "defines an unconscionable trade

practice as 'an act or practice. . .which to a person's detriment: (1) takes advantage of

the lack of knowledge, ability, experience or capacity of a person to a grossly unfair

degree; or (2) results in a gross disparity between the value received by a person and

the price paid."  N.M. Rev. Stat. § 57-12-2(E).

To support their claim under New Mexico's Unfair Practices Act, EPPs allege

that the conspiracy resulted in significant artificial increases in the price of WHS,

leading to a "gross disparity" between the value received by the New Mexico plaintiff

and class and the prices paid by them for the WHS. (Doc. No. 174 at ¶ 272(b)).

Collective Defendants ask for dismissal of these state law claims because merely

pleading that the price of a product was unfairly high is insufficient to state a claim

under the statute.  See GPUI, 527 F. Supp. 2d at 1029-30 (finding that

unconscionability requires something more than merely alleging that the price of a

product was unfairly high" and dismissing price fixing claim).

46

The Court finds EPPs have satisfied their pleading obligation.  As noted by the district court in In re Flat Panel, 586 F. Supp. 2d at 1127, the defendants' reliance on In re GPU I, in misplaced.  In that case, the indirect purchasers' claims under the New Mexico statute were dismissed because the plaintiffs had not alleged that as a result of the price-fixing conduct, a "gross disparity in the value of products received and the amount that they paid for those products" existed.  Id.  See also In re Chocolate, 602 F. Supp. 2d 851 F. Supp. 2d at 902-905; In re New Motor Vehicles, 350 F. Supp. 2d at 196.  Accordingly, EPPs' claims conform to the pleading requirements of Rule 12(b)(6).

### d.  North Carolina

The North Carolina Unfair Trade Practices Act ("UTPA"), N.C. Gen. Stat. § 75-1.1, contains broad-sweeping language that declares unlawful, "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."  Collective Defendants assert that a plaintiff must allege some type of egregious or aggravating circumstances to state a claim under the UTPA.  See Dalton v. Camp, 548 S.E.2d 704, 711 (N.C. 2001).

In Dalton, the court articulated the elements of a claim for unfair trade practices. To prevail, "a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff."  548 S.E.2d at 711 (citing Spartan Leasing Inc. v. Pollard, 101 N.C.App. 450, 461, 400 S.E.2d 476, 482 (1991)).  The Dalton court, which was presented with a breach of contract claim, added that "[s]ome type of egregious or aggravating circumstances must be alleged and proved before the [Act's] provisions may [take effect]."  Id. (quoting Allied Distribs., Inc. v. Latrobe Brewing Co.,

47

847 F.Supp. 376, 379 (E.D. N.C.1993).  Because the Act allows for treble damages,

allegations beyond a breach of contract must be pleaded.  The rationale is consistent

with an earlier decision of the state court.

 Specifically, in ITCO Corp. v. Michelin Tire Corp., Commercial Div., 722 F.2d 42,

47-48 (4th Cir. 1983) on reh'g, 742 F.2d 170 (4th Cir. 1984), the court held "that proof of

conduct violative of the Sherman Act is proof sufficient to establish a violation of the

North Carolina Unfair Trade Practices."  Price-fixing is the type of commercial conduct

the Act was designed to target.  The need for allegations of aggravating circumstances

relates to claims wherein a plaintiff seeks recovery for breach of contract.  See Branch

Banking & Trust Co. v. Thompson, 418 S.E.2d 694, 700 (N.C. Ct. App. 1992).

Therefore, the Court denies Collective Defendants' request for dismissal on this basis.

### 3. Price Fixing

Collective Defendants object to IPPs' relabeling of antitrust price-fixing claims as

state consumer protection claims. They assert that the relabeling renders claims of

price-fixing under the laws of several states subject to dismissal.  At the outset the

Court narrows its discussion to those states where IPPs actually pursue claims under

the consumer protection law.  ADPs bring a claim under Arkansas law.  EPPs advance

claims under the laws of New Mexico and Rhode Island.

### a. Arkansas

Collective Defendants assert that the Arkansas consumer protection statute

does not cover price-fixing.  To state a claim under the Arkansas Deceptive Trade

Practices Act ("ADTPA"), the ADPs must allege that Defendants engaged in an

48

"unconscionable, false, or deceptive act or practice."  Ark. Code Ann. § 4-88-107(a)(10).

See GPU I, 527 F. Supp. 2d at 1029-31 (dismissing consumer protection claims under

the Arkansas statute because price-fixing claims are "not the kind of conduct

prohibited").  The GPU I decision referenced State ex rel. Bryant v. R & A Inv. Co., Inc.,

985 S.W.2d 299, 302 (Ark. 1999) (holding that the statute was broad enough to

encompass usury), wherein the Supreme Court of Arkansas addressed the history and

scope of the provision:

> The words 'and unconscionable' were added to section 4-88-107(a) and (b) by Act 587 of 1993. Section 4-88-107(b) illustrates that liberal construction of the DTPA is appropriate, as it provides that '[t]he deceptive and unconscionable trade practices listed in this section **are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state.**'

Id. (emphasis added).  The state supreme court also noted the remedial purpose of the

Act in advocating a liberal construction.  And for that reason, the court in In re

Chocolate Confectionary Antitrust Litig., 602 F. Supp. 2d 538, 583 (M.D. Pa. 2009)

rejected the argument raised here by Collective Defendants.  The Court finds the

reasoning persuasive.  The statute does not limit its protection to unconscionable acts.

It merely requires false or deceptive acts or practices.  Accordingly, the Court will allow

the price-fixing claim under the consumer protection law of Arkansas to proceed.

### b.  New Mexico

In the Court's discussion of the parties' argument as to the requirement that

EPPs must allege aggravating factors to pursue a consumer protection claim under the

law of New Mexico, it set forth authority allowing price-fixing claims under the statute.

49

The Court reiterates Collective Defendants' position that In re GPU I, 527 F. Supp. 2d at 1029-1031, is authority for its position lacks merit.  The In re GPU I decision merely held the indirect purchasers' claims under the New Mexico statute failed to state a claim because they never alleged a "gross disparity in the value of products received and the amount that they paid for those products" existed as a result of price-fixing conduct. See also In re Chocolate, 602 F. Supp. 2d 851 F. Supp. 2d at 902-905; In re New Motor Vehicles, 350 F. Supp. 2d at 196.  Therefore, Collective Defendants' argument provides no basis for dismissal of the consumer protection act claims.

### c.  Rhode Island

The Rhode Island Unfair Trade Practice and Consumer Protection Act ("RIUTPCPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  R.I. Gen. Laws § 6-13.1-2. Collective Defendants note that price-fixing claims under the Rhode Island consumer protection law were dismissed in In re GPU I, 527 F. Supp. 2d at 1029-1031, and in In re DRAM I, 516 F. Supp. 2d at 1117.

The statute enumerates twenty methods of unfair or deceptive competition, including conduct that "creates a likelihood of confusion or of misunderstanding."  Id. § 6-13.1-1(6)(xii). In looking to determine whether a practice is "unfair" under the statute, state courts consider:

> (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes

substantial injury to consumers (or competitors or other
businessmen).

Ames v. Oceanside Welding & Towing Co., Inc., 767 A.2d 677, 681 (R.I. 2001) (citing

FTC v. Sperry & Hutchinson Co., 405 U.S. 233, 244-45 n. 5 (1972)).

In reviewing these factors several courts have determined that price-fixing

injuries fall within the scope of the statute and have allowed consumers alleging a price-

fixing claim to proceed under the RIUTPCPA.  In re Chocolate Confectionary Antitrust

Litig., 602 F. Supp. 2d 538, 586 (M.D. Pa. 2009) (citing In re Flat Panel, 586 F. Supp.

2d at 1129-30; In re (DRAM II), 536 F. Supp. 2d at 1144-45 (observing that price fixing

is "likely to offend public policy[,]" as reflected by statutes proscribing anticompetitive

activity).

Therefore, the EPPs' claim under the consumer protection act of Rhode Island

survives.

### 4.  Standing under New York Law

The New York General Business Law ("GBL") § 349(a), prohibits "[d]eceptive

acts or practices in the conduct of any business, trade or commerce in the furnishing of

any service in this state."  To advance a claim under § 349, a plaintiff must allege a

deceptive act or practice" directed at a consumer and one that resulted in actual injury

to the plaintiff.  JPMorgan Chase Bank, N.A. v. Controladora Comercial Mexicana

S.A.B. De C.V., 920 N.Y.S.2d 241 (Sup. Ct. 2010).  Collective Defendants assert that

New York courts dismiss claims brought under this provision when the plaintiffs allege

price-fixing, but do not allege any misrepresentation directed at the indirect purchasers.

New York v. Daicel Chem. Indus., Ltd., 840 N.Y.S.2d 8 (N.Y. App. Div. 2007) (noting

that the "provision applies to conduct premised on the deception of consumers").

Accord Paltre v. Gen. Motors Corp., 810 N.Y.S.2d 496 (N.Y. App. Div. 2006)

(dismissing claim under § 349 because the alleged misrepresentations were either not

directed at consumers or were not materially deceptive).  Because the IPPs admit that

they had no direct contact with Defendants, they cannot state a claim under New York

law.

Nevertheless, authority exists demonstrating that an antitrust claim may be

viable under § 349.  Cox v. Microsoft Corp., 778 N.Y.S.2d 147, 148 (N.Y. App. Div.

2004).  In support of their claim, EPPs allege that New York consumers paid inflated

prices, that Defendants took efforts to conceal their agreement from New York plaintiffs

and the indirect class.  (Doc. No. 174 at ¶ 273).  Similar allegations satisfied the court

that the claim was viable in In re DRAM II, 536 F. Supp. 2d at 1143-44.  Accord In re

Flat Panel, 586 F. Supp. 2d at 1128 (citing In re GPU I, 527 F. Supp. 2d at 1030)

(denying motion to dismiss claim under § 349 where "Plaintiffs have alleged at least in a

conclusory fashion that defendants have engaged. . .in deceptive acts to conceal the

alleged agreement to fix prices.").  Accordingly, the claim can proceed.

### 5.  Nexus between Conduct and Intrastate Commerce

Collective Defendants challenge claims under the consumer protection laws of

California, Montana, New Hampshire, New York, and North Carolina.  According to

Collective Defendants, the complaints lack any allegations that any of the offending

conduct took place within the state or had an effect on intrastate commerce.  The

arguments are analyzed state by state below; however, the Court only considers claims

52

under California and Montana law as those are the only jurisdictions addressed in IPPs' response brief.  (See Doc. No. 390 at 25-26).

### a.  California

Collective Defendants argue that IPPs do not allege any of the challenged conduct took place in California; therefore, the claim under California law fails.  In Meridian Project Sys. Inc. v. Hardin Constr. Co., 404 F. Supp. 2d 1214, 1225 (E. D. Cal. 2005), the court dismissed an unfair competition claim under California law against an out-of-state defendant because "no specific intrastate misconduct" was alleged in the complaint.  The dismissal was warranted because the plaintiff explicitly alleged that the misconduct occurred in Illinois.  Under case law from California, "claims by nonCalifornia residents where none of the alleged misconduct or injuries occurred in California" do not state a claim.  See Norwest Mortgage, Inc. v. Superior Court, 85 Cal.Rptr.2d 18 (Cal Ct. App. 1999).

Clearly the statute does not apply to extraterritorial conduct, but IPPs assert that the allegations here are distinguishable. They have included allegations that anticompetitive conduct caused supracomepetitive price effects nationwide, which they assert meets the "intrastate effects" requirement.  To support their position, they cite In re Packaged Ice, 779 F. Supp. 2d 642, 664 (E. D. Mich. 2011) (citing cases holding that nationwide price-fixing schemes sufficient to satisfy the intrastate effects element).  The Court agrees that the allegations are sufficient to survive this motion.

### b. Montana

IPPs bring a claim under Montana's Unfair Trade Practices Act ("MUTPA"). <u>See</u> Mont. Code Ann. § 30-14-101 <u>et</u> <u>seq</u>.  Collective Defendants rely on <u>In re DRAM I</u>, 516 F. Supp. 2d at 1104, to support their position that claims under the MUTPA must be dismissed where the plaintiff fails to allege "any conduct or activity taking place within the state that sets forth a basis for connecting the individual claims with representative claims under. . .Montana. . .statutes."

Here ADPs allege that plaintiffs and members of the proposed classes "purchased new vehicles containing Automotive Wire Harness Systems or Automotive Wire Harness Systems themselves from OEMs. . .in each state having laws permitting recovery of damages by indirect purchasers. . .who in turn purchased Automotive Wire Harness Systems from Defendants."  (Doc No. 85 at ¶ 139).  ADPs also allege that the challenged conduct was "intentionally directed at the market for Automotive Wire Harness Systems in all states allowing indirect purchasers to collection damages. . .and had a substantial and foreseeable effect on intrastate commerce by raising and fixing prices for Automotive Wire Harness Systems throughout those states."  (Doc. No. 85 at ¶¶ 259, 292).  These allegations satisfy their burden.

### 7. Availability of Protection of Businesses

Collective Defendants also dispute Automobile Dealer Plaintiffs' ability to bring claims under the consumer protection laws of Massachusetts, Montana, and Missouri. The Court considers the parties' arguments below.

### a. Massachusetts

Although Collective Defendants assert that ADPs may not bring claims under Missouri, Montana, and Massachusetts law, the only case law offered is from Massachusetts. In Ciardi v. F. Hoffmann-La Roche, Ltd., 762 N.E.2d 303, 309 (Mass. 2002), the state court allowed individuals who were indirect purchasers of vitamin products to sue for anticompetitive conduct under § 9 of the Massachusetts consumer protection statute. In contrast, § 11 of the Mass. Gen. Laws Ann. ch. 93A, which governs consumer protection claims of unfair or deceptive trade practices as between businesses, In re TJX Cos. Retail Sec. Breach Litig., 564 F.3d 489, 495 (1st Cir. 2009), has not been extended to indirect purchasers. Specifically, under § 11, "the court shall. . .be guided in its interpretation of unfair methods of competition by those provisions of chapter ninety-three known as the Massachusetts Antitrust Act." Accordingly, "the Illinois Brick approach is taken under the Massachusetts Antitrust Act and G.L. c. 93A, § 11." Ciardi, 762 N.E.2d at 321. Consequently, this Court is bound to enforce the bar prohibiting an indirect purchaser business plaintiff from proceeding, and the Court finds Collective Defendants' request for dismissal of ADPs' consumer protection law claims must be granted.

### b. Missouri

Collective Defendants cite the Missouri statute, Mo. Rev. Stat. § 407.025, which provides a private civil cause of action for persons who purchase or lease merchandise primarily for "personal, family or household purposes." They conclude that the language of the statute precludes the Automobile Dealer Plaintiffs. This Court agrees.

ADPs argue that as "'intermediaries' they are protected because they purchase vehicles in bulk not for their own commercial use," but to pass them "to persons and entities who will devote the automobiles to 'personal, family, or household purposes.' " (Doc. No. 390 at 28). ADPs' position is contrary to the plain language of the statute, which limits the claims to the actual consumers, not the intermediaries. ADPs have offered no authority from Missouri to support their expansive interpretation of the statutory language. Accordingly, the Court dismisses the ADPs' claim under the consumer protections laws of Missouri.

### c. Montana

Montana's statute similarly provides a private right of action to consumers, defined as persons how purchase or lease "goods primarily for personal, family or household uses." Mont. Code § 30-14-133. Again the Court finds no basis for allowing ADPs to proceed under Montana consumer protection law.

### 8. Remoteness

Collective Defendants' request that the Court dismiss the consumer protection claims brought under Arkansas, Nebraska, New York, and Vermont on the basis of remoteness. The Court already rejected Collective Defendants' remoteness argument relative to antitrust considerations under AGC. Because the allegations advanced in support of the antitrust claims support the consumer protection claim, the Court finds it unnecessary to repeat the analysis, and the request is denied.

### 9.  Class Action Bar

Collective Defendants assert that IPPs are barred from bringing their consumer protection claims under the laws of Kansas, Mississippi,  Montana, and South Carolina because each of these states prohibits class actions.  In the response brief, IPPs assert that ADPs have not brought a consumer protection claim under either Mississippi or Kansas law.  IPPs respond only to the arguments under Montana and South Carolina law.  Because the authority cited is applicable to both states, the Court makes no separate analysis.

Collective Defendants rely on In re DRAM I, 516 F. Supp. 2d at 1004, to support their argument that the statutes of Montana and South Carolina do not allow private class action suits for money damages.  Specifically, Mont. Code Ann. § 30-14-133(1) allows consumers to "bring an individual, but not a class action."  Likewise, S.C. Code Ann. § 39-5-140 only authorizes individual actions.

Although the language is quite clear, Collective Defendants have not met their burden to show dismissal is required.  In re DRAM I, was decided three years before Shady Grove.  Collective Defendants do not provide any analysis or support post Shady Grove to support their position.  Shady Grove, 130 S.Ct. at 1437-38, made it clear that class certification in federal court is governed by Rule 23.  Moreover, more recent authority rejected South Carolina's class prohibition as a basis for dismissal of a class action.  In re Optical Disk Drive Antitrust Litig., 3:10-MD-2143 RS, 2012 WL 1366718 (N.D. Cal. Apr. 19, 2012).

### D.  Unjust Enrichment

In support of their unjust enrichment claim, End-Payor Plaintiffs assert that as a result of the unlawful conduct Defendants have and continue to be unjustly enriched (Doc. No. 174 at ¶ 278).  According to EPPs, it would be inequitable to allow Defendants to retain their "ill-gotten gains." (Id. at ¶ 279).  ADPs allege the same (see Doc. No. 85 at ¶¶ 298-99), but add that pursuit of remedies against the OEMs, from whom ADPs purchased vehicles containing price-fixed wire harness systems, would be futile because the OEMs were not part of the conspiracy (Doc. No. 85 at ¶ 300).

The Court agrees with Collective Defendants that IPPs' failure to identify the unjust enrichment laws of any particular jurisdiction subjects the causes of action to dismissal.  There is no federal common law of unjust enrichment, see In re Wellbutrin XL Antitrust Litig., 260 F. R. D. 143, 167 (E. D. Pa. 2009), and courts have recognized that a federal remedy would be contrary to the Supreme Court's holding in Illinois Brick. See In re Motor Vehicles Canadian Exp. Antitrust Litig., 250 F. Supp. 2d 160, 211 (D. Me. 2004).  Accord In re Chocolate Confectionary Antitrust Litig., 602 F. Supp. 2d 538, 587 (M.D. Pa. 2009).  Therefore, the Court grants Collective Defendants' request to dismiss IPPs' respective claims of unjust enrichment.

### E.  Injunctive Relief

Indirect Purchaser Plaintiffs ask the Court for an injunction preventing Defendants from "continuing and maintaining" the price-fixing conspiracy.  (Doc. No. 85 at 84, Prayer for Relief at ¶ E; Doc. No. 174 at 94, Prayer for Relief at ¶ E).  The request is authorized under the Clayton Act, which provides that "[a]ny person, firm,

58

corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws."  15 U.S.C. § 26.

In challenging the request, Collective Defendants argue that the complaints lack the factual support necessary to establish a real or immediate threat of future harm. Specifically, Collective Defendants contend that the relief is undermined by the guilty pleas, the JFTC Orders, and the widespread publicity garnered by enforcement agency investigations since February 2010.

The Court finds the allegations in the respective complaints are sufficient, at this stage of the proceedings, to satisfy IPPs' burden to allege the existence of "some cognizable danger of recurrent violation."  United States v. W. T. Grant Co., 345 U.S. 629, 633 (1953).  The purpose of an injunction is to prevent future violations.  Swift & Co. v. United States, 276 U.S. 311, 326 (1928).  Speculation by Collective Defendants' that the orders, pleas, and publicity will prevent further misconduct fails to demonstrate the threat of future injury is implausible, particularly in light of the length of the conspiracy alleged and the market conditions.  This Court is not in a position to render an assessment that injunctive relief cannot be had at this stage of the proceedings. Accordingly, the Collective Defendants' request is denied.

## V.  CONCLUSION

For the reasons discussed above, the Court **GRANTS** in part and **DENIES** in part Collective Defendants' motion.

59

ADPs' antitrust claims under Massachusetts, Missouri, and Illinois are

**DISMISSED**.  The applicable statutes of limitation limit damages under the laws of Utah

and New Hampshire.  ADPs' consumer protection claims under Arizona, Iowa, Kansas,

Massachusetts, Michigan, Mississippi, Missouri, Montana, New Hampshire, New

Mexico, Nebraska, New York, North Carolina, North Dakota, Rhode Island, South

Dakota, Vermont, and the District of Columbia are **DISMISSED**.

End-Payor Plaintiffs' antitrust claims under the laws of Massachusetts are

**DISMISSED**.

**IT IS SO ORDERED.**


s/Marianne O. Batani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE


Date:  June 6, 2013

CERTIFICATE OF SERVICE

I hereby certify that on the above date a copy of this Opinion and Order was
served upon all parties of record via the Court's ECF Filing System.

s/Bernadette M. Thebolt
Case Manager