# EXHIBIT 3

KeyCite Yellow Flag - Negative Treatment
Distinguished by In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation, 3rd Cir.(Pa.), March 12, 2004

246 F.3d 315
United States Court of Appeals,
Third Circuit.

In re ORTHOPEDIC BONE SCREW PRODUCTS
LIABILITY LITIGATION.
Alexander Sambolin, Appellant.

No. 99–2054.
|
Argued Sept. 13, 2000.
|
Filed April 16, 2001.

## Synopsis

In orthopedic bone screw products liability class action, the United States District Court for the Eastern District of Pennsylvania, Louis C. Bechtle, J., denied a claimant participation in the mandatory, non-opt-out settlement class because of his failure to comply with the registration deadline imposed, and claimant appealed. The Court of Appeals, Ambro, Circuit Judge, held that the district court abused its discretion in excluding claimant from sharing in the class action settlement fund simply because he failed to meet the registration deadline.

Reversed and remanded.

**Procedural Posture(s):** On Appeal.

West Headnotes (6)

**[1]** **Compromise, Settlement, and Release**⬤Time for notice and communications

While deadlines are an integral component of effective consolidation and management of a mass tort class action, rigid and unquestioned adherence to such limitations belies principles of equity and the court's role as a fiduciary in class actions when allowing a claimant participation in a settlement works no harm on the conduct of the proceedings and does not significantly prejudice the interests of the parties.

Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

11 Cases that cite this headnote

**[2]** **Federal Courts**⬤Class actions

The district court's exercise of its equitable authority to excuse late filings for participation in class action settlement is only reviewable for an abuse of discretion, and Court of Appeals refrains from substituting its judgment for that of the district court insofar as its holding is reasonable and supported by the evidence.

17 Cases that cite this headnote

**[3]** **Compromise, Settlement, and Release**⬤Time for filing claims; late claims

The equitable powers of the district courts to manage class action settlements are retained by the court until the settlement fund is actually distributed, and a primary use of these equitable powers is balancing the goals of expedient settlement distribution and the consideration due to late-arriving class members. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

11 Cases that cite this headnote

**[4]** **Compromise, Settlement, and Release**⬤Time for notice and communications

There is no per se rule that doctrine of excusable neglect is unavailable to a party whose untimely filing of claim to participate in class action settlement was due to circumstances within his or her control.

4 Cases that cite this headnote

In re Orthopedic Bone Screw Products Liability Litigation, 246 F.3d 315 (2001)

49 Fed.R.Serv.3d 655

**[5]**   **Compromise, Settlement, and Release**⚬Time for notice and communications

The following factors would be considered in determining whether late registrant of claim for participation in class action settlement should have the benefit of the doctrine of excusable neglect: (1) the danger of prejudice to the parties; (2) the length of the delay and its potential effect on judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the claimant; and (4) whether the claimant acted in good faith. 📑Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

62 Cases that cite this headnote

**[6]**   **Compromise, Settlement, and Release**⚬Time for notice and communications

District court abused its discretion in excluding claimant from sharing in a class action settlement fund simply because he failed to meet the registration deadline; claimant met requirements for excusable neglect, since loss of a windfall to timely registrants is not prejudicial, the effect of late registrants' inclusion would be marginal, registration form was seven months late but proof of claim was timely, failure to comply with that deadline would not deter the expedient and just resolution of claims, delay resulted from claimant's lack of awareness, in light of the minimal constructive notice provided by the parties, and no party alleged that claimant exhibited less than good faith in seeking redress for his injury. 📑Fed.Rules Civ.Proc.Rule 23(b)(1)(B), 📑(b)(3), 28 U.S.C.A.

42 Cases that cite this headnote

**Attorneys and Law Firms**

**\*316** Brian S. Wolfman (Argued), Public Citizen Litigation Group, Washington, D.C., Counsel for Appellant.

Richard I. Werder, Jr. (Argued), Deborah L. Hamilton, Jones Day Reavis & Pogue, Cleveland, OH, Counsel for Appellee AcroMed Corporation.

Frederick S. Longer (Argued), Arnold Levin, Levin, Fishbein, Sedran & Berman, Philadelphia, PA, Counsel for Appellee Plaintiffs' Legal Committee.

Robert E. Welsh, Jr. (Argued), Welsh & Recker, P.C., Philadelphia, PA, Counsel for Intervenor Robert E. Welsh, Jr.

Before: BECKER, Chief Judge, NYGAARD and AMBRO, Circuit Judges.

**OPINION OF THE COURT**

AMBRO, Circuit Judge

Alexander Sambolin appeals from an order of the United States District Court for the Eastern District of Pennsylvania dismissing his claim as untimely. As a result of the dismissal, Sambolin's claim fails to qualify for compensation pursuant to the multidistrict class action settlement agreement (the "Settlement Agreement") between the Appellees—AcroMed Corporation ("AcroMed") and the Plaintiffs' Legal Committee ("PLC")—approved by the District Court in *In re: Orthopedic Bone Screw Products Liability Litigation,* 176 F.R.D. 158 (E.D.Pa.1997). On appeal, Sambolin presents three arguments that the District Court improperly denied him participation in the mandatory, non-opt-out settlement class. He first maintains that the District Court abused its discretion in denying him participation in the settlement under the equitable doctrine of "excusable neglect," a doctrine whose label we find unnecessarily pejorative here but whose principles are nonetheless relevant. Sambolin next argues that the settlement's registration deadline, under which his claim is untimely, violates the equal protection and procedural due process protections of the Fifth and Fourteenth Amendments. His final contention on appeal is that the court-approved notice program in this class action was deficient under the

standards of Federal Rule of Civil Procedure 23 and due process.

[1] We forgo ruling on the constitutional challenges, for we conclude that the District Court's ruling was inconsistent with the exercise of sound discretion in denying Sambolin participation in the settlement solely for his failure to comply with the registration deadline imposed. We recognize that deadlines are an integral component of effective consolidation and management of the modern mass tort class action. *See, e.g., In re Gypsum Antitrust Cases,* 565 F.2d 1123, 1127 (9th Cir.1977). Yet rigid and unquestioned adherence to such limitations belies principles of equity and the court's role as a fiduciary in class actions when allowing a claimant participation in a settlement works no harm on the conduct of the proceedings and does **\*317** not significantly prejudice the interests of the parties. In the circumstances this case presents, we reverse the District Court's order denying Sambolin participation in the AcroMed settlement.

## I. JURISDICTION

The District Court exercised diversity jurisdiction over this multidistrict litigation matter pursuant to 28 U.S.C. §§ 1332(a) and 1407. *In re: Orthopedic Bone Screw Prods. Liab. Litig.,* 176 F.R.D. 158, 171 (E.D.Pa.1997). The order denying Sambolin participation in the settlement is a final decision of the District Court conferring jurisdiction on this Court pursuant to 28 U.S.C. § 1291.

## II. FACTS

The circumstances surrounding the pedicle bone screw litigation and resulting settlement by AcroMed have received more complete and eloquent exposition in other opinions than is required in this appeal. *See, e.g., In re: Orthopedic Bone Screw Prods. Liab. Litig.,* 193 F.3d 781, 784–87 (3d Cir.1999). As a result, we cover only the highlights and how they pertain to Sambolin's claims.

The multidistrict litigation of orthopedic bone screw

products liability claims has been directed by the nine-member PLC, which agreed, in December 1996, to settle with one of the principal manufacturers of bone screws—AcroMed. Under the terms of the Settlement Agreement,[1] AcroMed agreed to create a fund of $100 million, plus the proceeds of the bulk of its insurance policies, in return for a complete release from liability by the certified class.[2] Because the $100 million exceeded AcroMed's earnings or net assets at the time, it was obtained by monetizing AcroMed's future earnings and was conditioned on the resolution of this action. The District Court granted mandatory, non-opt-out class certification under Fed.R.Civ.P. 23(b)(1) and preliminarily approved the Settlement Agreement on January 16, 1997 in Pretrial Order ("PTO") No. 724.[3] *In re: Orthopedic Bone Screw Prods. Liab. Litig.,* No. M.D.L. 1014, 1997 WL 303242 (E.D.Pa. January 16, 1997) (hereinafter "PTO 724"). The Court's final approval of the Settlement Agreement followed on October 17, 1997. *In re: Orthopedic Bone Screw,* 176 F.R.D. at 186.

The class certified in the settlement included all persons who underwent surgical implanting of AcroMed bone screws through December 31, 1996, a group estimated by the parties to exceed 100,000. *Id.* at 170–71, 173. These class members were required by the Settlement Agreement **\*318** to file two documents to perfect their rights to recovery. First, it required claimants to file a Registration Form by May 1, 1997 to participate in the settlement. PTO 724, ¶ 12. The Registration Form required, *inter alia,* listing the claimant's name, address, age, Social Security number, legal representation and date and type of bone screw surgery. Second, the Settlement Agreement required the filing of a Proof of Claim form, which was to be drafted by the later-appointed Claims Administrator to permit an equitable distribution of the settlement fund. The Claims Administrator was appointed in January 1998 and a Proof of Claim form was agreed on by the parties and approved by the Court on January 6, 1999. PTO 1655. The Proof of Claim form contained extensive release and indemnity terms and required claimants to describe and document their medical histories with the AcroMed bone screws in some detail. It further stated that it must be mailed to the Claims Administrator postmarked no later than April 15, 1999. The Court was unequivocal in its statement of the consequence of a failure to file timely both forms. "Settlement Class Members who are AcroMed Orthopedic Bone Screw Recipients and who do not timely Register and submit Claims Forms are not entitled to share in the AcroMed Settlement Fund, [and] are ... barred and enjoined from asserting Settled Claims." PTO

724, ¶ 12.

Nevertheless, neither of the deadlines for the two forms escaped postponement. The May 1, 1997 Registration Form deadline was pushed back until May 15, 1997 due to administrative difficulties caused by receiving and processing the large volume of registrations. Almost two years later, the Proof of Claim deadline was delayed twice, cumulatively from April 15, 1999 until June 15, 1999, to remedy the difficulties of many claimants documenting their injuries. PTO 1802.

Pretrial Order No. 724 also approved the settlement's notice procedures. The Settlement Agreement required the PLC to mail a settlement notice and the Registration Form to known class members, primarily persons who had already filed suit against AcroMed or who had identified themselves to the PLC by responding to a series of advertisements placed by various plaintiffs' attorneys. This group was comprised of 6,949 persons who were either class members or related claimants. The Settlement Agreement further provided for additional constructive notice in certain newspapers. Pursuant to the Court's order and the Settlement Agreement, formal notice was published during January and February 1997 as follows: twice in *USA Today*, a national newspaper with a circulation of 1.9 to 2.4 million; once in *TV Guide*, a national magazine with a circulation of 13 million; once in *Parade Magazine*, a national Sunday newspaper insert with a circulation of 81 million; and once in "a Spanish-language newspaper of general circulation in Puerto Rico." PTO 724, ¶ 8. The Puerto Rican newspaper chosen was *El Nueva Dia,* published in San Juan, Puerto Rico. The notice in *El Nueva Dia* ran on January 24, 1997 in small text on page 50. The publication notice published in each of the periodicals contained basic information about the settlement, including the May 1, 1997 Registration Form deadline, and the address of the PLC where potential class members could write for more information. Other than the PLC's address, the notice listed no other means to receive further information, no telephone number (toll-free or otherwise) and no internet address. Purportedly as a result of the published notice, the PLC received 1,457 requests for further information or registration for ms by late April 1997.

**\*319** Sambolin lives outside Luquillo, a seaside village on the Northeast coast of Puerto Rico. He had AcroMed pedicle screws implanted in his spine on April 3, 1995[4] to treat recurring back pain. Sambolin's initial recovery went well, but six weeks following the surgery he experienced severe back pain. Physicians later diagnosed the pain as the result of one loose and one broken AcroMed screw, and both were extracted in June 1996. According to

Sambolin, the AcroMed screws caused him severe pain and ongoing medical difficulties. Sambolin communicated with attorneys in Puerto Rico at some point in 1997, but they failed to inform him of the settlement. Later that year, he spoke with a Miami attorney who apprised him of the class action and settlement and helped him prepare the necessary paperwork. Without delay, the settlement Registration Form was signed on December 16, 1997, and subsequently filed with the Claims Administrator, approximately seven months after the May 1 deadline stated in the notices and repeated on the Registration Form.

In September 1998, the Claims Administrator submitted the Proposed Plan of Settlement Administration (the "Proposed Plan") for the Court's approval. Among other details, the Proposed Plan stated that class members who failed to submit the Registration Form by the May 1997 deadline were subject to a 20% reduction in award "points," and not total disqualification from participation in the settlement. Withholding judgment on the Proposed Plan, the District Court approved the Proof of Claim form accompanying the Plan on January 6, 1999. PTO 1655. It then was disseminated to all settlement registrants, whether timely or not.

Sambolin filed his Proof of Claim on February 10, 1999, well before the initial April 15, 1999 deadline. Shortly afterward, he requested of the Claims Administrator that the 20% reduction in the Proposed Plan be waived as to his claim because the notice of the registration deadline was deficient. On February 22, 1999, the District Court issued PTO 1722, which rejected the 20% discounting provision of the Proposed Plan and reasserted its position in PTO 724—that May 1, 1997 was an absolute deadline for registration, as stated in the notices and on the Registration Form. The Court did, however, extend the registration deadline to May 15, 1997 to remedy any receipt date problems encountered by the large numbers of registrations received by the PLC during that period. The absolute deadline for registration of May 15, 1997 was restated again in PTO 1757, but the Court in this order also permitted late registrants, such as Sambolin, to show cause to the Claims Administrator why their claims should be deemed timely.

Sambolin responded to the show cause order with a one-page statement asserting ignorance of the settlement and lack of notice. That response was rejected by the Claims Administrator. Sambolin protested his exclusion from the settlement in a motion filed with the Court requesting relief from PTO 1722. That motion, which is the subject of this appeal, was considered at a November

22, 1999 status conference and was rejected by the Court in PTO 1870 without comment.

In PTO 1930 the District Court addressed, in bulk, the validity of claims presented by untimely registrants in their appeal from the Claims Administrator's rejection of their claims. **\*320** *In re: Orthopedic Bone Screw, C.A. No. 97–381, 2000 WL 1023782 (E.D.Pa. July 10, 2000).* That order addresses the claims of 168 class members who failed to file the Registration Form by May 15, 1997 and who responded to the show cause order of PTO 1757, including Sambolin. The Court first rejected claims that the settlement's notice provisions were inadequate under Fed.R.Civ.P. 23(b)(1) and related principles of due process. *Id.* at \*9. It further applied the "excusable neglect" standard we later address in this opinion and permitted eight persons to participate in the settlement under its rationale. *Id.* at \*11. All of the eight late registrants included in the settlement suffered from debilitating medical disabilities that prevented the timely perfection of their claims. *Id.*

According to the Claims Administrator, there have been 534 late filings of the Registration Form as of February 14, 1999. Between 243 and 306 of these arrived before Sambolin's Registration Form in December 1997. According to the PLC's records, there are 104 claimants in Sambolin's predicament—an untimely Registration Form but a timely Proof of Claim. Assuming that Sambolin's statements in his Proof of Claim are accurate, the Claims Administrator has estimated his gross award at $33,000, subject to deductions for legal fees and potential subrogation claims.

### III. DISCUSSION

[2] We undertake circumspectly our review of the District Court's exercise of its equitable authority to excuse the late filings, as the District Court's application of those powers is only reviewable by this Court for an abuse of discretion. *See In re Cendant Corp. Prides Litig.,* 233 F.3d 188, 192 (3d Cir.2000) (hereinafter "*Cendant Prides I*"); *In re: Gypsum Antitrust Cases,* 565 F.2d at 1128; *cf. Dominic v. Hess Oil V.I. Corp.,* 841 F.2d 513, 516 (3d Cir.1988) (employing an abuse of discretion standard to the review of a grant of extension of time to serve process). We refrain from substituting our judgment for that of the District Court insofar as its holding is reasonable and supported by the evidence. "The test is not

what this court would have done under the same circumstances; that is not enough. The court must feel that only one order could have been entered on the facts." *Gypsum Antitrust,* 565 F.2d at 1128; *see also Rode v. Dellarciprete,* 892 F.2d 1177, 1182 (3d Cir.1990) (finding an abuse of discretion "when no reasonable person would adopt the district court's view"). We will therefore not disturb an exercise of discretion 'unless there is a "definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." ' *Hanover Potato Prods., Inc. v. Shalala,* 989 F.2d 123, 127 (3d Cir.1993) (citing *Ferrero, U.S.A., Inc. v. Ozak Trading, Inc.,* 952 F.2d 44, 48 (3d Cir.1991) (citation omitted)). "An appellate court may find an abuse of discretion where the 'district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact.' " *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 783 (3d Cir.) (citing *International Union, UAW v. Mack Trucks, Inc.,* 820 F.2d 91, 95 (3d Cir.1987), *cert. denied,* 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991)) (hereinafter "*GM Truck*"), *cert. denied sub nom., Gen. Motors Corp. v. French,* 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995).

### A.

In reviewing the District Court's order denying Sambolin participation in the settlement, we are hampered by the summary treatment given his claim by the Court. It **\*321** chose not to explain its reasoning in denying Sambolin's motion, stating only that "Sambolin's Motion ... for Relief from Pretrial Order No. 1722 is DENIED." (PTO 1870). Generally we require further explanation of an order terminating a litigant's claim. *See Interpace Corp. v. City of Philadelphia,* 438 F.2d 401, 404 (3d Cir.1971) ("[I]t is a salutary practice to give the litigants, either orally or in writing, at least a minimum articulation of the reasons for its decision."). Indeed, as we commented in *Cendant Prides I,* "[w]e have imposed a duty of explanation on District Courts when they conduct 'excusable neglect' analysis." *Cendant Prides I,* 233 F.3d at 196 (citing *Chemetron Corp. v. Jones,* 72 F.3d 341, 350 (3d Cir.1995)). Yet we must acknowledge that the District Court realized that it would face a bevy of substantially similar claims in response to its show cause

In re Orthopedic Bone Screw Products Liability Litigation, 246 F.3d 315 (2001)

49 Fed.R.Serv.3d 655

order. As such, we will adopt, where relevant, the Court's later analysis of these claims, *see In re: Orthopedic Bone Screw Prods. Liab. Litig.,* C.A. No. 97–381, 2000 WL 1023782 (E.D.Pa. July 10, 2000) (PTO 1930), as it applies with equal force, and with the same result, to Sambolin's case.

[3] Settlement administration in a complex class action often requires courts to use their equitable powers under Rule 23 to manage the disparate interests competing over a finite pool of assets with which to satisfy the class. As stated in the Manual for Complex Litigation, "[t]he equitable powers of the court may be invoked to deal with other problems that commonly arise during administration of the settlement." Manual for Complex Litigation (Third) § 30.47 (1995) (the "Manual"). These equitable powers are retained by the court until the settlement fund is actually distributed. *See Zients v. LaMorte,* 459 F.2d 628, 630 (2d Cir.1972). A primary use of these equitable powers is balancing the goals of expedient settlement distribution and the consideration due to late-arriving class members. *Compare Georgine v. Amchem Prod., Inc.,* No. 93–0215, 1995 WL 251402, *5 (E.D.Pa. Apr.26, 1995) ("This Court has an interest in enforcing its deadlines and ensuring that this litigation finally comes to a conclusion.") *with* the Manual § 30.47 ("Adequate time should be allowed for late claims before any refund or other disposition of settlement funds occurs."). Integral to this balancing, however, is the court's responsibility and "inherent power and duty to protect unnamed, but interested persons." *Zients,* 459 F.2d at 630. The Second Circuit in *Zients* likened those claimants excluded from recovery in a class action to "wards of the court," *id.,* and we have similarly stated that "the court plays the important role of protector of the absentees' interests, in a sort of fiduciary capacity." *GM Truck,* 55 F.3d at 784; *see also In re Cendant Corp. Prides Litig.,* No. 99–5555, 2001 WL 276677, at *6 (3d Cir. March 11, 2001). Though we were speaking more generally in *GM Truck* about the court's approval of class counsel and evaluation of the settlement's fairness, the aggregate nature of the class action in no way implies that the court's fiduciary duties to the whole class are somehow greater or more important than its duties to the individual members of the class.

The district courts of this Circuit have frequently analyzed late claims in class actions under the rubric of whether the claimant has shown "excusable neglect." *See In re Cendant Corp. Prides Litig.,* 189 F.R.D. 321, 324 (D.N.J.1999); *Valente v. Pepsico, Inc.,* 89 F.R.D. 352, 359 (D.Del.1981); *Georgine,* 1995 WL 251402, at *3.

There is authority for the correctness of doing so. *See Supermarkets Gen. Corp. v. Grinnell Corp.,* 490 F.2d 1183, 1186 (2d Cir.1974). Indeed, this Court recently announced in a pair of decisions from the **\*322** *Cendant Prides* litigation that the "excusable neglect" standard, as announced in the Supreme Court's ruling in *Pioneer Inv. Servs. v. Brunswick Assoc. Ltd. P'ship,* 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993), provides the analysis for consideration of untimely claims for inclusion in a class action settlement.[5] *Cendant Prides I,* 233 F.3d at 196; *In re Cendant Corp. PRIDES Litig.,* 235 F.3d 176, 180 (3d Cir.2000) (hereinafter "*Cendant PRIDES II*").

[4] Thus we begin with *Pioneer,* in which the Supreme Court addressed excusable neglect in the context of Fed. R. Bankr.P. 9006(b)(1), governing the enlargement of time for filing of proofs of claim in bankruptcy cases. The Court in *Pioneer* noted that the genesis of the bankruptcy rule was found in Fed.R.Civ.P. 6(b), which governs the enlargement of time periods in the civil rules. *Pioneer,* 507 U.S. at 391, 113 S.Ct. 1489. It stated that

> in applying Rule 6(b), the Courts of Appeals have generally recognized that "excusable neglect" may extend to inadvertent delays. Although inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute "excusable" neglect, it is clear that "excusable neglect" under Rule 6(b) is a somewhat "elastic concept" and is not limited strictly to omissions caused by circumstances beyond the control of the movant.

*Id.* at 391–92, 113 S.Ct. 1489 (citations omitted). As such, *Pioneer* rejected the holding of some courts of appeal that the benefit of excusable neglect could only be employed where late filing was due to circumstances beyond the control of the party. *Id.* at 387, 113 S.Ct. 1489. This analysis eschews any *per se* rule that excusable neglect is unavailable to a party whose untimely filing was due to circumstances within his or her control.[6] *See Cendant Prides I,* 233 F.3d at 196. Indeed, in *Cendant PRIDES II* this Court excused the late filing of a class action proof of claim form where the

"reason for the delay ... was either unforeseeable sabotage by mailroom employees who purposely misled [the claimant], or even more simply, a mailroom which did not operate as it should have in the ordinary course of business." *Cendant PRIDES II*, 235 F.3d at 183.

[5] The fault of the untimely party is not our only consideration in determining whether a claimant should have the benefit of excusable neglect. *Pioneer* noted the following four factors: 1) the danger of **\*323** prejudice to the nonmovant; 2) the length of the delay and its potential effect on judicial proceedings; 3) the reason for the delay, including whether it was within the reasonable control of the movant; and 4) whether the movant acted in good faith. *Pioneer,* 507 U.S. at 395, 113 S.Ct. 1489; *see also Cendant Prides I,* 233 F.3d at 196. We earlier stated, while discussing excusable neglect in the context of Fed.R.Civ.P. 4 (regarding time for issuing service), that the District Court should inquire into six factors. *See Dominic v. Hess Oil V.I. Corp.,* 841 F.2d 513, 517 (3d Cir.1988).

> 1) whether the inadvertence reflected professional incompetence such as ignorance of rules of procedure, 2) whether an asserted inadvertence reflects an easily manufactured excuse incapable of verification by the court, 3) counsel's failure to provide for a readily foreseeable consequence, 4) a complete lack of diligence or 5) whether the inadvertence resulted despite counsel's substantial good faith efforts towards compliance.... Moreover, we also consider whether the enlargement of time will prejudice the opposing party.

*Id.* (citing *Consol. Freightways Corp. of Del. v. Larson,* 827 F.2d 916, 919 (3d Cir.1987)). These six factors, announced in *Dominic* before *Pioneer* was decided, present a more specific application of the general considerations later announced by the Supreme Court in *Pioneer.* The *Dominic* factors that were not restated in *Pioneer* were instead subsumed in the more general consideration of "reason for the delay." *Cendant Prides I,* 233 F.3d at

196 n. 8.

Lacking any allegations of professional incompetence in this case, it seems less important to focus on the "inadvertence" of counsel which concerned the Court in *Dominic.* Consequently, for purposes of applying excusable neglect principles to Rule 23, we will employ the four factors announced in *Pioneer* to Sambolin's claim.

**B.**

[6] We cannot agree with the District Court that Sambolin should be excluded from the settlement class simply because he failed to meet the May 15, 1997 registration deadline. Rather, we are convinced in these circumstances that Sambolin has adequately pursued his claim against AcroMed in good faith and with reasonably timely efforts since learning of the settlement. Under these facts, we find that each factor of the *Pioneer* analysis counsels in favor of including Sambolin within the settlement class and that the Court abused its discretion in excluding him from sharing in the remedy.

*i. The Danger of Prejudice to the Non–Movant*

Consideration of the prejudices created by including Sambolin's claim within the settlement class is a unique inquiry, for while the expansion of the plaintiff class in the ordinary class action will be to the detriment of the defendant, here the liability of AcroMed has been capped by the Settlement Agreement at over $100 million. Inclusion of Sambolin's claim, and those of others similarly situated, has no effect on the amount AcroMed will pay to those aggrieved by its products. The prejudice to AcroMed by counting Sambolin's claim is similar to that in the closed-end class action in *Cendant PRIDES II,* in which this Court noted that inclusion of another claimant within the class will do no detriment where the scope of the defendant's liability has already been fixed. *Cendant PRIDES II,* 235 F.3d at 184 ("The Court found that Cendant would not be harmed because the original limits of Cendant's financial obligation had not been **\*324** expanded."). Indeed, in *Cendant PRIDES II* (unlike here) Cendant would have received as a windfall any diminution in claims caused by a plaintiff's exclusion from the class. "In truth, since the only 'prejudice'

Cendant would suffer by being forced to pay [the claimant] is the 'loss of a windfall,' we conclude that Cendant will suffer no prejudice at all." *Id.* AcroMed would not receive any similar windfall in this case, and thus it has no argument that it will be prejudiced by Sambolin's recovery.

More generally, we find it appropriate to consider the effect of Sambolin's inclusion on those whom it might prejudice—namely those members of the settlement class who filed their registrations by the May 15, 1997 deadline. It cannot be maintained that timely registrants are more deserving of remedy, for purposes of equity, than tardy registrants with similar claims, presuming the failure to register on time was indeed blameless. By excluding Sambolin and other similarly situated late registrants from the class, the timely registrants would receive what is essentially a "windfall," comprised of some portion of the recovery that would be owed to the otherwise deserving late registrants. As noted in *Cendant PRIDES II*, the loss of a windfall is not prejudicial. *Cendant PRIDES II*, 235 F.3d at 184.

Even if we were to assume, *arguendo*, Sambolin's recovery prejudices other class members, there are only approximately 100 claimants who, like Sambolin, failed to file a timely Registration Form but did file the Proof of Claim form by the twice-extended June 15, 1999 deadline. Assuming all of these claimants present valid claims for inclusion in the class, which is by no means certain, they would still represent only a minuscule fraction of the total settlement class, estimated at 4,412 bone screw recipients, 1,424 consortium claims and 1,109 subrogation claims. Further assuming that the claims of these 100 are similar in magnitude, and thus damages, to the remainder of the settlement class, it cannot reasonably be argued that the effect of their inclusion is anything but marginal. *See Zients*, 459 F.2d at 630.

*ii. Length of the Delay and its Effect on Judicial Proceedings*

Sambolin's Registration Form was signed and filed on December 16, 1997, approximately seven months following the May 15, 1997 registration deadline. His Proof of Claim form, detailing the extent of his injury and other details necessary to resolve his claim, was filed February 10, 1999, approximately two months before the initial deadline for that document, April 15, 1999, and over four months before the revised deadline of June 15, 1999. Relevant here is the seven month delay in filing the

Registration For m and what effect that delay wrought on the proceedings.

In its quixotic attempt to show that the delay was unreasonably long and substantially affected the conduct of these proceedings, the PLC argues that the early registration deadline served an important purpose in settlement administration. Among the justifications proffered in support of the May 15, 1997 deadline are that it helped define the class of persons to be included in the settlement for the final fairness hearing and facilitated the efforts of the Claims Administrator in preparing mechanisms for the eventual distribution of the settlement fund. We have substantial doubts, however, that these factors motivated the selection of the May 15, 1997 deadline, as the District Court granted preliminary approval to the settlement before publication notice was even given.[7] *325 Furthermore, the Claims Administrator was not appointed until January 30, 1998, more than a month after Sambolin's Registration Form was filed.[8]

Whatever the purpose of the May 1997 registration deadline, focus on its rationale evades the relevant inquiry here: how Sambolin's failure to comply with that deadline will deter the expedient and just resolution of claims. It is uncontested that the PLC continued to receive and process Registration Forms throughout 1997 and 1998. Furthermore, the process of winnowing the valid claims from the invalid, and the compensable claims from the uncompensable, did not even begin until the 1998 appointment of the Claims Administrator and the approval of a Proof of Claim form thereafter. We also find it telling that the Claims Administrator's Proposed Plan would have included untimely registrants, with only a 20% reduction in the "points" used to allocate equitably the settlement fund. While we do not review the District Court's eventual rejection of that Plan provision, we cannot ignore the fact that, as of September 1998, the Claims Administrator tacitly acknowledged both that inclusion of late registrants was neither prohibitively difficult nor unjust to those who met the Proof of Claim deadline.

The PLC contends that we should look back from our current vantage point in assessing the influence on the proceedings of Sambolin's seven month delay. That is, the PLC suggests that we should measure the delay's effects on the proceedings as of the present and not the delay's effects on the proceedings when that delay was ended by Sambolin's registration. As long as distribution of the limited fund settlement remains pending, we reject this contention. Such a rule would be unfair, for the delay caused by the adjudication of the late claim, and not the lateness of the claim itself, would often give sufficient

reason to reject the claim regardless of the effect of the movant's actual delay. Moreover, consideration of the current effect of the delay on the proceedings would conflict with our holding that the length of the delay should be considered in absolute terms and not by reference to the import of intervening circumstances. *In re O'Brien Envtl. Energy, Inc.,* 188 F.3d 116, 130 (3d Cir.1999) (holding that the relevant time period is the delay between the date the bankruptcy claim should have been filed and the date it was filed, and that the *Pioneer* analysis should not be affected by the significance of the intervening approval of the reorganization plan and the debtor's expedited schedule).

Even if we were to consider the length of Sambolin's delay and its effect on judicial proceedings as of today, we are unpersuaded that including Sambolin within the recovering class would cause great dislocation in the current administration of the **\*326** settlement. While the PLC exhorts that "myriad" administrative issues would arise from the recalculation of the limited fund, this claim is unsupported. The Claims Administrator was able to calculate a hypothetical recovery for Sambolin's claim quite easily in his brief to this Court. Furthermore, as of the current process of the litigation, class members have only been told the number of points they are entitled under the Settlement Agreement and can appeal the Claims Administrator's determination of those points. Those appeals have as much potential to upset the current distribution of claims as the inclusion of Sambolin and other similarly situated claimants. At oral argument, the Claims Administrator himself noted that distribution of the settlement had not occurred and, even if distribution began before resolution of this case, the awards could be structured in a manner that would allow for the inclusion of later-allowed untimely registrants. Given these facts, we believe that any hindrance in settlement fund administration caused by inclusion of Sambolin's claim is too minimal to justify exclusion of his claim on that basis.[9] "We conclude that where, as here, all the equities are on the side of the claimants, the fund has not been distributed and the administration of the fund would be insignificantly hampered by allowing these few late claims, appellants should be permitted to participate in the fund." *Zients,* 459 F.2d at 630–31.[10]

In considering the effect on the proceedings, we find that cases applying excusable neglect concepts to the time limitation for "opting out" of a Rule 23(b)(3) class action are conversely distinguishable from the circumstances here—essentially "opting in" to a closed-end settlement fund. *See Georgine v. Amchem Prods., Inc.,* Civ. A. No. 95–0215, 1995 WL 251402

(E.D.Pa. April 26, 1995). *Georgine* considered the untimely requests to opt out of the class action asbestos settlement. Relying on *In re Four Seasons Sec. Laws Litig.,* 59 F.R.D. 667, 677 (W.D.Okla.1973), the court, in rejecting the excusable neglect argument of the movants, expressed its opinion that "[a] too liberal application of [excusable neglect] in class actions would undermine the finality of judgments entered therein and would discourage settlement of such actions." *Georgine,* 1995 WL 251402, at \*6 (quoting *Four Seasons*). While this result in *Georgine* had a compelling rationale in that case, Sambolin desires the opposite result: inclusion in a settlement that will otherwise bar his remedy. As such, Sambolin's claim for inclusion in an opt-in class action lacks the potentially detrimental effect on the process of settlement from which a claim for exclusion from an opt-out class action suffers.

*iii. Reason for the Delay*

Sambolin's seven month delay in filing his Registration Form resulted from his lack of awareness, in light of the minimal constructive notice provided by the parties, that his right to a remedy was being litigated in a binding class action. Though we do not at this time opine as to the constitutional sufficiency of the notice provided under Rule 23 and **\*327** *Mullane v. Central Hanover Bank & Trust,* 339 U.S. 306, 314–15, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (requiring notice "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections"), we do note that, absent actual notice mailed to his address, it is incongruous, in the unique circumstances of this case, to find Sambolin culpable for his failure to note a small advertisement run once on page 50 of a newspaper he does not receive.[11] Indeed, **\*328** in *Zients* the Second Circuit found that the plaintiffs' failure to make a timely filing for inclusion in a class action settlement was blameless, despite the fact that actual notice had been mailed to them through their broker. *Zients,* 459 F.2d at 630. Similarly, in *Cendant Prides I,* this Court held that the district court acted within its discretion in excusing the late filings of several claimants where the stated reasons included, among others, "the failure of claimants to receive notice." *Cendant Prides I,* 233 F.3d at 197.

In considering the reason for the delay, we are not constricted in examining the conduct of the claimant which contributed to the delay, but may examine as well

whether the notice given by the PLC also contributed to the delay. *See* In re O'Brien, 188 F.3d at 129. In *In re O'Brien* this Court stated that "although [the claimant] was careless in not reading the Application carefully, and specifically, paragraphs fourteen through sixteen, his neglect is excusable since it was caused at least in part by[the debtor's] own failure to properly alert[the claimant] that this 'application' was really an objection to its claim." *Id.* Though the Court there was discussing the clarity of written notice, we find Sambolin's predicament to be analogous. The constructive notice given to him was too minimal to impart blame upon him for his lack of awareness.

In its later rejection of the excusable neglect claims of a group of late registrants, including Sambolin, the District Court more fully explained its application of the *Pioneer* standard to those claimants and, we believe, incorrectly found Sambolin and others blameworthy for their failure to become aware of the settlement. *See* In re: Orthopedic Bone Screw, C.A. No. 97–381, 2000 WL 1023782 (E.D.Pa. July 10, 2000) (PTO 1930). Responding to the Court's show cause order, the group of 168 class members who failed to file the Registration Form by May 15, 1997 argued for inclusion in the settlement class. Referencing *Pioneer,* the Court permitted only eight persons to participate in the settlement, all of whom suffered from medical disabilities that prevented the timely perfection of their claims. While we do not purport to address the claims of all of those 168 class members, at least with respect to Sambolin's inclusion within that group we must examine the District Court's analysis of the *Pioneer* considerations. In setting out those considerations, the District Court stated:

> The central feature of the court's determination in each of these cases is that the person's disability or other problem was a prohibitive factor in their [sic] attempt to perfect their [sic] claim on a timely basis. In contrast, although other persons demonstrated the extent of their disability and pain, the court could not conclude as a factual matter that the injured person's failure to prosecute a timely claim was caused by their [sic] injury, disability or other impediment.

PTO 1930, at *11. By focusing on whether the person's

injury prohibited the timely filing of his or her claim, the Court's considerations *329 turned wholly on whether the claimant's failure to file the claim by May 15, 1997 was due to medical circumstances beyond the control of the claimant, and not on other equitable considerations such as the prejudice to other claimants or potential effect on judicial proceedings. Furthermore, there is no consideration of whether the actions of the PLC or AcroMed contributed to the delay. *See* In re O'Brien, 188 F.3d at 129. By making the medical status of the claimants in May of 1997 dispositive of their excusable neglect claims, the Court misapplied the holding of *Pioneer* that excusable neglect is an "elastic concept" and is "not limited strictly to omissions caused by circumstances beyond the control of the movant." Pioneer, 507 U.S. at 392, 113 S.Ct. 1489. Failing to inquire beyond the health status of the claimant in deter mining the reason for the delay was error.

*iv. Whether the Movant Has Acted in Good Faith*
Given the equitable nature of our inquiry, it is of course true that the movant must demonstrate good faith or otherwise seek the relief of the court with clean hands. *See* Gaudiosi v. Mellon, 269 F.2d 873, 881 (3d Cir.1959). No party has alleged that Sambolin exhibited less than good faith in seeking redress for his injury. He acted responsibly and with alacrity to secure a remedy for the pain allegedly caused to him by the pedicle screw surgery. *See* Cendant PRIDES II, 235 F.3d at 184. Absent any further evidence that Sambolin's failure to apprise himself seasonably of the settlement was the result of anything other than ignorance that his rights were being litigated in a non-opt-out class action under Rule 23(b)(1), we find that Sambolin has displayed good faith in his pursuit of class inclusion.

IV. CONCLUSION

Because we find that the District Court did not perform a balancing of the equitable factors of excusable neglect in determining Sambolin's exclusion from the settlement class, and because none of the equitable factors support the District Court's result, we conclude that its holding was necessarily in error. Applying the *Pioneer* factors to the facts of this case, we cannot conclude that the Court

correctly considered the equities of Sambolin's claim for inclusion in the settlement class. While "[t]here is no question that in the distribution of a large class action settlement fund, 'a cutoff date is essential and at some point the matter must be terminated,' " *In re Gypsum Antitrust Cases,* 565 F.2d at 1127 (citation omitted), application of this principle must not be so rigid as to preclude recovery by a deserving claimant. *See Zients,* 459 F.2d at 631.

Because we conclude the District Court's ruling was inconsistent with the exercise of sound discretion in excluding Sambolin from the settlement class, we do not reach Sambolin's other claims of error in this appeal.

* * * * * *

For the foregoing reasons, we reverse the judgment of the District Court in that portion of Pretrial Order No. 1870 denying Sambolin participation in the settlement class, and remand for further proceedings consistent with this opinion.

### All Citations

246 F.3d 315, 49 Fed.R.Serv.3d 655

## Footnotes

[1]   Though the Settlement Agreement was the subject of frequent revision, none of its provisions relevant to this appeal were changed.

[2]   Under the Settlement Agreement, the released parties include AcroMed and any treating physicians and hospitals who might be liable on a products liability theory. "However, claims for independent medical malpractice against these physicians and hospitals will not be dismissed under the settlement." *In re: Orthopedic Bone Screw,* 176 F.R.D. at 166.

[3]   Though not directly pertinent to this appeal, it should be noted that the District Court's grant of certification reasoned that AcroMed had a "limited fund" with which to meet the demands of plaintiffs. *In re: Orthopedic Bone Screw,* 176 F.R.D. at 177. Since that ruling, the "limited fund" of a defendant to meet claims has been substantially circumscribed by the Supreme Court as a basis for the maintenance of a class action. *See Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999) (when a mandatory class action is certified on a limited fund theory, the fund must be limited independently of the parties' agreement). Before the ruling in *Ortiz,* the appeal of the settlement's approval in this case was voluntarily dismissed.

[4]   Because the settlement class includes all recipients of AcroMed pedicle screws before December 31, 1996, it is undisputed that Sambolin is within the certified class.

[5]   Though the opinions in both *Cendant Prides I* and *Cendant PRIDES II* were not released until after oral argument in this matter, we find that neither opinion substantially alters the analysis suggested by the parties—namely, whether Sambolin could demonstrate "excusable neglect" under the considerations announced in *Pioneer.*

[6]   It also bears noting that while fault does not necessarily invalidate a claim of "excusable neglect," the analysis applies with equal force on the other end of the spectrum—to those whose untimely filing was entirely faultless. "Excusable neglect," then, is not an entirely proper label for the scope of inquiry available under its rationale. As the Court observed in *Pioneer,* the "ordinary meaning of 'neglect' is 'to give little attention or respect' to a matter, or closer to the point for our purposes, 'to leave undone or unattended to *esp[ecially] through carelessness*.' " *Pioneer,* 507 U.S. at 388, 113 S.Ct. 1489 (citing Webster's Ninth New Collegiate Dictionary 791 (1983)) (emphasis in original). Thus, even though "neglect" is normally perceived negatively to connote carelessness in pursuit of a claim, it also "encompasses ... simple, faultless omissions to act." *Id.* While "neglect" may not be an apt term to describe those situations in which the failure to file timely is entirely faultless, the principles extracted from the doctrine of "excusable neglect"

apply nonetheless.

[7]   We also note on this point that the date of the fairness hearing was April 23, 1997, a week before the first deadline for receipt of the Registration Form.

[8]   The Claims Administrator further attempts to justify the registration deadline by reasoning that the early deadline aided subrogation claimants' subsequent identification of their claims. While this may, indeed, have been a beneficial outcome of the registration deadline *post hoc*, we find interesting that the initial Settlement Agreement fixed one deadline for both bone screw recipients and subrogation claimants. Thus the fact that subrogees were later given the opportunity to "piggyback" their claims on those of individual claimants initially could not have justified the May 1, 1997 deadline. Nevertheless, given that the subrogees have long been aware of the identity of those bone screw recipients (like Sambolin) whose recovery was precluded by their noncompliance with the deadline, his later inclusion in the settlement class will not unduly prejudice the ability of subrogees to "piggyback" on those late registrants who filed timely Proof of Claim forms.

[9]   We caution that our conclusion on this point might be different had Sambolin not made a timely filing of the Proof of Claim. The Proof of Claim contained the bulk of the information vital to settlement administration, including the timing, nature, and severity of the injury and information necessary to the identification of interested subrogees.

[10]   The PLC's attempt to distinguish the Second Circuit's holding in *Zients* on the basis that distribution of the settlement fund is imminent is hardly convincing in this case.

[11]   Because notice issues of this type are recurring in the district courts, we would be remiss if we did not express our concerns about the notice program used in this class action and suggest some better practices, especially in the wake of the Supreme Court's discussion of Rule 23(b)(1)(B) limited fund mandatory class actions in *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999). In *Ortiz,* the Court expressed skepticism that Rule 23(b)(1)(B) limited fund class actions are valid at all under Rule 23, and stated that, if these class actions were to be valid, they would have to conform closely to the contours of traditional limited fund cases that predated Rule 23. *See id. at* 842–44, 864, 119 S.Ct. 2295. The Court noted that one of the important characteristics of traditional limited fund cases was a certain level of notice: "[T]raditional limited fund actions typically provided notice to all claimants and the opportunity for those claimants to establish their claims before the actual distribution took place." *Id.* at 841 n. 19, 119 S.Ct. 2295. The Court then strongly implied that a Rule 23(b)(1)(B) mandatory limited fund class action had to meet the same procedural requirements as to notice as Rule 23(b)(3) actions: "It is simply implausible that the Advisory Committee, so concerned about the potential difficulties posed by dealing with mass tort cases under Rule 23(b)(3), with its provisions for notice and the right to opt out, *see* Rule 23(c)(2), would have uncritically assumed that mandatory versions of such class actions, lacking such protections, could be certified under Rule 23(b)(1)(B)." *Id.* at 844, 119 S.Ct. 2295. Thus, *Ortiz* seems to imply (although it specifically declined to rule) that the level of notice required for a settlement like AcroMed's is the same as is required in a Rule 23(b)(3) action: the best notice practicable, "including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2). *Cf. Phillips Petroleum v. Shutts,* 472 U.S. 797, 811–12, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) (holding that "[i]f the forum State wishes to bind an absent plaintiff concerning a claim for money damages or similar relief at law," the notice given "must be the best practicable").

Sambolin's brief lists the following ways that the notice program in this case could have been easily improved through more directed attempts to determine the identities of class members who were not mailed individual notice. First, the PLC and AcroMed could have asked the hospitals and doctors who purchased the bone screws for a list of their patients who had bone screws implanted, as they would presumably have these records on file. The PLC could also have sent out a general "Dear Doctor" letter to

the orthopedic medical community, explaining the settlement and enclosing notice packets. Finally, the PLC could have placed ads in orthopedic trade publications asking doctors for help in identifying the names and addresses of AcroMed bone screw recipients. We agree that likely all of these methods would have substantially increased the PLC's database of class members, and some combination of them would have constituted a reasonable effort to identify individual class members.

AcroMed argues that hospitals and doctors should not be used as notice distributors because giving notice was against their interests, as they might themselves have been targets of lawsuits. This argument is unconvincing. First, the AcroMed settlement immunized doctors and hospitals from AcroMed bone screw products liability lawsuits (though not malpractice actions), so notice was not entirely against their interests. Second, Sambolin notes that there have been many other similar notice programs that have involved entities distributing notice when it was possibly against their interests to do so. For example, in securities class action lawsuits, brokers are routinely used to distribute notice, even when they are potential targets of the lawsuit.

Sambolin also lists ways in which the publication notice could have been substantially improved, asserting that the publication could have been much broader, using a mix of national and local publications. Additionally, Sambolin submits that the PLC could have placed notices on the internet, run radio and television advertisements, and undertaken a free media campaign involving public service announcements. The content of the notice publication could also have been improved. For example, it could have contained a simple tear-off registration form, and included an 800 number for obtaining registration materials, both of which would have made registration much easier. The notice also did not warn readers of the serious consequences of missing the registration deadline: losing one's right of action with no chance to share in the settlement fund. While all of these efforts may not be required by due process, we are inclined to believe that some combination of them would help to bring the notice program closer to "the best notice practicable."

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.