# EXHIBIT 6

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO

|  |  |
|---|---|
| In re POLYURETHANE FOAM ANTITRUST LITIGATION | ) ) ) ) ) MDL Docket No. 2196 ) Index No. 10-MD-2196 (JZ) |
| This document relates to: ALL DIRECT PURCHASER CLASS ACTIONS | ) ) ) ) ) |

**MOTION AND MEMORANDUM IN SUPPORT FOR ORDER TO APPROVE DISTRIBUTION OF SETTLEMENT FUNDS TO CLASS MEMBERS AND PAYMENT OF NOTICE FEES FOR THE DIRECT PURCHASER SETTLEMENT CLASSES**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT ...................................................................................................................................2

I. NOTICE AND FINAL APPROVAL OF SETTLEMENTS ................................................2

II. CLAIM FORMS FOR ALL THREE SETTLEMENT ROUNDS .......................................3

III. AMOUNT OF FUNDS AVAILABLE FOR DISTRIBUTION ...........................................6

    A. Vitafoam Settlement ................................................................................................6

    B. Carpenter and L&P Settlements ...............................................................................7

    C. The Spring 2015 Settlements 2015 .........................................................................8

IV. ADMINISTRATIVE DETERMINATIONS WITH RESPECT TO SUBMITTED CLAIMS .................................................................................................................................9

    A. Vitafoam ..................................................................................................................9

    B. Carpenter and L&P Settlements .............................................................................10

    C. Spring 2015 Settlements ........................................................................................11

    D. Outstanding Disputes .............................................................................................13

V. PLAN OF DISTRIBUTION FOR SETTLEMENT FUNDS .............................................14

VI. ADMINISTRATION FEES AND COSTS ........................................................................15

i

**PRELIMINARY STATEMENT**

The Direct Purchaser Class ("Plaintiffs" or the "Class") respectfully requests that this Court enter the [Proposed] Order to Approve: (1) the administrative determinations of the Claims Administrator Garden City Group ("GCG") as to whether to accept or reject the claims submitted by the Class (including acceptance of various late Claim Forms), and resolution of all disputed and adjusted claim amounts with respect to the Settlement Agreement Between Direct Purchaser Class Plaintiffs and Defendant Leggett & Platt, Incorporated (the "L&P Settlement Agreement"); the Settlement Agreement Between Direct Purchaser Class and Defendants Carpenter Co., E.R. Carpenter, L.P., and Carpenter Holdings, Inc. (the "Carpenter Settlement Agreement"); the Settlement Agreement Between Direct Purchaser Class and Defendant FFP Holdings, LLC (f/k/a Flexible Foam Products, Inc.) (the "FFP Settlement Agreement); the Settlement Agreement Between Direct Purchaser Class and Defendant Future Foam, Inc. (the "Future Foam Settlement Agreement"); he Settlement Agreement Between Direct Purchaser Class and Defendant Foamex Innovations, Inc. (the "FXI Settlement Agreement"); the Settlement Agreement Between Direct Purchaser Class and Defendant Hickory Springs Manufacturing Company (the "Hickory Springs Settlement Agreement"); the Settlement Agreement Between Direct Purchaser Class and Defendant Mohawk Industries, Inc. (the "Mohawk Settlement Agreement"); the Settlement Agreement Between Direct Purchaser Class and Defendants Woodbridge Foam Corporation, Woodbridge Sales & Engineering, Inc., and Woodbridge Foam Fabricating, Inc. (the "Woodbridge Settlement Agreement"); and the Settlement Agreement Between Direct Purchaser Class and Defendants Vitafoam, Inc. and Vitafoam Products Canada Limited ("Vitafoam Agreement") as set forth in Exs. C, D, H, J, N, and R[1] to the declaration of Lori Castaneda

---

[1] These exhibits are separately being filed under seal.

1

("Castaneda Decl."); (2) direct distribution of the Net Settlement Funds to Settlement Class Members consistent with the Claim Amounts set forth in Exs. D, J, and R to the Castaneda Declaration; and (3) approve of GCG's fees and expenses of $65, 522.49 invoiced since the last motion seeking approval of notice fees (Dkt. 1868), as set forth in Exs. I and Q to the Castaneda Declaration.

## ARGUMENT

Due to the timing of the settlements, there were three "rounds" of settlement notices and claim forms in this litigation: (1) the Vitafoam and Domfoam/Valleform settlements[2]; (2) the Carpenter and L&P Settlements; and (3) the FFP, Future Foam, FXI, Hickory Springs, Mohawk, and Woodbridge ("Spring 2015 Settlements"). Likewise, for efficiency and ease of administration, Class Counsel and GCG have administered these settlements according to these three groupings.

## I. NOTICE AND FINAL APPROVAL OF SETTLEMENTS

After this Court preliminarily approved the Vitafoam Settlement (Dkt. 457), GGC provided class members with notice of these settlements This notice program was comprehensive. Dkts. 374; 457. On June 20, 2013, after the notice program was complete and a Final Approval hearing was held, this Court granted final approval to the Vitafoam Settlement. Dkt. 597. Subsequently, this Court preliminarily approved the Carpenter and L&P Settlements (Dkts. 1391, 1406), and GCG provided class members with notice of these settlements. Dkt. 1475-1 (Dowd February 2, 2015 Declaration, describing notice program). This notice program was extensive. Dkt. 1475-1 at 6. On February 26, 2015, after the notice program was complete and a Final Approval hearing was held, this Court granted final approval to Plaintiffs'

---

[2] There was no monetary recovery as part of the Domfoam/Vallefoam settlements.

2

settlements with Carpenter and L&P. Dkt. 1534. This Court later preliminarily approved the Spring 2015 Settlements (Dkt. 1703), and GCG provided notice of these settlements. Dkt. 1828-2 (Dowd July 16, 2015 Declaration, describing notice program). Like the previous notice programs, this one was extensive. On November 19, 2015, this Court granted final approval to the Spring 2015 Settlements. Dkt. 1971.

## II. CLAIM FORMS FOR ALL THREE SETTLEMENT ROUNDS

Pursuant to the notices that were circulated, Class Members wishing to participate in the various settlements were required to return Claim Forms approved by this Court (which were distributed along with notices), to GCG by certain deadlines. (Dkts. 457; 1406; 1703). Class Members seeking to participate in the Vitafoam Settlement were required to submit Claim Forms by mail, postmarked on or before April 30, 2013; by January 26, 2015 to participate in Carpenter and L&P Settlements; and by September 15, 2015 to participate in the Spring 2015 settlements. Castaneda Decl. ¶4, 19, 37.

Class Members were not required to submit claim forms in order to participate in every settlement. Once a Class Member submitted a Claim Form, that Class Member was automatically a participant in the settlement(s) connected with that particular Claim Form, and every subsequent settlement, unless that Class Member specifically opted out of any subsequent settlement. *See, e.g.*, Dkt. 1699-10 at 2; Castaneda Decl. ¶19, 37.[3]

---

[3] For example, if a Class Member submitted a Claim Form as part of the Vitafoam settlement, that Class Member was automatically considered to be a claimant as part of the L&P and Carpenter Settlements, as well as all of the Spring 2015 settlements. If a Class Member did not submit a Claim Form as part of the Vitafoam settlement but did submit a Claim Form as part of the L&P and Carpenter Settlements, that Class Member was also automatically considered to be a participant in the Spring 2015 Settlements as well, but did *not* retroactively become a participant in the Vitafoam settlement. Likewise, if a Class Member submitted a Claim Form only as part of the Spring 2015 settlements, that Class Member did *not* retroactively participate

3

GCG sent, via direct mail, Claim Forms to Class Members identifiable from the various Defendants' transactional records. Castaneda Decl. ¶4, 19, 37. To the extent Class Members did not receive Claim Forms in the mail, blank Claim Forms were available directly from GCG and on the Settlement Website. *Id.* ¶4, 19, 37 Various Claimants completed these blank forms and submitted them to GCG. *Id.* ¶6, 21, 39 The Claim Forms that GCG mailed directly to Class Members contained information about each Class Member's purchases of polyurethane foam that were contained in Defendants' transactional data. *Id.* ¶4, 19, 37

When a Claim Form contained information about a Class Member's purchases, that Class Member had the option to submit a claim for the amount set forth on the Claim Form (called a "Category A" claim) by signing the claim form and submitting a Substitute IRS W-9. *See, e.g.*, Dkt. 1699-10. That Class Member also had the option to submit supplemental information demonstrating that they had more or different purchases than reflected on the Claim Form (called a "Category B" claim). *Id.* Class Members who did not receive Claim Forms that contained purchase information (e.g. Class Members downloaded blank Claim Forms from the Settlement Website), those Class Members could only submit Category B claims by providing proof of purchases. Castaneda Decl. ¶5, 20, 38.

In each of the three "settlement rounds," GCG received and reviewed all Claim Forms received from Claimants for completeness, timeliness, and to determine if any were deficient. *Id.* at. ¶6, 7, 8, 21, 22, 23, 39, 40, 41. To the extent that Claim Forms were deficient in any regard, GCG sent letters to the relevant Claimants identifying the reasons for the deficiency(s) and providing the Claimants with opportunities to cure the deficiency(s) by a deadline clearly set

---

in the Vitafoam, L&P, or Carpenter Settlements. However, if a Class Member previously sought to participate in a settlement but opted out of subsequent settlements, those class members were excluded from subsequent settlements.

4

forth in the "deficiency letter". *Id.* ¶8, 23, 41. There were four main categories of deficiencies: (1) unsigned Claim Form; (2) incomplete IRS Form W-9 and/or failure to provide federal taxpayer identification number; (3) selecting to submit a Category B claim without providing the amount of polyurethane foam purchased; (4) selecting to submit a Category B claim but did not provide adequate proof of the additional purchases. *Id.* ¶ 8, 23, 41 and Exs. B, F, and L. (example deficiency letter). Additionally, GCG emailed and held phone calls with Claimants as necessary. *Id.* ¶9, 24, 42.

Where a Claimant failed to cure a defective claim, GCG followed the following protocol:

For Claimants present in Defendants' source data (for all three settlement rounds)

- Where a Claimant submitted an unsigned Claim Form, GCG still accepted the claim as valid

- Where a Claimant did not provide a W-9 (or if that W-9 was incomplete), GCG still accepted the claim as valid, if the Claim was otherwise valid.

- Where a Claimant submitted a Category B claim but failed to provide the amount of polyurethane foam purchased, GCG re-designated that Class Member as a Category A claim (i.e. the Class Member is credited with the amount of polyurethane foam purchases reflected on the Original Claim Form)

- Where a Claimant submitted a Category B claim but failed to provide adequate proof of additional purchases, GCG re-designated that Class Member as a Category A Claim

For Claimants *not* present in Defendants' source data in the Vitafoam Settlement

- All deficient claim forms from non-source claimants were denied.

For Claimants *not* present in Defendants' source data in the Carpenter and L&P, and Spring 2015 Settlements:

- Where a Claimant submitted an unsigned Claim Form, but the Claim was otherwise complete (e.g. supporting documentation was provided), GCG still accepted the claim as valid.

- Where a Claimant did not provide a W-9 (or if that W-9 was incomplete), GCG still accepted the claim as valid, if the Claim was otherwise valid.

5

- Where a Claimant submitted a Category B claim but failed to provide the amount of polyurethane foam purchased, GCG denied the claim.

- Where a Claimant submitted a Category B claim but failed to provide adequate proof of additional purchases, GCG denied the claim.

*Id.* ¶¶9, 24, 42

In April 2016, after the deficiency deadline associated with the Spring 2015 Settlements passed, GCG sent out letters to all Claimants identifying the final amount of polyurethane foam purchases with which they were credited for purposes of distributing settlement funds. An Exemplar of this letter is attached as Exhibit O to the Castaneda Declaration. Those whose claims were denied because they are indirect purchasers received denial letters as well (*Id.* ¶ ¶13, 28, 46 and Ex. M). Those whose claims were denied for other reasons did not receive additional denial letters; the deficiency letters warned recipients that unless their deficiencies were cured they might not be able to participate in the settlements. *Id.* ¶¶13, 28, 46

## III. AMOUNT OF FUNDS AVAILABLE FOR DISTRIBUTION

### A. Vitafoam Settlement

The Vitafoam Settlement provides for payments between $9 and 15 million, depending on Vitafoam's recovery in the *Urethane* Litigation, which just completed. (Dkt. 293-2 at 9). By December 2013, $7,402,246.60 was paid to the Class under this Agreement. Declaration of Adam Wolfson ¶2. After accounting for the awarded attorneys' fees and costs, $4,434,000.00 million was available as part of the first round of settlements for distribution to Class Members. *Id.* ¶2. These funds were distributed to eligible class members on December 30, 2013. Castaneda Decl. ¶17. The funds were distributed on a *pro rata* basis among all Class Members who

6

submitted valid claims, but payments were adjusted to reflect a minimum payment of $20.00.[4] *Id.* ¶17. Currently, there is $22,153.07 relating to uncashed and undeliverable checks from the initial distribution, for which GCG will re-distribute checks. *Id.* ¶18. Subsequently, Vitafoam provided the Class with an additional payment of $2,397,807.00, as well as a final payment of $5,200,076.25 on May 5, 2016, which brought the total Vitafoam settlement funds to $15,000,000 (the maximum under the settlement agreement). (Wolfson Decl. ¶3). After accounting for awarded fees and costs (Dkt. 598), as well as anticipated costs that GCG expects to incur,[5] $5,120,491.93 remains for payment to Class Members eligible to participate in the Vitafoam settlement. *Id.* ¶3. Should the Court grant this Motion, these payments will be distributed to eligible Claimants at the same time as payments out of the Carpenter and L&P Settlements and Spring 2015 Settlements.

### B. Carpenter and L&P Settlements

The Carpenter and L&P Settlements provide for a recovery of $39,800,000 and $108,000,000 respectively. (Dkts. 1379 and 1391). The Court awarded 30% in attorneys' fees and costs (Dkt. 1534), and has previously approved of payments of $542,642.36. (Dkt. 1868) and $16,740.26 (Dkt. 2012) under these settlements for notice and claim administration fees. (Dkts. 1872; 2015). Plaintiffs seek approval of an additional payment of $12,687.90 for notice and claim administration fees, pursuant to the invoices attached as Exhibit N to the Castaneda Declaration. Should the Court approve of these invoices, $25,509,468.80 will be available for

---

[4] Going forward, there will be no minimum payment; Claimants will receive their pro rata share of the settlements, regardless of whether this pro rata share is under $20.00.
[5] GCG estimates that it will incur an additional $37,499.76 in administrative fees.

7

distribution to eligible Class Members on a *pro rata* basis from the L&P Settlement and $69,222,808.53 will be available from the Carpenter Settlement. Castaneda Decl. ¶¶36.[6]

      **C.**      **The Spring 2015 Settlements 2015**

Combined, the Spring 2015 Settlements provide a recovery of $275.5 million. (Dkt. 1699). Several of the settlements provided for staggered payments. (*Id.*) As of this date, Hickory Springs has an outstanding payment of $7,000,000 owed by January 31, 2017, and Woodbridge has an outstanding payment of $14,000,000 that is owed by November 15, 2016; and $18,000,000 that will be paid on or before November 15, 2017.

The Court awarded $55,100,000 in attorneys' fees and $ 315,325.12 in costs from the Spring 2015 settlements, as well as $35,000 in payments to each Class Representative (Dkt. 1971), and has previously approved of payments of $546,097.38 to GCG for notice and claim administration fees associated with these settlements. (Dkt. 2012; 2015). Plaintiffs seek approval of an additional payment of $52,834.59 for notice and claim administration fees, pursuant to the invoices attached as Exhibit Q to the Castaneda Declaration. Should the Court approve of these invoices, $12,717,225.59 will be available for distribution to eligible Class Members on a *pro rata* basis from the FFP Settlement, $47,704,871.32 will be available for distribution to eligible Class Members on a *pro rata* basis from the FXI Settlement, $25,437,801.56 will be available for distribution to eligible Class Members on a *pro rata* basis from the Future Foam Settlement, $9,898,652.51 will be available for distribution to eligible Class Members on a *pro rata* basis from the Hickory Springs Settlement, $77,906,766.92 will be available for distribution to eligible Class Members on a *pro rata* basis from the Mohawk Settlement, and $14,146,349.21 will be

---

[6] The available distribution amounts also account for an estimated $47,425 in future administrative fees and costs relating to the distribution of funds to eligible class members; these funds are being held back from the amounts for distribution.

8

available for distribution to eligible Class Members on a *pro rata* basis from the Woodbridge Settlement.[7] Castaneda Decl. ¶55. GCG will do additional distributions after the remaining funds are paid.

## IV. ADMINISTRATIVE DETERMINATIONS WITH RESPECT TO SUBMITTED CLAIMS

The below summarizes the administrative determinations that GCG made.

### A. Vitafoam

GCG received 5,864 Claim Forms as part of the Vitafoam Settlement. Castaneda Decl. ¶5. The 5,864 received claim forms consisted of both Class Members identified in the Class Defendants' records and those self-identified as Class Members. Following review and processing of submitted claims forms and other submissions, GCG received 5,803 timely claim forms and 61 late claim forms. *Id.* ¶6. GCG consolidated duplicate and other related claims that shared a company name, address, and/or a tax identification number while maintaining the total value of Class Period Purchases between all consolidated claim forms. *Id.* ¶7.

Approximately 520 Class Members with deficient claim forms were mailed a Notice of Deficiency letter. *Id.* ¶10. Following consolidation of all claims and review of any deficient claims, GCG received a total of 3,527 claims deemed valid. *Id.* ¶14. Additionally, GCG removed 11 claims following a request for withdrawal from the claimant and determined 39 claims were ineligible due to an incomplete claim form or insufficient documentation. *Id.* ¶12-13.

Although 61 Vitafoam Claim Forms were untimely submitted, they were received while the processing of the previously-distributed Vitafoam funds was ongoing. The processing of

---

[7] The available distribution amounts also account for an estimated $222,364.74 in future administrative fees and costs relating to the distribution of funds to eligible class members; these funds are being held back from the amounts for distribution.

9

these late claims did not delay the completion of the claims administration process or distribution of the Vitafoam funds. Therefore Plaintiffs believe it would have been unfair to prevent otherwise valid claims from participating in the distribution of the Vitafoam funds solely because they were submitted after the cut-off dates. Accordingly, Plaintiffs accepted any Vitafoam claims that were submitted *prior* to the previous Vitafoam distribution.[8] *Id.* ¶6.

Vitafoam claims were rejected for the reasons explained in the attached Castaneda Declaration. The majority of the rejected claims were submitted by Claimants that were not included in Defendants' transactional data, and which were indirect purchasers of polyurethane foam, but mistakenly attempted to participate in the direct purchaser Vitafoam settlement. *Id.* ¶9, 13. GCG will utilize the same eligibility determinations in distributing the remaining Vitafoam settlement funds. *Id.* ¶8.

### B. Carpenter and L&P Settlements

GCG received 9,781 timely claim forms and 244 late claim forms. *Id.* ¶21. GCG then consolidated duplicate claims and other related claims that shared a company name, address, and/or a tax identification number while maintaining the total value of Class Period Purchases between all consolidated claim forms. 621 Class Members who submitted incomplete claim forms were mailed a Notice of Deficiency letter. *Id.* ¶23.

Following consolidation of all claims, including those claims deemed valid in the Vitafoam Settlement, and review of any deficient claims, as of the date of this declaration, GCG has received a total of 5,885 claims deemed valid for inclusion in the Leggett & Platt Settlement and 5,880 claims deemed valid for inclusion in the Carpenter Settlement. *Id.* ¶29. Five Class Members' submissions requested exclusion from the Carpenter Settlement, but requested claim

---

[8] To the extent any of the late submitted claims were not otherwise valid, they were not accepted.

10

inclusion into the Leggett & Platt Settlement. GCG removed approximately 22 claims following a request for withdrawal from the claimant. *Id.* ¶27. GCG determined approximately 202 claims were invalid due to an incomplete claim or insufficient documentation and determined approximately 271 claims were submitted by ineligible indirect purchasers. *Id.* ¶28.

Even though GCG instituted a deadline of 21 days after deficiency letters were mailed for Class Members to correct deficiencies, Class Members continued to provide corrections after the deadline passed. Because processing these corrections did not delay the distribution of funds, GCG continued to accept Class Members' corrections until the end of March, 2016 when GCG stopped accepting these corrections to permit the generation of distribution calculations. *Id.* ¶44.

244 L&P and Carpenter Claim Forms were untimely submitted. *Id.* ¶21. Nonetheless, because they were received prior to generating distribution calculations, Plaintiffs recommend that they be accepted for processing. The processing of these late claims has not delayed the completion of the claims administration process, nor will it delay the distribution of funds. Plaintiffs believe it would be unfair to prevent otherwise valid claims from participating in the distribution of the L&P and Carpenter funds solely because they were submitted after the cut-off dates.[9]

### C. Spring 2015 Settlements

GCG received 11,958 timely Claim Forms as part of the Spring 2015 Settlements. *Id.* ¶38. The 11,958 claim forms received relating to the FFP, FXI, Future Foam, Hickory Springs, Mohawk, and Woodbridge Settlements consisted of both Class Members identified in the Class Defendants' records and those self-identified as Class Members. *Id.* ¶39. Following review and

---

[9] The late claims were accepted only to the extent they were otherwise valid. Late filed claims that were not valid were not accepted.

11

processing of submitted claims forms and other submissions, GCG received 11,889 timely claim forms and 69 late claim forms. *Id.* GCG then consolidated duplicate claims and other related claims that shared a company name, address, and/or a tax identification number while maintaining the total value of Class Period Purchases between all consolidated claim forms. *Id.* ¶40.

Approximately 751 Class Members who submitted incomplete claim forms and/or insufficient supporting documentation were mailed a Notice of Deficiency letter. *Id.* ¶41. Claimants who were sent a Notice of Deficiency were provided a deadline of 21 days to submit any missing information and/or documentation. Following the deficiency response deadline, GCG processed any received responses and reviewed all submitted data. *Id.* ¶42.

Following consolidation of all claims, including those claims deemed valid in the Vitafoam, Leggett & Platt, and Carpenter Settlements, and review of any deficient claims, as of the date of this declaration, GCG has received a total of 7,022 claims deemed valid for inclusion in the FFP Settlement, 7,022 claims deemed valid for inclusion in the FXI Settlement, 7,023 claims deemed valid for inclusion in the Future Foam Settlement, 7,022 claims deemed valid for inclusion in the Hickory Springs Settlement, 7,022 claims deemed valid for inclusion in the Mohawk Settlement, and 7,022 claims deemed valid for inclusion in the Woodbridge Settlement. *Id.* ¶47. One Class Member submitted a claim form indicating inclusion only for the Future Foam Settlement and excluding their inclusion within the FFP, FXI, Hickory Springs, Mohawk, and Woodbridge Settlements. *Id.* ¶47. A total of six Class Members with carryover claims from the Vitafoam, Leggett & Platt and/or Carpenter Settlements were removed from inclusion within the FFP, FXI, Future Foam, Hickory Springs, Mohawk, and Woodbridge Settlements due to a prior Certification Class Exclusion. *Id.* ¶47. GCG removed 26 claims following a request for

12

withdrawal from the Class Member. GCG determined approximately 403 claims were invalid due to an incomplete claim or insufficient documentation and determined approximately 45 claims were submitted by ineligible indirect purchasers. *Id.* ¶46. Claimants determined to be indirect purchasers were mailed a notice of their denial. *Id.*

69 Spring 2015 Claim Forms were untimely submitted. *Id.* ¶39. Nonetheless, because they were received prior to generating distribution calculations, Plaintiffs recommend that they be accepted for processing. The processing of these late claims has not delayed the completion of the claims administration process, nor will it delay the distribution of funds. Therefore Plaintiffs believe it would be unfair to prevent otherwise valid claims from participating in the distribution of the Spring 2015 Settlements solely because they were submitted after the cut-off dates.[10]

### D. Outstanding Disputes

GCG has identified two outstanding disputes that arose as part of the Claim Administration process. The first relates to a claim from Metro Mattress Corporation of $100,755,019.50. GCG rejected this claim in full because, pursuant to Metro Mattress's attorney, all of Metro Mattress's claims were *indirect* purchases. GCG informed Metro Mattress that because its purchases were indirect, GCG would not accept the claim, but gave Metro Mattress multiple opportunities to provide data demonstrating that it made *direct* purchases— both before and after the deficiency period. *Id.* ¶50. Metro Mattress did not provide evidence of such purchases, but disputes that it is not a class member and requested that the dispute be submitted to the attention of the Court. *Id.* Class Counsel has reviewed the documentation that

---

[10] The late claims were accepted only to the extent they were otherwise valid. Late filed claims that were not valid were not accepted.

13

Metro Mattress provided to GCG and concurs that there is no evidence that Metro Mattress is a member of any of the Settlement Classes.

The second relates to a dispute between DPH Holdings and ACRS Group, LLC, related to purchases made by Delphi Automotive, which subsequently declared bankruptcy. Castaneda Decl. ¶32. GCG notified counsel for both entities that GCG is not authorized to determine which entity is the proper claimant and requested that the parties provide GCG with written resolution of the conflicting claims or an order of the bankruptcy court. Until GCG receives such a resolution, GCG will hold aside the relevant pro rata monetary award. *Id.* ¶32.[11]

## V. PLAN OF DISTRIBUTION FOR SETTLEMENT FUNDS

Consistent with the notices that were distributed in this case (Dkts. 457-1,3; 1379-3,4; 1699-8) Plaintiffs seek approval to distribute all of the relevant settlement funds on a *pro rata* basis among eligible class members. Specifically, each Class Member's share of each of each of the separate settlements will be determined by: (1) whether the Class Member submitted a timely claim (as well as those who submitted untimely claims, per above); (2) dividing the amount of each participating Class Member's eligible purchases of polyurethane foam by the the total dollar amount of polyurethane foam purchases represented by all participants in that particular settlement; (3) multiplying the resulting fraction by the remainder of the Settlement Fund after deducting applicable fees and expenses. *Id.* ¶17, 36, 50. . Each Settlement Class Member's individual *pro rata* share of each Settlement Fund shall then be distributed to each Settlement Class Member. Exhibits D, J, and R to the Castaneda Declaration contains the

---

[11] There also was a dispute between Home Depot and GMA as to which could recover as part of the claims process due to a prior assignment of some claims by GMA to Home Depot. GMA and Home Depot, however, jointly notified GCG, in writing, that it had resolved the dispute. Castaneda Decl. Ex. P.

14

amount of all eligible Class Members' purchases, which will be utilized for purposes of the pro rata calculation.

Assuming approval of GCG's invoices as set forth herein, the total amounts currently available for distribution in each of the settlement funds are:

| Vitafoam | $5,120,491.93 |
| L&P | $25,509,468.80 |
| Carpenter | $69,222,808.53 |
| Future Foam | $25,437,801.56 |
| FXI | $47,704,871.32 |
| Woodbridge | $14,146,349.21 |
| Future Foam | $25,437,801.56 |
| Mohawk | $77,906,766.92 |
| Hickory Springs | $9,898,652.51 |
| FFP | $12,717,225.59 |

**VI.    ADMINISTRATION FEES AND COSTS**

Subsequent to Plaintiffs' last motion for payment of fees (Dkt. 2012), GCG has incurred additional costs in executing the notice programs and administrating the settlements, all of which are set forth above. As set forth in Plaintiff's previous motion for payment of GCG's expenses, these expenses include notice dissemination; database management; data entry including entering relevant names and addresses into database; processing emails; imaging; document management and storage, including sorting, preparing, scanning, and processing mail, including undeliverable email; claim validation, including processing claims and deficiency responses and handling and processing exclusions; management of the call center, and handling of class member communications. *Id.* As set forth at Docket Entry 2012 at 3, 5-6, (Motion and Memorandum in Support for Order to Approve Distribution of Settlement Funds for Payment of Notice Feesfor the Direct Purchaser Classes), each of the FXI, Hickory Springs, Mohawk, FFP, Future Foam, and Woodbridge settlement agreements provide that a portion of the settlement proceeds can be utilized for Court approved class notice expenses.

15

Given GCG's expenses to date (as demonstrated in Exhibits I and Q to the Castaneda Declaration) in conjunction with the settlement agreement provisions cite above, Plaintiffs respectfully request that the Court enter the [Proposed] Order to Approve Distribution of Settlement Funds for Payment of Notice Fees for the Direct Purchaser Settlement Classes in the *pro rata* amounts of: $3,416.85 from the Leggett & Platt settlement fund; $9,271.05 from the Carpenter settlement fund; $11,508.46 from the FXI settlement fund; $3,741.04 from the Hickory Springs settlement fund; $18,795.04 from the Mohawk settlement fund; $3,069.98 from the FFP settlement fund; $6,134.68 from the Future Foam settlement fund; and $9,590.39 from the Woodbridge settlement fund.

DATED: May 9, 2016

 /s/ *William A. Isaacson*  
William A. Isaacson  
BOIES, SCHILLER & FLEXNER LLP  
5301 Wisconsin Avenue, NW  
Washington, DC 20015  
Phone: 202-237-5607  
Fax: 202-237-6131  

 /s/ *Stephen R. Neuwirth*  
Stephen R. Neuwirth  
QUINN EMANUEL URQUHART  
 & SULLIVAN, LLP  
51 Madison Avenue, 22nd Floor  
New York, NY 10010  
Phone: 212-849-7165  
Fax: 212-849-7100  

*Co-Lead Counsel for Direct Purchaser Class Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2016, I served via the Court's Electronic Case Filing system, **MOTION AND MEMORANDUM IN SUPPORT FOR ORDER TO APPROVE DISTRIBUTION OF SETTLEMENT FUNDS TO CLASS MEMBERS AND PAYMENT OF NOTICE FEES FOR THE DIRECT PURCHASER SETTLEMENT CLASSES**, on all counsel of record.

/s/ Melissa Felder Zappala

17